**LAW OFFICES OF MARK WRAY**
Mark Wray
608 Lander Street
Reno, Nevada 89509
Telephone:  (775) 348-8877

**BERNSTEIN LIEBHARD LLP**
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 E. 40th Street
New York, NY 10016
Telephone:  (212) 779-1414

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150

*Attorneys for Plaintiffs*
[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| WAYNE SZYMBORSKI, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No.: 3:10-CV-00132-ECR-RAM |
| Plaintiff, | ) ) ) | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | ) ) ) | |
| ORMAT TECHNOLOGIES, INC., YEHUDIT BRONICKI, JOSEPH TENNE, | ) ) ) | |
| Defendants. | ) ) | JURY TRIAL DEMANDED |
| ──────────────────────────────── | ) | |
| PAUL STEBELTON, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No.: 3:10-CV-00156-ECR-RAM |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |

CONSOLIDATED AMENDED COMPLAINT

ORMAT TECHNOLOGIES, INC., JOSEPH            )
TENNE, YEHUDIT BRONICKI, YORAM             )
BRONICKI, LUCIEN Y. BRONICKI, DAN          )
FALK, JACOB J. WORENKLEIN, ROGER W.        )
GALE, ROBERT F. CLARKE,                    )
                                           )
                Defendants.                    )
_____  )

JOHN J. CURTIS, On Behalf of Himself and All   )   Case No.: 3:10-CV-00198-ECR-RAM
Others Similarly Situated,                     )
                                               )
                Plaintiff,        )
                                               )
                vs.               )
                                               )
ORMAT TECHNOLOGIES, INC., JOSEPH               )
TENNE, YEHUDIT BRONICKI,                       )
                                               )
                Defendants.       )
_____  )

CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiffs Jianxun Dong, George Umino, and the A.R.D. Investment Club, L.P. (collectively "Lead Plaintiffs" or "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.  Lead plaintiffs' information and belief is based upon, among other things, counsels' investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Ormat Technologies, Inc. ("Ormat" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Ormat; and (c) review of other publicly available information concerning Ormat.

## <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.      This is a federal class action on behalf of purchasers (the "Class") of Ormat's securities between May 7, 2008 and February 24, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Ormat and its subsidiaries engage in the geothermal and recovered energy power business in the United States and internationally.  The Company operates in two segments, Electricity and Products.  The Electricity segment develops, builds, owns, and operates geothermal and recovered energy-based power plants, and sells electricity.  The Products segment designs, manufactures, and sells equipment for geothermal and recovered energy-based electricity generation, and remote power units and other power generators, including fossil fuel powered turbo-generators and heavy duty direct current generators.

3.      On February 24, 2010, the Company disclosed that the Company's financial statements for the year ended December 31, 2008 (the "2008 Financial Statements") contained in its Annual Report on Form 10-K for the year then ended, 2008, required restatement and should

no longer be relied upon.  The Company announced that the restatement would show a change in the Company's accounting treatment for certain exploration and development costs.  According to Ormat, these costs were capitalized on an area-of-interest basis using an accounting method that is analogous to the full-cost method, and upon review of this accounting treatment in response to comment letters from the Staff of the SEC, the Company concluded that this accounting treatment was inappropriate in certain respects.  Specifically, the Company disclosed that it will no longer continue to capitalize costs for any individual project after it decides to abandon further exploration and development of that project, and will instead expense those costs in the period in which any such determination is made.  Ormat additionally indicated that as a result it also planned to revise its consolidated financial statements as of and for the three and nine months ended September 30, 2009.

4.      On this news, shares of Ormat declined $1.28 per share, nearly 4%, to close on February 24, 2010 at $31.90 per share, on heavy volume, and further declined an additional $0.89 per share, nearly 3%, to close on February 25, 2010 at $31.01 per share, on heavy volume, and continued to decline an additional $2.08 per share, more than 6.5%, to close on February 26, 2010, at $28.93 per share, on heavy volume.  Over the course of these three days of trading, shares of Ormat declined a total of $4.25 per share, or 12.81%.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company improperly capitalized costs for individual projects after Ormat had decided to abandon further exploration and development of individual projects, instead of expensing those costs in the period in which any such determination was

made; (2) that, as a result, the Company's financial results were overstated during the Class Period; (3) that the Company's financial results were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

6.      In addition to the fraudulent accounting and overstated financial results, Ormat misrepresented and failed to disclose material adverse facts about the severe operational problems plaguing its landmark North Brawley, California geothermal project (and its largest project under construction).      The substantial complications and difficulties that Ormat experienced with North Brawley had extremely negative consequences on the Company's financial prospects and condition.   The delay in the startup and limited capacity in the North Brawley plant once operating, materially contributed to lower earnings, revenues, and diminished future prospects.

7.      As a result of Defendants' wrongful acts and omissions as alleged herein, and the decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.      Venue is proper in this Judicial District pursuant to § 28 U.S.C. § 1391(b), § 27 of the Exchange Act (15 U.S.C. §78aa(c)).   Substantial acts in furtherance of the alleged fraud or

the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Ormat maintains its principal executive offices within this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Lead Plaintiffs, as set forth in the certifications previously filed with the Court in connection with their motion to be appointed as lead plaintiffs (Docs #19-21), incorporated by reference herein, purchased Ormat common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant Ormat is a Delaware corporation with its principal executive offices located at 6225 Neil Road, Reno, Nevada, 89511.

14.     Defendant Yehudit Bronicki ("Bronicki") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Ormat. During the Class Period, Bronicki signed SEC filings including the Company's 2008 Form 10-K, Form 8-K, Sarbanes-Oxley Certifications, and corresponded with the SEC concerning matters at issue.

15.     Defendant Joseph Tenne ("Tenne") was, at all relevant times, Chief Financial Officer ("CFO") of Ormat. During the Class Period, Tenne signed SEC filings including the

Company's 2008 Form 10-K, Form 10-Q, Sarbanes-Oxley Certifications, and presented financial results during earnings conference calls with investors.

16.     Defendants Bronicki and Tenne are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ormat's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS REGARDING ORMAT'S FRAUDULENT ACCOUNTING

17.     Ormat engages in the geothermal and recovered energy power business in the United States and internationally.  The Company's Electricity segment develops, builds, owns, and operates geothermal and recovered energy-based power plants, and sells electricity.

18.     According to the Company's website, Ormat "put[s] great effort into the exploration and identification of new geothermal resources.  Ormat carries out field tests followed by exploratory drilling to validate and quantify the size and potential of the geothermal

resource, thus reducing the risk involved in every geothermal project." Ormat claims that "[a] key component to the success of project development is a proven track record."

19.     Ormat builds four different geothermal power plant configurations: Air-Cooled Binary Geothermal Power Plant for low temperature ranges; Two-Phase Binary Power Plants for medium temperature ranges; Geothermal Combined Cycle Units for high temperature ranges; and Geothermal Integrated Combined Cycle Units for high enthalpy resources.

20.     Each geothermal power plant generates electricity using steam produced by tapping heat from the Earth's core. The Earth's core is used as a boiler that allows the power plant to work 24 hours a day, 7 days a week. Below is Ormat's description of how an Air-Cooled Binary Geothermal Power Plant (used at low temperature ranges 220-300°F (104-148°C)) works:

- The fluid is extracted from an underground reservoir and flows from the wellhead through pipelines to heat exchangers in the ORMAT ENERGY CONVERTER (OEC).

- Inside the heat exchangers, the geothermal fluid heats and vaporizes a secondary working fluid, an organic fluid with a low boiling point.

- The organic vapors drive the turbine and then are condensed in a condenser, which is cooled by air or water.

- The turbine rotates the generator.

- The condensed fluid is recycled back into the heat exchangers by a pump, completing the cycle within the closed system.

- The cooled geothermal fluid is re-injected into the reservoir.

21.     In 2007, Ormat discussed geothermal projects at Grass Valley and Buffalo Valley in its public disclosures. Each project was expected to generate between 18 and 30 megawatts of power by "state of the art air-cooled binary or combined steam/binary power plant that re-injects

100 percent of all geothermal fluid produced while consuming no water or chemicals."  Both

projects were located in Lander County, Nevada.

      22.    On March 5, 2008, the Company stated in its 10-K for year-end 2007 (the "2007

Form10-K"):

### Projects under Development and Future Projects

We also have projects under development in the United States, and Indonesia. We
expect to continue to explore these and other opportunities for expansion so long
as they continue to meet our business objectives and investment criteria.

#### *The Buffalo Valley Project (U.S.)*

We are conducting exploration activities as part of the development of the Buffalo
Valley project on Bureau of Land Management leases located in Lander County,
Nevada.  The project will deliver between 18 MW to 30 MW of power generation
under a 20-year power purchase agreement with Nevada Power Company.  We
expect the construction to be completed by the end of 2009 or in the first half of
2010.

#### *The Grass Valley Project (U.S.)*

We are currently developing the Grass Valley project on Bureau of Land
Management leases located in Lander County, Nevada.  The project will deliver
between 18 MW to 30 MW of power generation under a 20-year power purchase
agreement with Nevada Power Company.  We expect the construction to be
completed in late 2010.

      23.    Ormat's 2007 Form 10-K also stated that it started exploration activities at the

geothermal resource called Rock Hills in Nevada.

      24.    On August 6, 2008, during the second quarter Ormat earnings conference call,

Defendant Yehudit Bronicki stated:  "Our projects beyond 2009 are mostly in exploration and

development stages and include work to develop between 18 and 30-megawatt plants from our

Eastern Nevada prospects, Buffalo and Grass Valley . . . ."

25.     On November 6, 2008, during the third quarter Ormat earnings conference call, the Company presented a slide projecting the Buffalo Valley and Grass Valley Projects to generate 18-30 megawatts.

26.     In or around September 2009, the SEC reviewed the Company's disclosures to investors.   During the SEC's review, the Company advised the SEC that it abandoned the Buffalo Valley Project and Grass Valley Project late in the fourth quarter of 2008.   The Company also stated that it abandoned the Rock Hills Project during the third quarter of 2009.

27.     In correspondence to the SEC dated October 12, 2009, the Company disclosed:

> We expect that, of our many prospects, a certain portion will not support commercial operations due to the lack of sufficiently high temperature, the lack of permeability or both.  There have been three prospects that we have determined will not support commercial operations during the years covered by our 2008 Annual Report.   In all three cases, the geochemical and or geophysical information was good, but upon drilling of slim holes, commercial temperatures were not encountered.  Thus, during 2008, we decided to focus our exploration and development activities on other projects and not to pursue further exploration or development of these sites at this time.

28.     In additional correspondence with the SEC on January 13, 2010, Ormat admitted:

> We have drilled a total of eleven slim holes at our development sites in Nevada. Six of these slim holes were drilled at sites for which we have determined not to pursue further development.  Those sites are Grass Valley, Buffalo Valley, and Rock Hill.  In each case, we did not encounter a sufficiently high temperature resource and therefore decided to plug and abandon the slim holes.  And we have reclaimed their well pads and roads in compliance with Bureau of Land Management (BLM) requirements.

29.     Ormat also informed the SEC that "[a]ny determination to discontinue [a] potential project must be approved by our President or CEO."

30.     At the time of abandonment, Ormat did not write-off expenses for these projects. Instead, the Company, capitalized costs for these projects with other successful projects within undisclosed, self-defined areas of interest in Nevada.

31.     At the end of the Class Period, Ormat wrote-off these projects in conformance with its representations to investors and GAAP.

**Ormat Misrepresented That It Would Write-Off Abandoned Projects**

32.     The Company's annual reports disclosed accounting treatment for "Property, Plant, and Equipment."   In contradiction of the Company's actual practices, the Company informed investors that abandoned projects would be expensed, not capitalized over the life of other successful projects.

33.     For example, in the Company's 2007 Form 10-K the Company stated:

> We capitalize costs incurred in connection with the exploration and development of geothermal resources on an "area-of-interest" basis.  All such costs, which include dry hole costs and the cost of drilling and equipping production wells and other directly attributable costs, are capitalized and amortized over their estimated useful lives when production commences.  **Although we do not commence exploration activities until feasibility studies have determined that the project is capable of commercial production, it is possible that economically recoverable reserves will not be found in an "area of interest" and exploration activities will be abandoned. In this case, capitalized exploration costs would be expensed**.  ***To date, we have not abandoned any exploration projects***.  (Emphasis added)

34.     In the Company's 2008 10-K, filed March 2, 2009 (the "2008 Form 10-K"), this disclosure remained the same except the last sentence, "To date, we have not abandoned any exploration projects," was deleted:

> We capitalize costs incurred in connection with the exploration and development of geothermal resources on an "area-of-interest" basis.  All such costs, which include dry hole costs and the cost of drilling and equipping production wells and other directly attributable costs, are capitalized and amortized over their estimated useful lives when production commences.  **Although we do not commence exploration activities until feasibility studies have determined that the project is capable of commercial production, it is possible that economically recoverable reserves will not be found in an "area of interest" and exploration activities will be abandoned. In this case, capitalized exploration costs would be expensed**.  (Emphasis added)

35.     Though in quotes, the Company did not define the term "Area of Interest" in its public filings.  Additionally, the term "Area of Interest" is not a defined term under GAAP.  In fact, "Area of Interest" appears within a discussion of FAS 19, which rejected the use of an area of interest approach to capitalize costs, noting that it was too arbitrary.

36.     Accordingly, Ormat led investors to believe that an exploration project was the culmination of exploring a specific area of interest and deciding to drill in that area after receiving positive data about the area's recoverable reserves.  If no economically recoverable reserves were found at the project to develop the area of interest, and the Company abandoned the project, investors were led to believe that the Company would expense the project's capitalized exploration costs.

37.     Moreover, Ormat reinforced the perception that an area of interest was the size of an exploration project by assuring investors that "[t]o date, we have not abandoned any exploration projects."  This statement was made immediately after the Company discussed its policy of expensing capitalized exploration costs for abandoned exploration activities in its 2007 Form 10-K.  Notably, in Ormat's 2008 Form 10-K – the year the Buffalo Valley Project and Grass Valley Project failed – the Company deleted this sentence.

38.     Ormat's deletion of the sentence, "To date, we have not abandoned any exploration projects," without replacing it with a description of the projects that were abandoned, concealed readily-available, quantitative data on costs incurred on abandoned projects that were capitalized as assets.  This action was contrary to GAAP as explained in FAS 19 at ¶¶143-44:

¶143.  In the presently accepted financial accounting framework, an asset is an economic resource that is expected to provide future benefits, and nonmonetary assets generally are accounted for at the cost to acquire or construct them.  Costs that do not relate directly to specific assets having identifiable future benefits normally are not capitalized—no matter how vital those costs may be to the

ongoing operations of the enterprise.  If costs do not give rise to an asset with identifiable future benefits, they are charged to expense or recognized as a loss.

¶144.  In the Board's judgment, successful efforts costing is consistent with that accounting framework, and full costing is not.  Under full costing, even costs that are known not to have resulted in identifiable future benefits are nonetheless capitalized as part of the cost of assets to which they have no direct relationship.

39.     The Company later admitted to the SEC that it intentionally capitalized expenses for its abandoned projects instead of expensing them during the period of abandonment.

## ORMAT INTENTIONALLY ISSUED INFLATED FINANCIAL RESULTS

40.     Ormat had no reasonable basis to capitalize costs from abandoned geothermal projects.  This practice is not permitted by GAAP, nor is it otherwise the industry standard.

41.     Companies engaged in the production of oil and gas are permitted by GAAP to capitalize costs for failed or abandoned projects with other successful oil and gas projects under what is known as the full-cost method – geothermal companies are not.

42.     When Ormat was investigated by the SEC, it stated that it applied the full-cost method to capitalize costs for abandoned projects.  It justified using this method because it believed other geothermal companies used the full-cost method and because Ormat's business was analogous to the production of oil and gas.

43.     The oil and gas industry is permitted to use the full-cost method pursuant to Rule 4-10 of Regulation S-X.  But the rule specifically excludes geothermal operations.  Under Rule 4-10 of Regulation S-X: "Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975," clearly states that: "Oil and gas producing activities do not include: . . . The production of geothermal steam or the extraction of hydrocarbons as a by-product of the production of geothermal steam or associated geothermal resources as defined in the Geothermal Steam Act of 1970."

44.     According to *Accounting Horizons*, March 2001, Volume 1, "Congress looks at accounting for business combinations, Congressional involvement in FASB's standard-setting activities," the full cost method was a special concession to the oil and gas industry.  The Financial Accounting Standards Board (FASB) advocated for use of only the successful-efforts method for oil and gas companies.  But the SEC overruled the FASB and permitted oil and gas companies to use either method as the result of political pressure from Congress and the oil and gas industry.

45.     In fact, the full-cost method for capitalizing expenses is not permitted in all industries, in part, because it has the effect of delaying loss recognition.  The full-cost method also impedes measurement of the efficiency and effectiveness of exploration and development activities, allowing a company to mask poor results.

46.     Ormat ignored the fact that geothermal operations were specifically carved out of the SEC rules for oil and gas operations and intentionally applied the rules of the oil and gas industry to inflate the financial results of its geothermal operations.

47.     The more conservative accounting method for failed projects known as the successful-efforts method is appropriate for geothermal companies.  Under this method, failed projects are written-off in the period that they are abandoned or fail.

48.     For example, Raser Technologies, Inc., a publicly traded corporation, accounts for its geothermal operations as follows:

> Each hole we drill will result in either a production well, a reinjection well, or an unsuccessful well.  Production wells and reinjection wells will ultimately be used in the production of electricity at the geothermal power plant.  Therefore, drilling costs for production wells and reinjection wells are capitalized.  **Drilling costs associated with unsuccessful wells are expensed in the period in which we determine they cannot be used in the production of electricity**.

*        *        *

> **The Company also incurred certain impairment charges during 2008 related to certain unsuccessful geothermal wells at the Company's Truckee and Thermo sites, which resulted in a non-cash expense of $13.6 million**.

(Emphasis added – Raser 2009 Form 10-K)

49.     Ormat later argued to the SEC that there is no industry standard for geothermal companies asserting that some geothermal companies employ the more conservative successful-efforts approach and others employ the full-cost method.

50.     Moreover, FAS 19 ¶¶130-31 contemplated that if "full costing" and "successful efforts" were both GAAP, the FASB would mandate footnote disclosure of the dry-hole costs that have been capitalized as assets – so that investors can see how the assets and expenses would be measured under "successful efforts" methods.  This footnote disclosure would be similar to what is required of companies that use the Last in First Out Method instead of the First in First Out Method.  Thus, if Ormat was using FAS 19 as a guide, it should have footnoted costs for Grass Valley, Buffalo Valley, and Rock Hills under the successful-efforts method in its financials.

51.     Ormat also told the SEC that it could capitalize costs for these projects because hypothetically there may be some value at some future point in time for abandoned projects, citing ASC 360-10-35.  This assertion was made even though the projects had been abandoned, wells plugged, well pads reclaimed, and infrastructure removed.

52.     As the SEC stated: "We do not believe that ASC 360-10-35 (formerly SFAS 144) allows you to group an abandoned project, due to the lack of a commercially viable resource which would not support an asset, with other projects for which you still believe a commercially viable resource is probable and may support an asset."

53.     Accordingly, Ormat intentionally capitalized costs for its abandoned geothermal projects without a reasonable basis.  This act materially overstated Ormat's financial statements.

## THE SEC'S REVIEW AND FINDINGS

54.     On September 14, 2009, the SEC sent Ormat a letter concerning comments that it had to Ormat's disclosures.  Among other questions, the SEC asked for an explanation as to how the Company capitalizes costs on an area of interest basis "including explaining how you determine an area of interest and your basis in GAAP for using this methodology. . . .  Please explain to us your basis in GAAP for capitalizing dry hole costs. . . .  Please provide us with more information about the projects that do not achieve economic feasibility."

55.     Ormat responded without providing a GAAP basis for its policy of capitalizing expenses.  Ormat wrote on October 12, 2009, that:

> There are no geothermal-specific industry accounting standards or guidance, and industry practice is diverse.  Our capitalization policy for exploration activities is based in part on practices followed by certain other companies in the geothermal industry and on our consideration of and/or analogies to the following authoritative or industry guidance:
>
> • Rule 4-10 of Regulation S-X, Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975
>
> • PwC's edition of "Financial Reporting in the Mining Industry"
>
> • SFAS No. 67, Accounting for Costs and Initial Rental Operations of Real Estate Projects
>
> • PwC's Accounting and Reporting Manual Section 9772.2 – Real Estate Cost Capitalization and Allocation
>
> • CON 6, Elements of Financial Statements
>
> • SFAS No. 144, Impairment or Disposal of Long-Lived Assets
>
> We believe that many geothermal companies in the U.S. have analogized to Rule 4-10 of Regulation S-X, Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975 and Statement of Financial Accounting Standards ("SFAS") No. 19, Financial Accounting and Reporting by Oil and Gas Producing Companies.

56.     The company admitted that "[a]lthough these pronouncements do not apply to the production of geothermal resources, these companies have adopted the accounting model used in the oil and gas industry (at least partially) for the following reasons: . . . ."

57.     Ormat also informed the SEC that three projects in 2008 were abandoned after drilling slim holes because commercial temperatures were not encountered [later revealed to be Buffalo Valley, Grass Valley, and Rock Hills].  This "unsuccessful drilling within an area of interest is considered an impairment triggering event" for which the Company used the full-cost method and capitalized the costs.

58.     On November 17, 2009, the SEC sent another letter in response requesting more clarification:

> We note your response to the first bullet point of our prior comment concerning your "area of interest" methodology.  You state that the grouping of projects within an area of interest can be analogized to the grouping of accounts under paragraph 10 of SFAS 144 or ASC 360-10-35-23.  Please clarify whether this statement indicates that each area of interest is the level at which you test for impairment of your exploration projects because this is the lowest level for which identifiable cash flows are largely independent of the cash flows of other groups of assets and liabilities.  If our understanding is correct, please explain to us in more detail how your management is able to effectively manage your various geothermal exploration projects without tracking a lower level of cash flows.  In this regard, it appears that your current methodology could result in the poor performance of certain exploration projects being masked by the strong performance of other exploration projects within the same area of interest, and we assume that this would be important information for your management to know.  Additionally, it remains unclear to us that it would be appropriate under GAAP to not impair the poorly performing geothermal resources within an area of interest.
>
> We note your response to the fifth bullet point of our prior comment concerning your prospects that do not achieve economic feasibility.  Please clarify to us whether all of the capitalized costs related to these three prospects were expensed, as this is unclear from your current response.  If any costs related to these prospects were not written off, please further explain your basis in GAAP for continuing to capitalize these costs.  In this regard, we note your reference to unsuccessful drilling within an area of interest, and it is unclear to us whether this reference indicates that you have continued to capitalize the costs of these

unsuccessful prospects due to the success of other prospects within the areas of interest.

We note your response to the second bullet point of our prior comment concerning your capitalization of dry hole costs.  Notwithstanding your belief that all dry holes are useful for the discovery of commercially viable resources within an area of interest and for the operation of the power plant thereafter, it remains unclear to us that capitalizing dry holes is appropriate under GAAP or consistent with industry practice.  Please provide us with further information as to how you determined this practice was appropriate under GAAP.  Additionally, please tell us how you considered prevailing practice for the accounting for dry holes by others in your industry.

59.     On November 25, 2009, Ormat responded to the SEC's November 17, 2009 letter. Ormat wrote that although other geothermal companies used the successful-efforts method, Ormat and other geothermal companies used the full-cost method based on Rule 4-10 of Regulation S-X, despite the fact that it specifically excludes Geothermal Companies' geothermal activities.   The Company also attempted to defend its grouping of abandoned projects with successful projects based on its definition of area of interest as being a part of the State of Nevada.  Ormat stated:

As the Staff is aware, there are no industry-specific accounting standards or guidance for companies in the geothermal industry.  Our accounting policy for exploration and development costs was developed by considering practices followed by other companies in the geothermal industry and by considering and/or analogizing to existing authoritative or similar industry guidance.  We have reviewed the accounting methodology for exploration and development costs followed by a number of geothermal companies in the U.S. using publicly available information.  We have found that geothermal industry accounting practice is diverse in this area with some geothermal companies following an approach that is similar in certain respects to the successful efforts method of accounting that is used in the oil and gas industry.  In this regard, we believe there is some diversity in the manner in which the successful efforts method is applied.  We believe that some companies expense all costs associated with exploration activities until a feasibility study has determined that the resource is capable of commercial production, while other companies capitalize all such costs until a decision is made to not pursue co's commercial operations on that resource.

We have also found that some geothermal companies follow an approach that we believe is similar in certain respects to the full cost method of accounting that is

used in the oil and gas industry. These companies generally capitalize all costs associated with the exploration and development of geothermal resources, including dry hole costs. As the Staff is aware, ASC 932-10-05 (formerly SFAS No. 19) and Rule 4-10 specifically exclude the production of geothermal resources. However, as set forth in our response to Comment No. 18 of our letter dated October 12, 2009, we believe that geothermal companies have adopted accounting methodologies that are similar to industry practice in the oil and gas industry for the reasons set forth in that response.

Our accounting methodology is most analogous to the full cost method. We believe that this accounting methodology best matches how we view and manage our exploration projects. The feasibility analysis we perform before securing a land lease assumes a certain amount of unsuccessful exploration and drilling activities, both prior to identifying a site with a commercially viable resource and during the life of the power plant. Based on years of collective geothermal experience, our management knows that some exploration activities will not lead to commercially viable power production facilities. However, we believe that the benefits obtained from prospects that are successful will be adequate to recover the costs of all exploration activities within an area of interest, including unsuccessful projects.

The area of interest concept that we use for our exploration projects is analogous in certain respects to the definition of a cost center that is used by companies following the full cost method. While cost centers generally must be established on a country-by-country basis, we concluded that a country-by-country basis would not be appropriate for our activities because a country is an overly broad geographical area, aggregation by country is not the way we view or manage our business, and it is not a practice that is prevalent in the geothermal industry. Instead, we consider geological and economic characteristics of an area when defining a cost center. On this basis and for the reasons set forth in our response to the first bullet point of Comment No. 18 in our letter dated October 12, 2009, we concluded that Nevada is a single cost center. However, we have further divided Nevada into three areas of interest to reflect the manner in which we intend to operate our power plant facilities that are ultimately constructed in each area of interest. Specifically, our definition of an area of interest is based on the geographical proximity of the geothermal resources and their proximity to the same electricity grid, the use of, in certain cases, a common transmission line, the ability to allocate (in some cases) a power purchase agreement to alternate resources in the same geographical area, and our intention to operate all the power plants in the same area of interest together as one complex.

We follow the guidance in ASC 360-10-35 (formerly SFAS No. 144) to test our exploration projects for impairment as further described below. We believe this approach is consistent with the prevailing practice for geothermal companies based on our review of the accounting methodology followed by a number of geothermal companies in the U.S. described above. Our existing power plants

are evaluated for impairment separately under ASC 360-10-35 (formerly SFAS No. 144).

60.    On December 29, 2009, the SEC noted that it was unclear why certain projects were in one area of interest and not another.

61.    On January 13, 2010, Ormat responded that placing projects in certain areas of interest was a business judgment.  This response highlighted the concern in FAS 19 that use of an area of interest method for offsetting expenses was too subjective and susceptible to manipulation.

62.    On February 11, 2010, the SEC asked Ormat to write-off all abandoned projects and to clarify its disclosures to investors.  The SEC wrote:

Dear Ms. Bronicki:

We have reviewed your responses dated January 11, 2010 to our comment letter and have the following additional comments.  In each of our comments below, please confirm in writing to us in detail sufficient for an understanding of your disclosure how you intend to comply in future filings by furnishing us your proposed revisions.  Please feel free to call us at the telephone numbers listed at the end of this letter.

Form 10-K for the Fiscal Year Ended December 31, 2008

1. We have reviewed your response letters dated October 12, 2009, November 25, 2009 and January 13, 2010.  We do not believe it is appropriate to analogize to full cost accounting.  ASC 932 (formally SFAS 19) and Rule 4-10 of Regulation S-X specifically exclude geothermal activities from their scope.  We believe that full cost accounting should only be applied or analogized to oil and gas activities. We do not believe that ASC 360-10-35 (formerly SFAS 144) allows you to group an abandoned project, due to the lack of a commercially viable resource which would not support an asset, with other projects for which you still believe a commercially viable resource is probable and *may* support an asset.  Please restate your financial statements to write off all projects that you have determined are not economically feasible and reflect the expense in the period in which you made this determination, consistent with the guidance in ASC 360-10-35.

2. We understand from your disclosures and your response letters dated October 12, 2009, November 25, 2009 and January 13, 2010 that you test your exploration projects for impairment at the area of interest level.  You define this area of interest as one or more projects serviced by a single control room and treat all

cash inflows and outflows as relating to the pool of these asset costs.  Based on the information provided in your response to our prior comments, it remains unclear to us that such high level of asset grouping for the purpose of evaluating impairment is appropriate under ASC 360-10-35 (formerly SFAS 144).  Further, we are unclear as to whether the control room is a direct, variable cost center whose operating costs should be "pushed down" to the individual projects when evaluating impairment at the plant level or whether the control room should be evaluated at a higher level using the excess cash flows of the individual plants. Please supplementally clarify your position on this matter.  In this regard, tell us whether your impairment testing would produce a materially different result if your exploration projects were tested for impairment at the project level (*e.g.* Wildhorse, Seven Devils).  Please specifically address how Carson Lake would fare in an impairment test at the plant level.  Please finally note that we may raise this matter in future reviews to the extent we identify circumstances in which it appears it could have a material impact.

3. We have reviewed your response letters dated October 12, 2009, November 25, 2009 and January 13, 2010. Given the increasing significance of your exploration projects to your company as a whole, we believe you should expand your disclosures concerning these projects in the description of your business and MD&A as follows:

In the description of your business or wherever you deem appropriate, please provide an expanded, robust discussion of the multiple stages of your exploration and development process, through construction and operation.  Please also provide a narrative discussion of significant changes in your exploration and development projects during the period covered by your financial statements, including discussions of projects that were added during the period and projects that were abandoned during the period.

In your Critical Accounting Policies, please explain the point at which you begin capitalizing costs for your exploration projects, disclose the types of costs capitalized and discuss the uncertainties inherent in management's judgment as to whether a commercially viable resource exists at the time capitalization commences.  To provide your investors with insight into the inherent risks of capitalizing these costs, you should briefly discuss projects that were ultimately abandoned and quantify the resulting impairment of previously capitalized costs. If management believes these historical impairments are not indicative of future impairments, you should discuss this.

Please show us the disclosures you expect to make for these matters.

63.      In a letter dated February 23, 2010 (filed with the SEC on February, 24 2010),

Ormat responded to the SEC stating it would restate its financial statements, writing-off costs for

abandoned projects.  The Company also agreed to clarify its disclosures to investors.  Regarding

the restatement, the Company stated:

> In response to the Staff's request that we restate our financial statements, after analyzing the impact of such a restatement, including the preparation of a SAB 99 analysis, our Board of Directors and Audit Committee concluded that we should restate our financial statements for the year ended December 31, 2008.  We will file a report under Section 4.02(a) of Form 8-K announcing that our financial statements for the year ended December 31, 2008 should no longer be relied upon.

> The restatement will show a change in our accounting treatment for certain exploration and development costs.  These costs were capitalized as described in Note 1 of the December 31, 2008 financial statements.  The December 31, 2008 financial statements will be restated to write-off unsuccessful exploration and development costs for sites where we determined not to pursue further development during 2008.

> The effect of this restatement on the December 31, 2008 financial statements is as follows:

| | (U.S. dollars in millions) |
|---|---|
| Consolidated balance sheet as of December 31, 2008: | |
| Decrease in construction-in-process | $  9.8 |
| Decrease in deferred tax liability | 3.6 |
| Decrease in equity | 6.2 |
| | |
| Consolidated statement of operations and comprehensive income for the year ended December 31, 2008: | |
| Decrease in net income | 6.2 |
| Decrease in comprehensive income | 6.2 |

> We plan to include the effect of the restatement of the December 31, 2008 financial statements in our Annual Report on Form 10-K for the year ended December 31, 2009.

> We also plan to revise our consolidated financial statements as of and for the three and nine months ended September 30, 2009 to reduce net income and comprehensive income by approximately $1.5 million to expense previously

capitalized exploration and development costs related to a project for which we determined we would abandon further exploration and development during the third quarter of 2009.  In connection with the filing of our Annual Report on Form 10-K for the year ended December 31, 2009, we will revise the third quarter unaudited financial information included in the notes to the financial statements included therein to reflect the expensing of such costs in that interim period.

64.     As seen in the paragraph above, among other items, the Company overstated its net income, and comprehensive income, during the Class Period.

65.     During a conference call with Investors on February 24, 2010, Ormat stated that its accounting policy would now follow the successful-efforts method:

[Question from Analyst]:  With the new area-of- interest basis that you are using, of the write-downs, I guess, so far, I was wondering if you would break that – are you going to break that down in terms of what percentage was exploration?  What percentage was dealing with the lease?  Can you give us any color on that?

[Answer from Defendant Yehudit Bronicki]: "Let me try to clarify, because maybe it wasn't clear.  Unfortunately the area-of-interest concept for testing impairment of exploration was not accepted, and the reason (for) the restatement is that we are doing the review for impairment on a project-by-project basis and not on an area-of-interest basis.  So whatever was written off is a specific project that was .. determined to be not commercially viable, and therefore it was written off."

**Materially False and Misleading Statements Issued During the Class Period**

66.     On February 24, 2009, Ormat issued a press release titled "Ormat Technologies Reports Record Fourth Quarter 2008 and Year-End Results."  Therein, the Company, in relevant part, stated:

RENO, Nevada, February 24, 2009-Ormat Technologies, Inc. (NYSE: ORA) today announced results for the fourth quarter and full year ended December 31, 2008.

Highlights of the company performance include:

•       Net income increased 31.3% to $11.7 million in the quarter and 82.0% to $49.8 million for the year.

•       Earnings per share increased 18.2% to $0.26 in the quarter and 60% to $1.12 for the year.

Adjusted EBITDA for the fourth quarter of 2008 was $31.5 million, compared to $25.2 million in the same quarter last year. Adjusted EBITDA includes operating income and depreciation and amortization totaling $1.3 million and $2.0 million for the quarters ended December 31, 2008 and 2007, respectively, related to the Company's unconsolidated investments. The reconciliation of GAAP net income to Adjusted EBITDA is set forth below in this release.

Annual Results

Net income for the year ended December 31, 2008 was $49.8 million, or $1.12 per share (diluted), compared to $27.4 million, or $0.70 per share (diluted), for the year ended December 31, 2007. ….

Operating income for the year ended December 31, 2008 was $60.6 million, compared with $43.5 million for the year ended December 31, 2007, an increase of 39.5%. ….

Adjusted EBITDA for the year ended December 31, 2008, was $124.7 million dollars, compared to $107.2 million for the year ended December 31, 2007. Adjusted EBITDA includes consolidated EBITDA and the Company's share in the operating income and depreciation and amortization totaling $5.4 million and $14.6 million for the year ended December 31, 2008 and 2007, respectively, related to the Company's unconsolidated investments.

The Company also attached financial results that repeated the financial results above, and stated that Operating Income was $14,781,000 for the three months ended December 31, 2008 and Operating Income was $60,607,000 for the year ended December 31, 2008.

67.     On February 25, 2009, the Company filed a Form 8-K with the SEC, which attached the February 24, 2009 press release. The Form 8-K was signed by Bronicki.

68.     During the Ormat earnings conference call with investors on February 25, 2009, Tenne presented the Fourth Quarter and Year-End 2008 Financial Results, including the Company's Net Income, EPS, and EBITDA that were disclosed in the Company's press release on February 24, 2009.

69.     On March 2, 2009, Ormat filed its 2008 Form 10-K. The 2008 Form 10-K was signed by Defendants Bronicki and Tenne. The 2008 Form 10-K listed the Company's financial results previously announced on February 24, 2009.

70.     In the 2008 Form 10-K, the Company also stated that:

**Exploration and drilling costs**

The Company capitalizes costs incurred in connection with the, exploration and development of geothermal resources on an "area-of-interest" basis.  All such costs, which include dry hole costs and the cost of drilling and equipping production wells and other directly attributable costs, are capitalized and amortized over their estimated useful lives when production commences. Exploration and drilling costs related to uncompleted projects are included as construction-in-process in the consolidated balance sheets and totaled $52,345,000 and $16,677,000 at December 31, 2008 and 2007, respectively.

71.     The statements contained in ¶¶66-70 were materially false and/or misleading when made for the reasons set forth in the Substantive Allegations at ¶¶17-65 and because defendants failed to disclose or indicate the following: (1) that the Company was improperly capitalizing costs for the Buffalo Valley Project and Grass Valley Project after Ormat had decided to abandon further exploration and development of the projects instead of expensing those costs in the period in which the determination was made; (2) that, as a result, the Company's financial results were overstated; (3) that the Company's financial results were not prepared in accordance with GAAP; and (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

72.     Additionally, the 2008 Form 10-K, in relevant part, stated:

•      *Property, Plant and Equipment.*  …..

We capitalize costs incurred in connection with the exploration and development of geothermal resources on an "area-of-interest" basis.  All such costs, which include dry hole costs and the cost of drilling and equipping production wells and other directly attributable costs, are capitalized and amortized over their estimated useful lives when production commences.  Although we do not commence exploration activities until feasibility studies have determined that the project is capable of commercial production, it is possible that economically recoverable reserves will not be found in an "area of interest and exploration activities will be abandoned. **In this case, capitalized exploration costs would be expensed**. (Emphasis added)

73.    The bolded statement in ¶72 was materially false and misleading because the Company did not write-off abandoned exploration projects as discussed in the Substantive Allegations at ¶¶17-65.  In fact, Ormat admitted to the SEC that costs for three projects (Grass Valley, Buffalo Valley, and Rock Hill) were capitalized and not expensed during the Class Period, even though the projects were not capable of commercial production, had no economically recoverable reserves, and were abandoned.

74.    The 2008 Form 10-K also contained Sarbanes-Oxley required certifications, signed by Bronicki.  Bronicki certified that:

1. I have reviewed this annual report on Form 10-K of Ormat Technologies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under his/her supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

75.    The 2008 Form 10-K also contained Sarbanes-Oxley required certifications, signed by Tenne.  Tenne certified that:

1. I have reviewed this annual report on Form 10-K of Ormat Technologies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under his/her supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

76.     The certifications in ¶¶74-75 are materially false and misleading as both Bronicki and Tenne knew or recklessly disregarded that the financial statements in the 2008 10-K were materially false and misleading and were not otherwise fairly and accurately presented as set forth in the Substantive Allegations at ¶¶17-65.

77.     On November 4, 2009, Ormat issued a press release titled "Ormat Technologies, Inc. Reports Third Quarter 2009 Results." Therein, the Company, in relevant part, stated:

Q3 Net Income increased 48% to $23.4 million

....

RENO, Nevada, November 4, 2009 - Ormat Technologies, Inc. (NYSE: ORA) today announced financial results for the third quarter of 2009.

Third Quarter Results

....

For the quarter, the Company reported net income of $23.4 million, or $0.52 per share of common stock (basic and diluted), compared to $15.8 million, or $0.35 per share of common stock (basic and diluted), for the same period a year ago, which represents an increase of 48.1%.  The increase in net income is primarily attributable to our Product Segment.

....

Adjusted EBITDA in the third quarter of 2009 increased 30.8% to $50.3 million compared to $38.5 million in the same quarter last year.  Adjusted EBITDA includes consolidated EBITDA and the Company's share in the interest, taxes, depreciation and amortization related to the Company's unconsolidated 50% interest in the Mammoth complex in California.  As further described in "Reconciliation of EBITDA and Adjusted EBITDA and Additional Cash Flows Information" below, we changed the method for calculating EBITDA and adjusted EBITDA beginning in the third quarter of 2009.

....

Nine-Month Results

.....    Net income for the period was $53.9 million, or $1.19 per share of common stock (basic and diluted), compared to $37.9 million, or $0.87 per share of common stock (basic and diluted) for the same period last year, which represents an increase of 42.3% in net income.

....    Adjusted EBITDA for the nine month period ended September 30, 2008 increased 25.2% to $127.5 million compared to $101.8 million in same period last year.  Adjusted EBITDA includes consolidated EBITDA and the Company's share in the interest, taxes, depreciation and amortization related to the Company's unconsolidated 50% interest in the Mammoth complex in California. As further described in "Reconciliation of EBITDA and Adjusted EBITDA and Additional Cash Flows Information" below, we changed the method for calculating EBITDA and adjusted EBITDA beginning in the third quarter of 2009.

The Company also attached financial results that repeated the financial results above, and stated that operating income was $25,961,000 for the three months ended September 30, 2009 and $61,837,000 for the nine months ended June 30, 2009.

78.     On November 4, 2009, Ormat filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal third quarter (the "Third Quarter 2009 Form 10-Q").  The Third Quarter 2009 Form 10-Q was signed by Tenne and reaffirmed the Company's financial results announced that day.

79.     The statements contained in ¶¶77-78 were materially false and/or misleading when made for the reasons set forth in the Substantive Allegations at ¶¶17-65 and because defendants failed to disclose or indicate the following: (1) that the Company was improperly continuing to capitalize costs for the Rock Hills Project after Ormat had decided to abandon further exploration and development of project instead of expensing those costs in the period in which the determination was made; (2) that, as a result, the Company's financial results were overstated during the Class Period; (3) that the Company's financial results were not prepared in accordance with GAAP; and (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

80.     The Third Quarter 2009 Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Bronicki and Tenne, substantially similar to the certifications contained in ¶¶74-75, *supra*, and were materially false and misleading for the same reasons set forth at ¶76.

81.     During the Ormat earnings conference call with investors on November 5, 2009, Tenne presented Third Quarter 2009 Financial Results, including the Company's Net Income, EPS, and EBITDA, that were disclosed in the Company's press release on November 4, 2009.

82.     On November 5, 2009, the Company filed a Form 8-K with the SEC, which attached the November 4, 2009 press release.  The Form 8-K was signed by Bronicki.

83.     The statements contained in ¶¶81-82 were materially false and/or misleading when made for the reasons set forth in the Substantive Allegations at ¶¶17-65 and because defendants failed to disclose or indicate the following: (1) that the Company was improperly continuing to capitalize costs for the Rock Hills Project after Ormat had decided to abandon further exploration and development of project instead of expensing those costs in the period in which the determination was made; (2) that, as a result, the Company's financial results were overstated during the Class Period; (3) that the Company's financial results were not prepared in accordance with GAAP; and (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

## The Truth Begins To Emerge

84.     On February 24, 2010, Ormat issued a press release titled, "Ormat Technologies Reports Record 2009 Year End and Fourth Quarter Results."  Therein, the Company, in relevant part, stated:

*2008 Restatement*

Through the third quarter of 2009, we accounted for exploration and development costs using an accounting method that is analogous to the full cost method used in the oil and gas industry.  Under that method, we capitalized costs incurred in connection with the exploration and development of geothermal resources on an "area-of-interest" basis.  Each area of interest included a number of potential projects in the state of Nevada that were planned to be operated together with the same operation and maintenance team.  Impairment tests were performed on an area-of-interest basis rather than at a single site.  Under this methodology, costs associated with projects that we have determined are not economically feasible remained capitalized as long as the area-of-interest was not subject to impairment.

Following a periodic review performed by the Securities and Exchange Commission ("SEC") Staff, we concluded that this accounting treatment was inappropriate in certain respects.  Accordingly, on February 23, 2010, our Audit Committee and Board of Directors, based on management recommendations,

concluded that our financial statements contained in our Annual Report on Form 10-K for the year ended December 31, 2008 require restatement and should no longer be relied upon.

The impact of the restatement is a decrease of approximately $6.2 million in net income (or $0.14 per share) during the year end and the fourth quarter ended December 31, 2008.  This decrease represents a reduction of 12.6% from our originally reported net income of $49.5 million in 2008 and a reduction of 53.6% from our originally reported net income of $11.6 million in the fourth quarter of 2008.  The Company is filing a Report on Form 8-K and intends to effect the above mentioned restatement in its annual report on Form 10-K for the year ended December 31, 2009.  The Company also plans to revise its financial statements as of and for the three and nine months ended September 30, 2009 to reduce net income by approximately $1.5 million (or $0.03 per share).  In connection with the filing of its Annual Report on Form 10-K for the year ended December 31, 2009, the Company will revise the third quarter unaudited financial information included in the notes to the financial statements to reflect the expensing of such costs in that interim period.

85.    On February 24, 2010, Ormat filed a Current Report with the SEC on Form 8-K.

Therein, the Company, in relevant part, stated:

**Item 4.02(a).   Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

On February 23, 2010, the Board of Directors and Audit Committee of the Company, upon recommendation of management, concluded that the Company's financial statements for the year ended December 31, 2008 (the "2008 Financial Statements") contained in its Annual Report on Form 10-K for the year then ended require restatement and should no longer be relied upon.   In addition, the Company's prior related earnings and news releases and similar communications should no longer be relied on to the extent they related to the 2008 Financial Statements.

The Company plans to include the restatement of the 2008 Financial Statements in its Annual Report on Form 10-K for the year ended December 31, 2009.  The restatement will show a change in the Company's accounting treatment for certain exploration and development costs.  These costs were capitalized on an area-of-interest basis as described in Note 1 of the 2008 Financial Statements using an accounting method that is analogous to the full cost method.  In reviewing this accounting treatment in response to comment letters from the Staff of the Securities and Exchange Commission ("SEC") as part of its periodic review of the reports the Company files with the SEC, the Company concluded that this accounting treatment was inappropriate in certain respects.  **As a result, the Company will no longer continue to capitalize these costs for any individual project after it decides to abandon further exploration and development of**

that project, and will instead expense those costs in the period in which any such determination is made. **The 2008 Financial Statements will be restated to write-off unsuccessful exploration and development costs for sites where we determined not to pursue further development during 2008**.

The effect of this restatement on the 2008 Financial Statements is as follows:

|  | (U.S. dollars in millions) |
|---|---|
| Consolidated balance sheet as of December 31, 2008: | |
| Decrease in construction-in-process | $9.8 |
| Decrease in deferred tax liability | $3.6 |
| Decrease in equity | $6.2 |
| Consolidated statement of operations and comprehensive income for the year ended December 31, 2008: | |
| Decrease in net income | $6.2 |
| Decrease in comprehensive income | $6.2 |

The Company also plans to revise its consolidated financial statements as of and for the three and nine months ended September 30, 2009 to reduce net income by approximately $1.5 million to expense previously capitalized exploration and development costs related to a project for which the Company determined it would abandon further exploration and development during the third quarter of 2009. In connection with the filing of its Annual Report on Form 10-K for the year ended December 31, 2009, the Company will revise the third quarter unaudited financial information included in the notes to the financial statements included therein to reflect the expensing of such costs in that interim period.

The Company's management, Audit Committee and Board of Directors have discussed the matters disclosed in this Item 4.02(a) filing on Form 8-K with the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

(Emphasis added)

86.     On this news, shares of Ormat declined $1.28 per share, nearly 4%, to close on February 24, 2010 at $31.90 per share, on heavy volume, and further declined an additional $0.89 per share, nearly 3%, to close on February 25, 2010 at $31.01 per share, on heavy volume, and continued to decline an additional $2.08 per share, more than 6.5%, to close on February 26, 2010 at $28.93 per share, on heavy volume. Over the course of these three days of trading, shares of Ormat declined a total of $4.25 per share, or 12.81%.

87.     On March 8, 2010, the Company filed its 10-K for year-end 2009 (the "2009 Form 10-K").  In the 2009 Form 10-K, the Company increased the write off for the Rock Hills Project to $2.4 million from the planned charge of $1.5 million announced on February 24, 2010. The Company stated that:

> Write-off of Unsuccessful Exploration Activities
>
> Write-off of unsuccessful exploration activities for the year ended December 31, 2009 was $2.4 million, compared to $9.8 million (as restated) for the year ended December 31, 2008. Write-off of unsuccessful exploration activities for the year ended December 31, 2009 relates to the Rock Hills exploration project, which we determined in the third quarter of 2009 would not support commercial operations. Write-off of unsuccessful exploration activities for the year ended December 31, 2008 relates to the Buffalo Valley and Grass Valley exploration projects, which we determined in the fourth quarter of 2008 would not support commercial operations.

The Company also stated under its critical accounting policies for property, plant, and equipment that:

> Our assessment of economic viability of an exploration project involves significant management judgment and uncertainties as to whether a commercially viable resource exists at the time we acquire land rights and begin to capitalize such costs.  As a result, it is possible that our initial assessment of a geothermal resource may be incorrect and we would have to write-off costs associated with the project that were previously capitalized.  During the years ended December 31, 2009 and 2008, we determined that the geothermal resource at three of our exploration projects would not support commercial operations and abandoned the sites.  As a result of this determination, we expensed $2,367,000 and $9,828,000 of capitalized costs during the years ended December 31, 2009 and 2008, respectively.

## ORMAT'S VIOLATION OF GAAP RULES

88.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the company's improper accounting for, and disclosure about its expenses, in violation of GAAP rules.

89.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

90.     The fact that Ormat restated its financial statements, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

91.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, 40);

(d)      The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

(e)      The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

(f)      The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

(g)      The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, 79); and

(h)      The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).

92.      The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities laws. (17 C.F.R. § 229.303).

## ADDITIONAL SCIENTER ALLEGATIONS CONCERNING ORMAT'S FRAUDULENT ACCOUNTING FOR EXPLORATION COSTS

93.      As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Ormat, their control over, and/or receipt and/or modification of Ormat's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ormat, participated in the fraudulent scheme alleged herein.

94.     Defendants knew or recklessly disregarded that capitalizing expenses for abandoned projects by using the full-cost method for its geothermal business was not in compliance with its accounting policy as disclosed to investors and would overstate its financial results.

95.     Defendants knew or recklessly disregarded that capitalizing expenses for abandoned projects by using the full-cost method for its geothermal business was not in accordance with GAAP and would overstate its financial results.

96.     Defendants knew or recklessly disregarded that capitalizing expenses for abandoned projects by using the full–cost method for its geothermal business was not the industry standard for geothermal operations and would overstate its financial results.

97.     A strong inference of Defendants' knowledge and/or recklessness arises from the following facts, taken singly or collectively:

        (a)     Defendant Bronicki admitted to the SEC that the Company capitalized costs based on rules and regulations that specifically excluded geothermal operations;

(b)     Defendant Bronicki was required to approve the abandonment of the projects at Buffalo Valley, Grass Valley, and Rock Hill, but Bronicki did not adequately disclose that these projects were abandoned or disclose costs incurred to investors; and

(c)     Defendant Tenne was the CFO of Ormat and was responsible for understanding the Company's finances and complying with SEC regulations.

98.     The restatement itself constitutes strong circumstantial evidence that the Defendants acted with scienter.  Under GAAP, the need to restate a previously reported financial statement arises only when the facts that necessitate the restatement existed at the time the financials were originally issued.  *See* Accounting Principles Board Opinion No. 20, ¶ 13.  By restating prior financials, Defendants have effectively admitted that the Company's improper treatment of expenses was therefore known or recklessly disregarded at the time all of the foregoing fraudulent financial statements were originally released, and that the originally issued financial statements were materially misleading.

99.     The magnitude of the alleged fraud also constitutes strong circumstantial evidence that Defendants acted with scienter.   The impact of the alleged fraud had a material effect on the Company's net income, earnings per share, operating income, and EBITDA.

**A Strong Inference of Scienter Arises from Defendants' Need to Pay Off Debt and Protect Ormat From a Take Over by Gazit, Inc.**

100.     According to Ormat's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed March 23, 2010, "Lucien and Yehudit Bronicki founded our parent company's predecessor, Ormat Turbines Ltd., in 1965 and, together with their son, Yoram Bronicki, continue to have a substantial economic interest in our parent, Ormat Industries Ltd.

(Ormat Industries [based in Yavane, Israel]), which, in turn, owns approximately 56.02% [25,450,000 shares] of our [Ormat] outstanding Common Stock."

101.     The management team at Ormat is made up of a number of members of the Bronicki family.  According to Ormat's proxy statement, Lucien Bronicki is Chairman of the Board and Chief Technology Officer, Yehudit Bronicki is Chief Executive Officer (CEO), and Yoram Bronicki is President and Chief Operating Officer (COO).

102.     Ormat Industries is currently controlled by Bronicki and family (the "Bronicki Family").  The Bronicki Family currently owns approximately 35% of Ormat Industries through Bronicki Investments Ltd.

103.     In December of 2007, Ormat Industries faced a takeover attempt by Gazit, Inc., which owns approximately 15% of Ormat Industries.  In order to prevent the takeover, the Bronicki Family purchased 7.6% of Ormat Industries' shares using a $157 million loan from Bank Hapoalim (the "Loan").

104.     A February 17, 2009 article in The Globes titled, "Bronickis put entire Ormat stake as collateral: The current value of the collateral to Bank Hapoalim is $325 million," stated:

> In 2007, Gazit Inc. (TASE: GZIT), controlled by chairman Chaim Katzman, launched a hostile takeover attempt of Ormat by buying up shares on the market. Gazit reached a 17 percent holding in the company, while the Bronickis' owned 28 percent through Bronicki Investments Ltd. and personally.  To block the takeover attempt of the company they had founded, they took a $150 million loan from Bank Hapoalim, and used the proceeds to purchase an additional 7.6 percent of the company's shares.
>
> The Bronickis put up part of their holding in Ormat as collateral for the loan in favor of Bank Hapoalim Trust Company.  The Bronickis bought the additional shares at nearly double the current share price, and the drop in the share price in recent months gave the bank the right to demand that the Bronickis either reduce the outstanding balance of the loan, or provide more collateral.
>
> Under the original loan agreement, the Bronickis put up as collateral 24.8 million Ormat shares, which were worth $135 million when Ormat's share fell to a low point of NIS 22 in late December 2008.  To avoid Bank Hapoalim recalling its

loan, the Bronickis renegotiated the loan agreement. Under the new loan agreement, they put up as collateral an additional 16.6 million Ormat shares, their entire holding in the company.

105.    Accordingly, Bronicki was motivated to secure large dividend payments from Ormat Industries and Ormat for personal gain. Additionally, dividend payments would allow Bronicki to pay down the Loan without selling shares in either Ormat Industries or Ormat.

106.    In order to maximize dividends at Ormat, Defendants employed the full-cost method. The full-cost method allowed Ormat to avoid write-offs for abandoned projects, and to capitalize the losses over long periods of time. This overstated net income, providing the opportunity to obtain a larger surplus from which to declare larger dividends.

107.    The Company stated in its earnings releases during the Class Period, that "the Company's dividend policy . . . targets an annual payout ratio of at least 20% of the Company's net income, subject to Board approval."

108.    Under the successful-efforts method, the Grass Valley Project and the Buffalo Valley Project should have been written-off when abandoned at the end of the fourth quarter 2008.

109.    The Company announced on February 24, 2009 that its net income for the fourth quarter 2008 was $11.6 million and that:

> On February 24, 2009, Ormat's Board of Directors approved the payment of a quarterly cash dividend of $0.07 per share pursuant to the Company's dividend policy, which targets an annual payout ratio of at least 20% of the Company's net income, subject to Board approval. The dividend will be paid on March 26, 2009, to shareholders of record as of the close of business on March 16, 2009.

110.    On February 24, 2010, The Company announced that its overstatement of the Grass Valley Project and Buffalo Valley Project translated to a "reduction of 53.6% from our originally reported net income of $11.6 million in the fourth quarter of 2008." Accordingly, dividends for the fourth quarter of 2008 were overpaid by approximately 53.6%.

111.    Under the successful-efforts method, the Rock Hills Project would have been written-off when abandoned at the end of the third quarter 2009.

112.    The Company announced on November 4, 2009 that its net income for the third quarter 2009 was $23.4 million and that:

> On November 4, 2009, Ormat's Board of Directors approved the payment of a quarterly cash dividend of $0.06 per share pursuant to the Company's dividend policy, which targets an annual payout ratio of at least 20% of the Company's net income, subject to Board approval.  The dividend will be paid on December 1, 2009 to shareholders of record as of the close of business on November 18, 2009.

113.    On March 8, 2010, the Company announced in its 2009 Form 10-K that the charge for the Rock Hills Project was $2.4 million.  This charge translates to approximately a 10% decrease in net income.  Accordingly, dividends for the third quarter were overpaid by approximately 10%.

114.    On June 21, 2010, the Globes Online reported that the "Struggle for Control at Ormat Industries heating up again."  The article stated that "The Bronicki family are seeking [an] investor for a 10% stake in Ormat Industries, the mother company of NYSE listed Ormat Technologies, to pay off debt and retain control.  Israeli news are announcing that the owners of Ormat Industries, the Bronicki family, are currently struggling with debt and are seeking an investor to repay debt with Bank Hapoalim while retaining control."

115.    The Globes Online also reported that collateral for the Loan "is currently worth NIS 1.18 billion (US$309 million).  If they [the Bronickis] cannot repay the loan to Bank Hapoalim, they could lose half their holding in the company, leaving it open to another takeover attempt."

116.    The article stated that "The Bronickis' problem is their dividend income from Ormat, which has totaled just NIS 65 million since 2005, [is] barely a tenth of their loan from

Bank Hapoalim. The Bronickis effort to find a financial, rather than a strategic partner, suggests that they are seeking to get cash for part of their holding."

117.    Defendants were motivated to maintain an inflated share price of Ormat stock during the Class Period in order receive maximum value for any shares sold to satisfy requirements of the Loan.

118.    Defendants were motivated to maintain an inflated share price of Ormat in order to protect the Bronicki family's ownership interests in Ormat and Ormat Industries from take-over threats by Gazit, Inc.

119.    On July 2, 2010, Haaretz.com reported that "Gazit mounting another attack on Ormat." The article stated that:

> Chaim Katzman and Dori Segal, the controlling shareholders of the Gazit real estate group, are upset about their NIS 400 million loss on Ormat Industries. This could signal the start of another battle for control of the geothermal energy company, analysts said.
>
> Gazit issued a biting letter to Ormat, which builds and operates geothermal power plants around the world. The letter, which was also delivered to the Tel Aviv Stock Exchange as an announcement to investors, attacks Ormat's management and board of directors.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS REGARDING DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE NORTH BRAWLEY PLANT

### Ormat Embarks on its Largest Project: the North Brawley Plant

120.    In 2006, Ormat began exploration activities in North Brawley, California in Imperial County. This project would eventually mark the first project that Ormat advanced from exploration activities to project construction phase and the Company's largest plant ever built. The project was for a new geothermal facility (initially 50-MW) utilizing binary power conversion technology, where heat from the geothermal fluid is transferred to a working fluid,

then injected back into the reservoir, and the working fluid is vaporized to be used in the facility's power turbine.

121.    Ormat announced certain details about the project in a press release on December 21, 2006, titled "Ormat Technologies, Inc. Secures Geothermal Leases in North Brawley, California."  Therein, the Company outlined its expectation to have the first 50-MW online by the end of 2008:

> Ormat Technologies, Inc. (NYSE: ORA) today announced that it has secured geothermal leases in the North Brawley Known Geothermal Resource Area ("KGRA") in Imperial County, California.  The leases were entered into between a wholly-owned indirect subsidiary of Ormat Technologies, Inc. and two separate land-owners.
>
> Together, these geothermal leases secured 1,270 acres at the heart of the KGRA. In addition, Ormat has opened discussions with other land owners and plans to secure additional leases in the North Brawley KGRA.
>
> Ormat expects to begin drilling activity to explore the resource upon receipt of the necessary drilling permits, which the Company expects will be granted in the first half of 2007.
>
> Commenting on the Company's recent news, [Yehudit] Dita Bronicki, President and Chief Executive Officer, stated, "As discussed on our recent quarterly results conference call, we expect to continue greenfield development of geothermal projects which, when combined with our other construction programs, will add during the three years 2006-2008 approximately 250 megawatts that we expect to complete by the end of 2008."
>
> Mrs. Bronicki concluded, "Development of the North Brawley geothermal project is expected to be completed in 50-MW clusters over a three to five years period, with the first 50 MW coming online by the end of 2008 at the earliest.  We intend to sell the project's entire output to one or more of the offtakers that have already published requests for proposals for renewable energy, and to which Ormat is currently short-listed."

122.    This was a major announcement as the North Brawley project reflected a significant opportunity for the Company's future growth.  Indeed, as of March 2007, the plans for the 50-MW North Brawley plant reflected a massive 17% increase in Ormat's domestic

power generation, a 12% increase in global production, and approximately 30% of Ormat's projects under construction.

123.    As the Company increased its exploration activities during the first half of 2007, Ormat continued to make periodic statements that the North Brawley plant was on track to be completed as expected by the end of 2008.  For example:

        (a)    In a filing with the SEC on March 12, 2007, Ormat indicated that construction on the plant had commenced.  Specifically, Ormat stated "Drilling started in February 2007 and we are negotiating the power purchase agreement for this project."  Ormat represented to the public that it expected "construction to be completed by the end of 2008."

        (b)    On May 10, 2007, in its Quarterly Report filed with the SEC on Form 10-Q for Q1 2007, Ormat reported: "Brawley Phase I Project:  We are currently constructing the Brawley Phase I project, which will deliver approximately 50 MW of power generation. We expect the construction to be completed by the end of 2008."

124.    Another major development with respect to North Brawley occurred on July 2, 2007, when Ormat issued a press release announcing that it had signed a 20 year power purchase agreement with Southern California Edison Company (SCE) – Ormat's largest customer – for the sale of 50-MW of energy produced from the North Brawley geothermal projects.  The press release, titled "Ormat Signs Its Largest Power Purchase Agreement to Date; 20-Year Agreement with Southern California Edison for 50 MW with Option to Increase," in relevant part, stated:

> Ormat Technologies, Inc. (NYSE: ORA) today announced that it has signed a 20-year power purchase agreement (PPA) with Southern California Edison (SCE) to purchase 50 megawatts (MW) of clean energy output from the Brawley I Project, which is currently under construction in Imperial County, California, by Ormat. The PPA includes an option to increase capacity to 100 MWs at Ormat's discretion, and is subject to the approval of the California Public Utilities Commission (CPUC).

The PPA results from a 2006 request for proposal from SCE. The power rate agreed upon will not exceed the 2006 Market Price Referent as approved by the CPUC.

[Yehudit] Dita Bronicki, Chief Executive Officer of Ormat said, "*It could not be more appropriate that this milestone agreement marking our largest PPA to-date is with Southern California Edison, our largest customer* and a strong supporter of clean energy production."

When completed, the Brawley I Project will increase the total output supplied from Ormat to SCE to approximately 190 MW.

"*This is one of the largest contracts SCE is entering into as part of its 2006 solicitation*. It is an important part of meeting our renewable energy goals," said Pedro Pizarro, senior vice president, Power Procurement, Southern California Edison. "We are very pleased that our counterparty is Ormat Technologies - a good business partner and leader in the renewable energy industry. SCE had been procuring geothermal power from Ormat-developed projects for the last 20 years and we consider them an exceptional supplier of green base load energy."

(Emphasis added)

125.     Given the potential for North Brawley, it was not surprising that shortly thereafter, on August 9, 2007, Defendant Bronicki touted the agreement with Ormat's "long-time customer" for the sale of 50-MW from the North Brawley geothermal projects.  During the call, Defendant Bronicki also indicated that Ormat had acquired two drilling rigs since the beginning of 2007, one of which was "currently being used for the construction of the North Brawley project."[1]  Even though the North Brawley project was still under development and construction, Defendant Bronicki made it perfectly clear that Ormat expected the project to come online by the end of 2008, which was "scheduled for completion by the end of 2008:"

North Brawley is currently under construction in the Imperial County, California. The power purchase agreement includes an option to increase capacity to 100 megawatt with our discretion and it's subject to – and it's still subject to regulatory approval. *We expect the North Brawley project to come online by the end of 2008* and the additional 50 megawatt if the resource is determined to support it, in 2009 or early 2010. ….

_____

[1] In a Quarterly Report on Form 10-Q filed that day with the SEC, Ormat indicated that the drilling rig being used to construct the North Brawley project was specifically "being used for the drilling [of] the Brawley production wells."

*      *      *

The 35 megawatt Olkaria in Kenya and the 50 megawatt North Brawley in California are both under construction and *scheduled for completion by the end of 2008*. ….

*      *      *

As previously mentioned *an additional 50 megawatt* in the Brawley area are likely to come online by the end of 2009 or early 2010 if the resource in this area is confirmed to support the additional products. . . .

(Emphasis added)

126.    During conference calls on November 7, 2007 and February 27, 2008, Defendant

Bronicki continued to assure investors that the North Brawley plant was on track to bring 50-

MW on line by the end of 2008, with another 50-MW on line by the end of 2009 or early 2010.

127.    When Ormat filed its 2007 Form 10-K on March 5, 2008, the Company indicated

that construction had reached "an advanced stage" and that "key power plant equipment has

arrived at the site":

> The North Brawley Project (U.S.):  We are constructing a 50 MW power plant located in the Brawley known geothermal resource area in Imperial County, California. Drilling started in February 2007; construction work is at an advanced stage; and the key power plant equipment has arrived at the site. In June 2007, we signed a 20-year power purchase agreement with Southern California Edison for the sale of 50 MW of energy to be produced from the project.  The North Brawley project is projected to come on line at the end of 2008. . . .

*      *      *

> Capital Expenditures . . .  North Brawley Project: The construction of the North Brawley project is currently under way. Once completed, it will deliver approximately 50 MW of power generation under an existing power purchase agreement with Southern California Edison. Drilling started in February 2007. Construction work is at an advanced stage and the key power plant equipment has arrived at the site. We expect the construction to be completed by the end of 2008.

-44-
CONSOLIDATED AMENDED COMPLAINT

128.    Of note, in the Company's Form 10-K filed with the SEC on March 5, 2008, Ormat represented that its expectation to have the North Brawley project online by the end of 2008 was "based on" the "current development and construction schedule":

> **Based on our current development and construction schedule**, which is subject to change at any time and which may not be met in its entirety, we expect to declare commercial operation of the 10 MW Heber South project during the first half of 2008, and of the **50 MW North Brawley project by the end of 2008**.

(Emphasis added)

129.    Thus, just prior to the start of the Class Period on May 7, 2008, investors were led to believe that the immediate prospects for Ormat were bright for a number of reasons. *First*, the Company was on track with its current development and construction schedule to get the North Brawley project online by the end of the year (*i.e.*, by December 31, 2008). *Second*, the North Brawley plant would achieve commercial operation of 50-MW. *Third*, Ormat was likewise on track to thereafter bring the previously mentioned **additional 50-MW** in the Brawley area online by the end of 2009 or early 2010. With these MW additions to the Company's portfolio, coupled with the reliability of the prearranged deal with its largest and long-time customer SCE, the prospects for 2009 and 2010 were nothing short of tremendous.

130.    But there was one more crucial reason why it was imperative that Ormat have its North Brawley project online by the end of 2008. The United States government had extended a tax subsidy and increased the amount of the tax subsidy for companies that use geothermal steam or fluid to generate electricity as part of the Energy Policy Act of 2005 that became law on August 8, 2005. The tax subsidy was a "production tax credit," which in 2007 was 2.0 cents per kWh and adjusted annually for inflation. The production tax credit could be claimed on the electricity output of new geothermal power plants put into service by December 31, 2008. These tax credits could be (and previously had been) monetized by the Company through various

financial transactions, allowing the Company to essentially sell the benefits in exchange for cash to finance other projects.

### The "Perfect Storm"

131.   While Ormat cavalierly proclaimed nothing but positive statements about the capacity and development of North Brawley, Ormat omitted any substantive information about the project's progress on the ground, the history of the field, or the geothermal resource. Unbeknownst to investors, Ormat's largest project was being undertaken with great risk as it was essentially contingent upon the Company being able to accomplish a task that other companies had previously undertaken and failed miserably.

132.   Geothermal energy is derived from naturally-occurring high temperature water or steam that sits in reservoirs deep below the Earth's surface.   These resources can be extracted through geothermal wells, known as production wells.   The extracted hot water (also called "brine") or steam can be used to drive a turbine and produce electricity.   The system used in North Brawley is known as a binary system.   In this approach, the extracted geothermal fluid is passed through a heat exchanger, where it heats a second liquid – such as isopentane or isobutane – in a closed loop.   These secondary liquids boil at a lower temperature than water, so it is more easily converted into steam to run the turbine.   The cooled geothermal fluid is re-injected back into the reservoir through a different well, called an injection well.   Geothermal energy is considered a renewable natural resource, because the geothermal fluids that are re-injected back into the earth can be naturally reheated and used again in the future.

133.   Development of the known geothermal resource area around the Salton Sea, where North Brawley is located, began long ago in the 1960s.   The geothermal area has a very high dissolved silica content, which has historically caused problems in both geothermal plant

equipment and re-injection equipment. From the start, geothermal projects in the area were abandoned due to problems of scaling and corrosion.

134.    In 1980, Southern California Edison constructed a 10MW experimental plant at North Brawley, with the steam gathering operated by Unocal. At the time, the decision was made to build only a 10MW plant instead of a 50MW or 100MW plant due to the technical risks associated with producing, handling and re-injecting the high salinity brines. However, even the 10 MW plant ran at only 35% of that expected capacity and was decommissioned in 1986 due to corrosion, reservoir uncertainties, and complications with the high salinity brines. To handle the high salinity brines, the system required maintaining dissolved solids in the solution. The disposal of these brines into the injection wells caused loss of injection capability. Damage occurred in the injection wells and they became plugged. The North Brawley field remained idle during the next twenty years until Ormat began to develop the ill-fated area in 2006.

135.    Based on public records of Ormat leases and well sites in North Brawley, Plaintiffs are informed and believe that the current site of Ormat's North Brawley plant is located in extremely close proximity to the abandoned SCE/Unocal plant site, and many of the wells are on the same land.

136.    Therefore, it is not surprising that Ormat would encounter problems at the North Brawley plant that are similar to those SCE and Unocal faced 25 years ago. Plaintiffs are informed and believe that by the start of the Class Period Ormat was already encountering problems/issues with sand and was trying to cope by bringing in sand removal equipment, because a recent "Amendment of Conditional Use Permit 07-0017" submitted by Ormat on February 12, 2010, to the Imperial County, Planning/Building Department, indicates that: "*As noted in the Request for Amendment to CUP #07-0017 in May 2008, all production wells will*

-47-
CONSOLIDATED AMENDED COMPLAINT

*have a sand separator system*.  Ormat would like to clarify that injection wells may be (sic) also

have a sand separator/filtration system."  (Emphasis added)[2]

137.    In addition to having to bring in sand separators, construction was being disrupted

because Ormat was having to go back and re-test and re-drill wells.

138.    As a result, during 2008, Ormat was several months behind schedule.  According

to CW#1,[3] Ormat was behind schedule on the North Brawley project in "getting the wells in" by

at least several months:

(a)    While CW#1 was not involved with drilling or testing of wells, he was

knowledgeable of and familiar with the extent of the delays because, as an electrical contractor,

the delays were a big deal for the contractor.  CW#1 indicated that CW#1 tracked Ormat's

progress and slippage closely because of the way the contract CW#1's company had with Ormat

was written.  CW#1 explained that there were liquidated damages if certain milestones were

missed and that Ormat's work was driving the contractor's work as the contractor was missing

milestones due to Ormat's failures.  CW#1 had to track what Ormat was doing and the delay

closely to not only keep the contractor clear but also because the contractor was similarly entitled

to bonus provisions in the contract if the contractor met the dates in the contractor's contract.

(b)    CW#1 recalled that, although Ormat had plans for a certain number of wells for

the site and originally projected a completion date of at least November 2008 or earlier, by

September 2008 Ormat had fallen increasingly behind on well drilling and construction, as

CW#1 indicated that only approximately a third of the wells had been installed.  At that time,

CW#1's assessment was that it would take until June 2009 to complete the wells.  CW#1

---

[2]  The Company's Conditional Use Permit ("CUP") relating to North Brawley (*i.e.*, CUP #07-0017) had originally been submitted in 2007.
[3]  CW#1 worked on the North Brawley project.  CW#1 was employed by a company contracted to lay electrical conduit lines for the wells from February 2008 through September 2008 (and left the company he was working for while the project was ongoing).  CW#1 worked as a scheduler handling project-cost controls.

indicated that this assessment was based on looking at the rate Ormat was going and Ormat having to build well pads so the contractor could take electrical conduit to the pads. As such, CW#1 was tracking when Ormat would finish the pads.

139.    CW#1's account is independently corroborated by certain information available about wells drilled by third-party drilling companies.  These records indicate that Ormat faced significant problems with drilling in the summer of 2008, causing delays far beyond what is normal.  Three wells, two of which were injection wells, took unusually long to complete – wells 78-16, 41-21, and 45-21.  Ormat stated in its application for its conditional use permit on the Brawley 2 project that the typical drilling process was sixteen days, and difficulties encountered could cause the time required to double.  However, each of these three wells took over 100 days to complete start to finish.  This is *over six times the usual time frame for well drilling* and indicative of the serious problems the Company was dealing with in the summer of 2008.  In addition, as a result of these delays in completing these wells, Ormat fell far behind with respect to a reasonable drilling schedule that could be completed by the end of 2008.   For instance, drill Nabors 57 was scheduled to complete four wells from September 2008 through February 2009. All the while, the Company continued to announce the project was on schedule.  Further compounding the issues with the construction and drilling for North Brawley was the fact that, as later admitted after the Class Period, Ormat "had a very aggressive completion schedule for that plant for very obvious reasons which were the remaining time horizon on the [production tax credit ("PTC")] at the time that the plant was released and the completion schedule was to be online by the end of December 2008."

140.    At the time, completing the necessary construction and drilling on the Company's "aggressive" schedule was even further hindered by the difficult operating and cost environment.

The Company subsequently admitted after the Class Period that "in terms of constructing a new plant on an aggressive schedule, 2007 and 2008 were probably the worst time to build such a facility" as "the market was very turbulent, equipment was expensive, labor was expensive, not the easiest of times to operate." Further, the Company indicated there had been "problems with the quality of equipment that was provided by third-party suppliers" which was simply one of "the signs of building in a turbulent market."

141. Despite the fact that the Company had to install sand separators by approximately April to May 2008, Ormat only first disclosed these problems to the public in early 2009. As the Company later admitted, the sand issue "was not something that surprised us" and that "originally [the Company] installed sand separators which were supposed to take care of this problem and each production well had its own sand separator." Additionally, the Company admitted that the sand separators "didn't do much" and "did generally nothing." As a result, Ormat admittedly had to install filters which were "not quick enough" and required "a lot of manual labor." While eventually larger filters were used and which allowed the Company to achieve a portion of the design flow rate and to keep the equipment running, it was very high cost.

142. Ormat later admitted that, as a result of the sand, "the biggest problem was that [the Company] saw a very rapid decline in the injectivity of [its] injection wells" which is a "measure that [is] use[d] to look at how much fluid can you push down the well for any given pressure on your injection pump." Further, "this was caused both by the bore hole being plugged by sand, and also near bore hole phenomenon, even once you go back into the well and clean the bore hole, something plugged the reservoir a little further away from the bore hole."

143.   It was not until February 2010 that the Company announced that the North Brawley plant had been finally placed in service.  The plant, however, was only operating at a capacity of 17-MW, well below the expected 50-MW.  While the Company acknowledged that it had made strides in handling the solids/sand issue via temporary measures, Ormat indicated that it would soon be receiving permanent equipment to handle the issue more efficiently and cheaply.  The Company indicated that, even with the measures in place, injection capacity at some wells was "disappointing."

144.   Within days, Ormat filed papers with Imperial County to approve use of its injection wells from its project in East Brawley for use in its North Brawley plant because the North Brawley project had suffered from insufficient injection capacity.  A few months later, Ormat identified this additional problem as "interference issues" which "mean[s] that injecting fluid down one injection well prevents you from injecting the same amount of fluid in an adjacent well" and "this is something that you don't, it means that each well would be much better on its own then it is operating as part of 12 or 16 injection wells."

145.   As of May 2010, the North Brawley plant was only able to operate at a capacity of 20-MW.

### Defendants' Materially False and/or Misleading Statements about the North Brawley Project During the Class Period

146.   On May 7, 2008, Ormat filed its Quarterly Report on Form 10-Q with the SEC for the first quarter of 2008, which in relevant part, stated: "we estimate that the North Brawley project will come on line by the end of 2008."   Additionally, in relevant part, the Company indicated:

> North Brawley Project: The construction of the North Brawley project is currently under way.  Once completed, it will deliver approximately 50 MW of power generation under an existing power purchase agreement with Southern California Edison.  Drilling started in February 2007. Construction work is at an advanced

stage and the key power plant equipment has arrived at the site.  We expect the construction to be completed by the end of 2008.

147.     The statements referenced in the immediately preceding paragraph were materially false and/or misleading because:

(a)     The statements created the materially misleading impression that Ormat currently remained on its schedule to have the North Brawley project online by the end of 2008 when in fact, as alleged above, Ormat was not on schedule due to issues with sand and having to re-drill wells.

(b)     Ormat failed to disclose the prior problems other companies had trying to develop the same land and the risk that the Company was facing with potential salt and sand issues.

(c)     Ormat failed to disclose that the Company was experiencing problems with sand and having to re-drill wells.

(d)     The North Brawley project has had insufficient injection capacity to achieve full production.

(e)     Due to sand issues, it was not possible for Ormat to get the North Brawley plant online at or near full capacity by the end of 2008.

148.     On this news, shares of Ormat increased $1.50 per share, or 2.86%, to close on May 7, 2008 at $54.00 per share.

149.     On August 6, 2008, Ormat filed its Quarterly Report with the SEC on Form 10-Q for the 2007 second quarter.  The filing was signed by Defendant Joseph Tenne. Therein, the Company, in relevant part, stated:

North Brawley Project: The North Brawley project will deliver approximately 50 MW of power generation under an existing power purchase agreement with Southern California Edison.  Construction work and drilling activity are at an

advanced stage and the majority of the power plant equipment has arrived at the site. We expect the construction to be completed by the end of 2008.

150. The statements referenced in the immediately preceding paragraph were materially false and/or misleading because:

(a) The statements created the materially misleading impression that Ormat currently remained on its schedule to have the North Brawley project online by the end of 2008, when in fact, as alleged above, Ormat was not on schedule due to issues with sand and having to re-drill wells.

(b) Ormat failed to disclose the prior problems other companies had trying to develop the same land and the risk that the Company was facing with potential salt and sand issues.

(c) Ormat failed to disclose that the Company was experiencing problems with sand and having to re-drill wells.

(d) The North Brawley project has had insufficient injection capacity to achieve full production.

(e) Due to sand issues, it was not possible for Ormat to get the North Brawley plant online at or near full capacity by the end of 2008.

151. On this news, shares of Ormat increased $1.40 per share, or 3.01%, to close on August 6, 2008 at $47.58 per share.

152. Due to the implications for the PTC, Ormat's indication that it remained on schedule to have its North Brawley plant online by the end of 2008 was important to investors. As noted in an analyst report issued by Avondale Partners on August 7, 2008, "***Brawley is the key project from our perspective as it must be online by year end to qualify for the PTC, assuming no extension***." (Emphasis added)

153.    Similarly, an analyst report issued on October 18, 2008 by Stanford Group stated: "We believe Ormat will most likely monetize the 50MW Brawley development scheduled to come online before the end of the year . . . We believe Ormat is in late stages of negotiating a tax monetization deal for the 50MW Brawley power plant the company should bring on by the end of the year."

154.    On November 5, 2008, Ormat filed its Quarterly Report on Form 10-Q with the SEC for the 2008 third quarter, which, in relevant part, stated:

> North Brawley Project: The North Brawley project will deliver approximately 50 MW of power generation under an existing power purchase agreement with Southern California Edison.  Construction work and drilling activities are proceeding in parallel with the project's start-up phase.  We expect to complete these activities by the end of 2008.

155.    On November 6, 2008, Ormat held a conference call to discuss the Company's results for the third quarter of 2008.  Defendants Yehudit Bronicki and Joseph Tenne were present.

156.    During the November 6, 2008 conference call, Defendant Yehudit Bronicki stated, in relevant part:

> We completed our first owned small project in New Zealand, and are moving closer to commercial operations of the Olkaria and North Brawley power plants. This will bring our portfolio to approximately 500 megawatts by the end of the year, an increase of approximately 100 megawatts from last year. . . .
>
> *        *        *
>
> In addition, the 50 megawatt North Brawley Project is in final stages of construction. Construction and drilling activities are proceeding in parallel with the project startup phase.  We expect to complete these activities by the end of 2008 as well. . . .

157.    Additionally, in the slide presentation accompanying the November 6, 2008 conference call, Ormat stated, in relevant part: "Satisfactory resource support for the 50 MW North Brawley project."

158.   The statements referenced in the preceding paragraphs (¶¶154,157) and the statements during the November 6, 2008 conference call (¶156), which were left uncorrected by Defendant Tenne, were materially false and/or misleading because:

(a)      The statements created the materially misleading impression that Ormat currently remained on its schedule to have the North Brawley project online by the end of 2008 when in fact, as alleged above, Ormat was not on schedule due to issues with sand and having to re-drill wells.

(b)      Ormat failed to disclose the prior problems other companies had trying to develop the same land and the risk that the Company was facing with potential salt and sand issues.

(c)      Ormat failed to disclose that the Company was experiencing problems with sand and having to re-drill wells.

(d)      The North Brawley project has had insufficient injection capacity to achieve full production.

(e)      Ormat was not in its "final stages" of construction.

(f)      Due to sand issues, it was not possible for Ormat to get the North Brawley plant online at or near full capacity by the end of 2008.

159.   Given Ormat's repeated assertion that the North Brawley plant would be done by the end of 2008, including such assertions as recent as November 2008, by late February 2009, the lack of any update from the Company on the North Brawley plant caused one analyst from Avondale Partners to raise some concern. In a report issued on February 24, 2009, the analyst remarked:

> Further, **with no update on the start up of the 50 MW North Brawley plant** and continued weak oil prices impacting Puna's economics, Power Sale revenue

guidance could prove disappointing. In spite of the potential for below-consensus guidance, and barring material operational issues, we believe the long-term story remains intact with excellent assets and a highly visible growth plan…. Estimates may be at further risk due to the delayed start of North Brawley and weakness in fuel oil prices (Puna). This combination could result in Power revenues as much as $20 mm less than our estimate. However, some offset come from better than projected Product Sale revenues…. We will look for updates on project development, ***most importantly the start date of the 50 MW North Brawley plant which we forecast to contribute $32 mm of revenue and $19 mm in 09 EBITDA. This large plant was expected to start in late 2008, but to date, we have no update on its status***."

(Emphasis added)

160.   On February 25, 2009, the Company partially disclosed the existence of sand issues with the North Brawley plant that had prevented it from being operational at that time. That day, Ormat issued a press release titled "Ormat Technologies Reports Record Fourth Quarter 2008 and Year-End Results."  Therein, the Company, in relevant part, stated: "In our Electricity Segment, we have substantially completed the construction of several projects that have increased our generating portfolio by 109 MW to 505 MW. This organic growth includes: . . . the 50 MW North Brawley project, which reached the start up phase and will ramp up gradually with full capacity expected in the second quarter of 2009."  This was the first indication of any delay in the North Brawley plant's planned 50MW output.

161.   Later on February 25, 2009, Ormat held a conference call to discuss the Company's results for the fourth quarter and full-year of 2008.  This was the first time the Company made any mention of the sand problem faced at North Brawley.  Defendant Yehduit Bronicki stated, in relevant part:

> We also substantially completed the construction of the 50 megawatts North Brawley and expect a gradual ramp up of the project with full capacity in the second quarter of 2009.  The slow ramp up is driven mostly by larger than expected quantities of sand within the geothermal reservoir.  Experience shows that (solids) production gradually declines over the life of the well.  However, during the initial operations the removal requires more care in order to safeguard the injection well.

162.    In a report issued on February 26, 2009, Avondale Partners noted: "The company reported strong Q4 results, though 2009 guidance was light due to delays at North Brawley and lower fuel prices. . . . ORA has delayed startup of several facilities in development, including 50 MW at North Brawley (full output in Q2 09).  Previously slated for 2009, the 30 MW East Brawley plant will now start in late 2010 . . . North Brawley (50 MW) - Originally scheduled to reach full capacity by the end of 2008, North Brawley is currently operating at roughly 20% and is now expected to reach full output during Q2. Delays in startup relate to chemistry of the fluids which will likely improve over the life of the well."

163.    On March 2, 2009, Ormat filed its 2008 Form 10-K.  Therein, the Company provided more details on the problems faced at North Brawley and, in relevant part, stated:

> The North Brawley Project: The North Brawley project is located in the Brawley KGRA in Imperial County, California.  The project utilizes a binary system and has a generating capacity of 50 MW. The binary system consists of five identical OEC [Ormat Energy Converters] units, which utilize water cooled condensers. The project will sell its electrical output to Southern California Edison under a 20-year power purchase agreement.  Construction of the project was substantially completed in December 2008. During the start-up testing we have encountered larger quantities of sand in the geothermal reservoir than initially expected, which required modification of the power plant.  As a result, commercial operation of the power plant and sale of power in commercial quantities is currently expected in the second quarter of 2009. Until then the plant is expected to run at partial load.
>
> *        *        *
>
> Capital Expenditures . . . In addition, in order to finalize the construction of the North Brawley project we plan to invest in such project approximately $25.0 million in 2009.

164.    On May 11, 2009, Ormat filed its Quarterly Report with the SEC on Form 10-Q for the first quarter of 2009.  Therein, the Company, in relevant part, stated: "In addition, in order to finalize the construction of the North Brawley power plant we plan to invest approximately $35 million in such power plant in the rest of 2009."

165.    Later on May 11, 2009, Ormat held a conference call to discuss the Company's results for the first quarter of 2009.  On this call, the Company explained with more detail how the sand problem was affecting operations.  The Company again pushed the operation date further back.  President and COO Yoram Bronicki stated, in relevant part:

> We have continued work in North Brawley and have updated our forecast to reaching full capacity towards the end of the third quarter, a three-month delay from our previous schedule.  As we noted in February, we have encountered a higher than expected solid content in our geothermal fluid, which leads to limitation on injection capacity.  During this quarter, we have successfully implemented mitigation measures in the surface equipment, which will be coupled with modification to the completion of existing injection wells and drilling three shallow injection wells.  We expect that this will provide us with the required injection capacity, and hence power generation.  One of these shallow wells is already complete, and we are proceeding with the drilling of the other two.  The increased cost of North Brawley was taken into account in the CapEx guidance we give for 2009.

166.    On the same conference call, President and COO Yoram Bronicki responded to an analyst's question on North Brawley:

> [Question from Analyst]: First, just on North Brawley, it was an incremental three months delay there. What's sort of the confidence level as to the start-up now at the end of Q3, just given the delays we've seen to date?  And if you could just give us a little bit more color just on the specific issue with the solids, if you've seen this anywhere else and how are you - what sort of mitigation plan you're actually putting into place?

> [Answer from President and COO Yoram Bronicki]: I think that we're fairly confident and I think that it's hard for me to tell you any more than that. I think that as soon as the plant is operating we'll probably notify the world on that. But we're fairly confident that we understand the situation and the challenge is just the high inertia of these problems that - after you've understood the problem, or let's say that after you've developed a hypothesis on what the problem is, it does take a number of months to source the equipment and sometimes you also need permitting; but just sourcing the equipment and putting in place until you can see the results.  And the problem that we have is not unique to North Brawley, but I think that the magnitude is probably unique.  I think that we see this - we've seen this in sandy wells everywhere, but in most cases our fields were diverse enough for the problems to be more localized to specific wells and not to have such a big impact; where in North Brawley just the nature of the field is one that where the problem is fairly uniform.  And so that's the general question. In terms of being a little more specific, the issue is both the large particulates and small particulates

that are produced with the produced fluids. And then some that get dislodged even in the injection well bore.  And because we're dealing with both the large particulates and the small particulates and because they come from two separate sources, our solution does require, if you like, it's an involved solution that addresses both the upstream part, capturing it and getting a greater sum of the particulates just by the production well and then disposing or removing some of the particulates just before injection and then a different completion of the injection well to make sure that neither particulate can plug injection.

167.    Later on August 6, 2009, Ormat held a conference call to discuss the Company's results for the second quarter of 2009.  Again, the Company announced a delay of energy production at North Brawley.  Defendant Yoram Bronicki stated, in relevant part:

Since our last call, we have been working to resolve the injection challenges in our North Brawley project.  Throughout the quarter we have been re-drilling our injection wells using a completion that we believe is far less susceptible to long-term damage from being trained solids in the geothermal brine.  We expect this work to continue through the third quarter.  In parallel we have been – we have continued to test different methods to remove large quantities of sand from the geothermal brine.  Based on those results, we are now sourcing and installing these control devices throughout the brine system and expect to control our total flow within the next four months with the plant ramping up gradually starting in October. . . .

*       *       *

The fine line in my statement that we will - we hope to control all the brine flow in four months, meaning that we'll have full growing capacity and therefore full generation. . . .

*       *       *

[I]f you imagine a system where the production wells produce sand, and fairly substantial quantities of sands.  We are talking dozens of pounds per hour of sand that is being produced by each well.  Then clearly that sand won't be missed on the production zone, but if it gets into an injection zone, it's not the greatest thing to have, because you are basically, it's as if you are pouring sandbags into your injection well.  And intuitively, you would understand that this would cause grief.  And so first, we're trying to get the sand out of the hot water as best we can, to reduce the number of bags that we pour into the injection well.  But then once the sand is in the injection well, we need to design the well in a way that the clean-up process would be the most efficient, so that whatever sand did make it into the well could be taken back out.  And it won't be stuck between the well bore and the reservoir, because once it gets out of the casing, or out of the liner, it's very hard to pull it back out.  And this requires a slightly different completion in the injection

zone itself, moving from a slotted liner to a solid liner with perforations that is less susceptible.  So that's fairly standard - a fairly standard solution, and each carry slot liner has its advantages and it allows for a higher injectivity, on the other hand it's not as easy to clean.  At least not in our situation. But that's fairly standard. . . .

*     *     *

The issue that we had is mostly – removing sand from water, it's something that doesn't require, it doesn't require breakthrough in technology.  The problem that we have is that the type of water, the temperatures and the pressure that we work in on the geothermal side is not what you typically have in commercially available water treatment system.  We're just too hot for that.  And so the problem that we have is that we're, as we are experimenting or trying to fine tune different control devices, we can't enjoy anything that is off the shelf and everything is special orders.  So it's really a development project that in an ideal case should be done before you build your full-fledged facility.  And this is very unfortunate in the case of North Brawley.  But whatever is done there would be applicable for East Brawley and on East Brawley, we have the time looking at the completion at the end of 2010.  We would have the time to special order almost anything to deal with it and this is why we don't think that – we don't – let me put it this way.  We think that we understand that the issue is the sand.  We know that sand can be removed and therefore we don't see this is being on a critical path for East Brawley.

168.    On November 5, 2009, Ormat held a conference call to discuss the Company's results for the third quarter of 2009.  Again, the North Brawley plant was delayed due to the sand issue in the injection wells.  President and COO Yoram Bronicki stated, in relevant part:

Since our last call, we have continued to manage the injection challenges in North Brawley.  As we described in our last call, we have tested different methods to remove the large quantities of solids from the geothermal brine and based on the success of the one-month test of a single well, we ordered equipment to replicate these measures on multiple wells.  If successful, the equipment that we currently have on order would allow us to treat about 70% of the total flow by year-end and based on the current delivery schedule, we anticipate to have the equipment to control all of the flow during the first quarter of 2010.

169.    Later on the conference call, Defendant Yehudit Bronicki responded to an analyst's question on North Brawley:

[Question from Analyst]: And you're saying that so by the end of 2009 that you think it will be placed in service?

[Answer from Defendant Yehudit Bronicki]: It's our expectation, yes.

170.    Although the statements in ¶¶160-161, 163-169 partially revealed the problems Ormat was having with sand issues, the statements were nevertheless materially false and/or misleading because they failed to disclose that, as the Company subsequently admitted even with the solids in check, the injection capacity of the wells was insufficient to bring the plant to its rated design due to interference issues.

171.    On February 9, 2010 Ormat issued a press release titled "North Brawley Power Plant Placed in Service; Currently Generating 17 MW."  Therein, the Company, in relevant part, stated:

> Ormat Technologies, Inc. (NYSE: ORA) announced today that its North Brawley power plant in California has been placed in service and is currently operating at a stable capacity of 17 MW.
>
> As previously disclosed, while the Company believes that the North Brawley reservoir is sufficient to support the 50MW output, the re-injection of the geothermal fluid has been a challenge due to the exceptional amount of un-dissolved solids in the geothermal fluid.
>
> During the last few months the Company has made substantial progress in its ability to manage the solids production by installing temporary measures.  As a result, the Company is now able to maintain a stable generation level of 17 MW, while awaiting the arrival of permanent equipment for the solids handling.  The Company believes that the permanent equipment will provide both a higher efficiency and lower operating cost for the facility.
>
> ***However, it appears that even with the solids in check, the injection capacity of some of the wells is disappointing and the Company is evaluating how to increase the injection capacity and bring the plant to its rated design***.
>
> The Company plans to request the power purchase agreement off taker to extend the firm operation date to the end of the year, which it expects allows sufficient time to bring the power plant to its design capacity of 50MW.
>
> Because the Company expects to incur additional capital expenditures to fully resolve the operational issues described above, it has temporarily deferred submitting an application for the ITC cash grant for the project. The cash grant is expected to be more than $100 million.

(Emphasis added)

172.     Ormat had been aware that even without the sand issues, the injection capacity was insufficient and had already prepared an action plan.   Thereafter, on February 12, 2010, Ormat submitted an "Amendment of Conditional Use Permit 07-0017" with the Imperial County, Planning/Building Department.  In a detailed report contained therein, the Company indicated its intention to use four specific wells from the East Brawley Geothermal Exploration Project for the North Brawley plant.  Therein the Company, in relevant part, stated:

> These four wells are numbered 62-15, 62A-15, 65-15, and 65A-15.  However, after evaluating these wells and the well issues at the North Brawley Geothermal Development Project, Ormat would like to use these four wells as injection wells for the North Brawley Geothermal Development Project (CUP #07-0017).  ***In part, this is necessary because the North Brawley project has had insufficient injection capacity and the addition of these wells for injection will to assist with the injection process for helping North Brawley more expeditiously achieve full capacity***.  (Emphasis added)[4]

Thus, Ormat's North Brawley project was in such disarray that the Company had resorted to cannibalizing its East Brawley project to try and resolve the problem with insufficient injection capacity at North Brawley.

173.     On February 25, 2010, Ormat held a conference call to discuss its financial results for the fourth quarter and full-year 2009.  Defendant Yehduit Bronicki stated, in relevant part:

> As we have recently disclosed, the North Brawley power plant has been placed in service in mid-January. The decision was preceded by a series of experiments that proved that the plant can operate long term at commercial loads.  Over the past months, we have seen considerable improvement in the quality of the produced geothermal fluid, especially from the longer running wells, and we were successful in devising means to prevent the produced solids from contaminating the rest of the system.  We have installed temporary filtration in all of our injection wells and identified qualified vendors for our filtration needs.  We were also successful in developing efficient ways to clean our injection wells as they clog up over time. The results of these efforts allowed us to inject treated brine, as much as 40% of the nominal flow, with the ability to generate over 17 megawatt.  Based on our experience so far, we believe that the production field can support the design capacity of 50 megawatt, and that ***the main issues that have not been resolved yet are the injectivity index in most of our injection wells that is too low even on***

---

[4] This information, however, was later made available *via* a public notice on May 25, 2010.

*what we believe are clean wells and treated brine*.  And despite our effort to expedite the procurement of permanent solid removal equipment, we are now looking at the late Q1 installation of the first unit and we hope that they will alleviate the need to procure large quantity of disposable cartridges.  We have developed a plan that would help us address these issues.  And it is comprised of better solids removal equipment, *resolution of the injection capacity through well improvement or addition of wells, and modification of the service equipment. The extent of the implementation will be determined by the success of each of the steps and may require an additional investment of $15 to $30 million*.

With the continued delay in getting the construction permits for East Brawley, we are now scheduling the project for 2012.  The delay will enable us to implement our learning from North Brawley in the East Brawley design.

(Emphasis added)

174.    In a March 3, 2010 Globes Online interview, with respect to North Brawley, Defendant Yehudit Bronicki stated: "There are phenomena in the geothermal field in the area that we have not met with at any other plant.  This is a very serious technological challenge, and it took us a long time to find solutions to the problem, which we are now implementing."

175.    On March 8, 2010, Ormat filed its 2009 Form 10-K.  The Company's Form 10-K, in relevant part, stated:

The North Brawley power plant is not operating at full capacity due to injection challenges we are experiencing. . . .

*           *           *

In February 2010, we announced that the North Brawley geothermal power plant in California has been placed in service and is currently operating at a stable capacity of 17 MW. We plan to request the PPA off-taker to agree to an extension of the firm operation date to the end of the year.  This extension would give us time to bring the power plant's generation to its full design capacity of 50MW. . . .

*           *           *

On January 15, 2010, the power plant was placed in service and it is currently generating at stable level of 17 MW.  While we believe that the power plant's reservoir has sufficient flow to support the 50 MW output, the re-injection of the geothermal fluid has been a challenge due to the existence of an exceptional amount of sand in the geothermal fluid.  We have made substantial progress in our ability to manage the large quantities of sand in the reservoir by installing certain

temporary measures for handling solids.  As a result, we are able to maintain a stable generation level of 17 MW, while awaiting the arrival of what is expected to be permanent equipment for the solids handling.  The permanent equipment is expected to provide better efficiency as well as a lower operating cost for the facility.  However, it appears that even with the solids in check, the injection capacity of some of the wells is disappointing and we are evaluating how to gradually bring the injection capability to its design capacity.  We plan to request the power purchaser to agree to an extension of the firm operation date to the end of the year.  This would give us more time to bring the power plant's generation to its full design capacity of 50 MW.  We have temporarily deferred submitting an application for the ITC cash grant for the project. The cash grant is expected to be more than $100 million.  The power plant currently has an interim transmission agreement with IID [Imperial Irrigation District].  A transmission study expected to be released shortly will allow IID to enter into a permanent transmission agreement.

(Emphasis added)

176.    On April 9, 2010, Ormat held its Analyst & Investor Day Meeting.  In connection with its presentation, Ormat provided certain slide-show materials including a slide titled, "Case Study 2 - North Brawley 'The Perfect Storm.'"  The additional material on "Case Study 2" included a slide with the heading "Challenges" that states "Little operational data on the field." Another slide with the heading "Startup Issues" included a bullet point indicating "Rapid decline in the ability of the injection wells to take fluid.  Identified as both borehole and near bore hole plugging."  Another slide with the heading "Analysis of Injection Problem" stated, "After a year of analysis our conclusion is that there were 2 factors in play: Solids (sand) issue; Interference Issues."  Another slide with the heading "Path Forward" listed three bullet points: "Additional solids mitigation;" "Injection well spacing;" and "East Brawley and Future projects."

177.    During the April 9, 2010 presentation, the Company noted that, after a period of extensive testing, approximately three weeks earlier it had gotten the first unit of new equipment to allow Ormat to effectively address the sand issues at North Brawley that it had been fighting for nearly two years.  With the sand issue now relatively under control, Ormat finally provided a more colorful explanation of the problems it had been trying to overcome:

It is not very complicated from a chemistry perspective, though it's not the easiest resource, but it is certainly complicated in terms of where the production is from – wells or well field that is not very stable, and tends to produce large quantities of solids, and also very high content of gas in the produced fluids that complicated a lot of the well field and a lot of the plant.

\*       \*       \*

***The other issue is that we had a very aggressive completion schedule for that plant for very obvious reasons which were the remaining time horizon on the PTC at the time that the plant was released and the completion schedule was to be online by the end of December 2008***.

\*       \*       \*

So when you translate this into what are the challenges that came from this – first of all, again, to go back to the previous presentation, we have very little information about the field, very little operational information about the field – in our case, no information about the field, and there could be a host of surprises. The high gas content I have mentioned.  ***And the other part is that in terms of constructing a new plant on an aggressive schedule, 2007 and 2008 were probably the worst time to build such a facility.  The market was very turbulent, equipment was expensive, labor was expensive, not the easiest of times to operate***.

\*       \*       \*

And then we came into our start-up issues. And we had teething problems with the gas handling equipment.  This is again on a scale this was on that was never done before, certainly not by us. And so these were the issues.  We had some minor problems that are always a headache, but some problems with the quality of equipment that was provided by third-party suppliers.  Again these are the signs of building in a turbulent market.  Typically you pay two penalties.  Prices are high and quality suffers.  ***But then the biggest problem was that we saw a very rapid decline in the injectivity of our injection wells.  The injectivity is really a measure that we use to look at how much fluid can you push down the well for any given pressure on your injection pump.  And what we were able to identify and this of course takes time, were able to identify that this was caused both by the bore hole being plugged by sand, and also near bore hole phenomenon, even once you go back into the well and clean the bore hole, something plugged the reservoir a little further away from the bore hole***.

\*       \*       \*

About a year after that, we now know that we really had two issues in the operations of the North Brawley well field.  The first is the solids. You can call it sand, it's not, technically it's not just sand, but it's anything from sand to clay. And the solids that are carried, mostly carried from the production zone into the

CONSOLIDATED AMENDED COMPLAINT

injection zone through the brine. ***But you also had interference issues.  And by interference issues, we mean that injecting fluid down one injection well prevents you from injecting the same amount of fluid in an adjacent well.  And this is something that you don't, it means that each well would be much better on its own then it is operating as part of 12 or 16 injection wells***.

                              *        *        *

Today we think the sand issues are something that we have a fairly good control over and I'll present that in a picture. We still need to handle the sand itself, but we have technical solutions to do this.

                              *        *        *

[displaying picture of vaporizer with accumulation of sand inside]: not good for the equipment and certainly not good for operation.... the trouble is what happens if it goes past the equipment and lodges in the injection wells.

                              *        *        *

***This is not something surprised us and originally we installed sand separators which were suppose to take care of this problem and each production well had its own sand separator but the sand separators*** that operated so well, or relatively well in Heber and Ormesa on fields that are not very different from the North Brawley field or at least not, we did not think that were that different, they didn't do much in Brawley or did generally nothing. And what we had to do was to go ahead and install filters. And what you can see here is a big housing, a steel vessel...  [describing a picture of a filter]

                              *        *        *

***And so our first step was to really test our assumption that the problem is the sand carrying through the facility not being removed at all or not enough in the sand separators and that if we could filter that sand, we could get reasonable life out of our injection wells. And as hard as it was to run this experiment, it was very clear that it had a positive impact on the operation of the injection wells. And then we multiplied this and added this equipment. First just the likewise equipment, but to allow to filter large flows, large volumes of injection fluid. But that required a lot of manual labor and was not quick enough. And so we changed the design of the filters. Again, as a makeshift solution, but we changed the design of the filter and you can see here the filter is an installation and these are the filters in operation and you can see that we moved in to big canisters***... [describing a picture of the canister and filter housing].

                              *        *        *

This generally allowed us to reach 25 MW filter, about at times about half the design flow rate of the facility and keep the injection wells running, keep the

CONSOLIDATED AMENDED COMPLAINT

equipment running.  *But at a very high cost.  And throughout that time we were looking for techniques that would allow us to remove the sand not through disposable element which is the filter, but in something that is more suitable for a plant that we would like to run for many, many years*.

\*     \*     \*

Three weeks ago, roughly three weeks ago [early April 2010] after an extensive period of testing, we got the first unit of a hydrocyclone, or high efficiency cyclone installed. And this is a system that has no disposable parts, its similar to the sand separators you saw in the first picture, but in this case the acceleration is much higher in each of the elements and the sand is actually being dropped out of the liquid and into this tank without any operator intervention … [describing the hydrocyclone].... we remove hundreds of pounds of sand....

\*     \*     \*

Basically after about a year's work[5], we now have very high confidence that we got the sand part under control. Again it allows us to generate about half of the capacity, costs about half of the generation of Brawley. What we need is to handle interference, and the way that interference needs to be handled is we just need different spacing for our injection wells, or this is our hope. You know, everything has to be qualified. It's the result at the end that shows that the assumption was correct. But we think is that we need different spacing on our injection wells, and this would allow us to get to full capacity.

\*     \*     \*

And again, if there's a lesson in it, it's how complicated development of a Greenfield resource is. It is certainly manageable. But you need certain, you need critical mass in order handle such complexity. And we certainly learned from this. But I think that other people could also learn from this how easy, somebody claims that he's going to develop a field that day produces nothing, and will be either 50 MW or 100 MW or 150 MW in a very short time span, this could happen, but there are many things that can be learned and that can happen, and therefore it might not happen, certainly not happen the way that it was originally anticipated.

\*     \*     \*

---

[5] Notably, couched within the statement that "after about a year's work" is the suggestion that Ormat has only been working on this issue since it first disclosed the problem in February 2009 (*i.e.*, slightly more than 1 year prior), in order to avoid admitting that the Company was actually well aware of this issue nearly two years prior when it took action to address the issue and failed to disclose the problem until February 2009. In a preceding statement, Ormat indicates that it was not surprised by the problem and that it had installed sand separators which "were supposed to take care of this problem." As noted above, as early as May 2008, the Company admitted in documents filed with the Imperial County Planning/Building Department, that all production wells would have sand separators.

CONSOLIDATED AMENDED COMPLAINT

All this work could have been done and would have been much less painful, could have been done in a slower development process of that well field. Our hydroclone, this is not, we haven't invented anything, but it's not an off-the-shelf item. And it we required testing on a pilot unit before the designer or the supplier could size it to our conditions. And it took, we started that in I believe October or September, and we got the first unit in the middle or the end of March. So that, this gives you a timeframe, again in a slower development process this is not so much of an issue.

*     *     *

And this reflects on East Brawley. We need to see that we can prove that we can clearly both our sand issues and our interference issues before it makes sense to build a plant like East Brawley and of course we have still permitting issues that we need to resolve in East Brawley, so North Brawley was a big challenge but I think that we have persevered in bringing the plant to where it is now and I'm sure that we will ultimately get it to where it needs to be in terms of our expectations.

(Emphasis added)

178.    The substantial complications and difficulties that Ormat experienced with North Brawley had extremely negative consequences on the Company's financial prospects and condition.  The delay in the startup and limited capacity in the North Brawley plant once operating, materially contributed to lower earnings and revenues, as well as future prospects.

## CLASS ACTION ALLEGATIONS

179.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Ormat's securities between May 7, 2008 and February 24, 2010, inclusive and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

180.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ormat's securities were actively traded on the New

York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Ormat shares were traded publicly during the Class Period on the NYSE and as of November 4, 2009, Ormat had 45,423,399 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Ormat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

181.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

183.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ormat; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

184.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

185.     The market for Ormat's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Ormat's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Ormat's securities relying upon the integrity of the market price of the Company's securities and market information relating to Ormat, and have been damaged thereby.

186.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Ormat's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Ormat's business, operations, and prospects as alleged herein.

187.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about Ormat's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

188.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

189.    During the Class Period, Plaintiffs and the Class purchased Ormat's securities at artificially inflated prices as a result of the materially false and misleading statements alleged herein.   As a result Lead Plaintiffs and the Class incurred damages.   The price of the Company's securities declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

190.    The market for Ormat's securities was open, well-developed and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, Ormat's securities traded at artificially inflated prices during the Class Period.   On June 17, 2008, the price of the Company's common stock reached a Class Period high of $54.94 per share.   Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of Ormat's securities and market information relating to Ormat, and have been damaged thereby.

191.    During the Class Period, the artificial inflation of Ormat's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ormat's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Ormat and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

192.    At all relevant times, the market for Ormat's securities was an efficient market for the following reasons, among others:

(a)    Ormat stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Ormat filed periodic public reports with the SEC and the NYSE;

(c)    Ormat regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

       (d)      Ormat was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

193.    As a result of the foregoing, the market for Ormat's securities promptly digested current information regarding Ormat from all publicly available sources and reflected such information in Ormat's stock price.  Under these circumstances, all purchasers of Ormat's securities during the Class Period suffered similar injury through their purchase of Ormat's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

194.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Ormat who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

195.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

196.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Ormat's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

197.     Defendants (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ormat's securities in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

198.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ormat's financial well-being and prospects, as specified herein.

-74-
CONSOLIDATED AMENDED COMPLAINT

199.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ormat's value and performance and continued substantial growth, which included the making, or the participation in the making, of untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ormat and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

200.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew, and/or recklessly disregarded, was materially false and misleading.

201.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ormat's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

202.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Ormat's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Ormat's securities during the Class Period at artificially high prices and were damaged thereby.

203.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding the problems that Ormat was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Ormat securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

204.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

205.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of The Exchange Act Against the Individual Defendants**

206.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

207.    The Individual Defendants acted as controlling persons of Ormat within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after

these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

208.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

209.    As set forth above, Ormat and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.


DATED: July 9, 2010                    **GLANCY BINKOW & GOLDBERG LLP**


                                       */s/ Michael Goldberg*
                                       Michael Goldberg
                                       Lionel Z. Glancy
                                       1801 Avenue of the Stars, Suite 311
                                       Los Angeles, CA 90067
                                       Telephone:  (310) 201-9150
                                       info@glancylaw.com

                                       **BERNSTEIN LIEBHARD LLP**
                                       U. Seth Ottensoser
                                       Joseph R. Seidman, Jr.
                                       10 E. 40th Street
                                       New York, NY 10016
                                       Telephone:  (212) 779-1414


                                       **SMITH & SMITH LLP**
                                       Howard G. Smith
                                       3070 Bristol Pike, Suite 112
                                       Bensalem, PA 19020
                                       Telephone:  (215) 638-4847
                                       Facsimile:   (215) 638-4867

                                       **LAW OFFICES OF MARK WRAY**
                                       Mark Wray
                                       608 Lander Street
                                       Reno, Nevada  89509
                                       Telephone: 775.348.8877

                                       *Attorneys for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING
AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of a United States District Court.  I am over the age of 18 and not a party to the within action.  My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California  90067.

On July 9, 2010, I caused to be served the following document:

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the District of Nevada, for receipt electronically by the following parties:

**See Attached Service List.**

And  by US mail to all known non-ECF registered parties.

**See Attached Service List.**

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 9, 2010, at Los Angeles, California.

*S/Michael Goldberg*
Michael Goldberg

## Mailing Information for a Case 3:10-cv-00132-ECR-RAM

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Z. Glancy**
  INFO@GLANCYLAW.COM

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com

- **Matthew B. Hippler**
  mhippler@hollandhart.com,btoriyama@hollandhart.com,lford@hollandhart.com,intaketeam@hollandhart.com,RenoFedECF@hollandhart.com,carnold@hollandhart.com,cpulsipher@

- **Tamara Jankovic**
  tjankovic@hollandhart.com,mdalluge@hollandhart.com,intaketeam@hollandhart.com

- **William M. O'Mara**
  bill@omaralaw.net

- **David C OMara**
  david@omaralaw.net,val@omaralaw.net

- **Seth Ottensoser**
  ottensoser@bernlieb.com

- **Joseph R. Seidman , Jr**
  seidman@bernlieb.com

- **Bruce G Vanyo**
  bruce@kattenlaw.com

- **Mark D Wray**
  staff@markwraylaw.com,mwray@markwraylaw.com

- **Richard Zelichov**
  richard.zelichov@kattenlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Marc L. Godino
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Ste 311
Los Angeles, CA 90067

Sandy Abraham Liebhard
.Bernstein Liebhard LLP
10 East 40th Street
22nd Floor
New York, NY 10016

Howard G. Smith
Smith & Smith LLP
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
```