1   HOLLAND & HART LLP
    Matthew B. Hippler
2   Nevada State Bar No. 7015
    mhippler@hollandhart.com
3   Tamara Jankovic
    Nevada Bar No. 9840
4   tjankovic@hollandhart.com
    5441 Kietzke Lane, Second Floor
5   Reno, Nevada 89511
    Telephone (775) 327-3000
6   Facsimile (775) 786-6179

7   KATTEN MUCHIN ROSENMAN LLP
    Bruce G. Vanyo
8   (admitted *pro hac vice*)
    Richard H. Zelichov
9   (admitted *pro hac vice*)
    2029 Century Park East, Suite 2600
10  Los Angeles, California 90067-3012
    Telephone: 310.788.4400
11  Facsimile: 310.788.4471

12  Attorneys for Defendants
    Ormat Technologies, Inc.,
13  Yehudit Bronicki and Joseph Tenne

14

15              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
16

17  WAYNE SZYMBORSKI, On Behalf of        **CASE NO.: 3:10-CV-00132-ECR-RAM**
    Himself and All Others Similarly Situated,
18                                          **NOTICE OF MOTION AND MOTION TO**
                                            **DISMISS CONSOLIDATED COMPLAINT;**
19              Plaintiff,                  **SUPPORTING MEMORANDUM OF**
                                            **POINTS AND AUTHORITIES**
20      vs.

21  ORMAT TECHNOLOGIES, INC.,              **ORAL ARGUMENT REQUESTED**
    YEHUDIT BRONICKI, JOSEPH TENNE,
22
                Defendants.
23

24

25

26

27

28

31532801

| | |
|---|---|
| PAUL STEBELTON, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ORMAT TECHNOLOGIES, INC., JOSEPH TENNE, YEHUDIT BRONICKI, YORAM BRONICKI, LUCIEN Y. BRONICKI, DAN FALK, JACOB J. WORENKLEIN, ROGER W. GALE, ROBERT F. CLARKE,<br><br>Defendants. | CASE NO:  3:10-CV-00156-ECR-RAM |
| JOHN J. CURTIS, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ORMAT TECHNOLOGIES, INC., JOSEPH TENNE, YEHUDIT BRONICKI,<br><br>Defendants. | CASE NO. 3:10-CV-00198-ECR-RAM |

31532801

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

SUMMARY OF COMPLAINT ....................................................................................... 2

I.      PLAINTIFFS ALLEGATIONS CONCERNING ORMAT'S DISCLOSURES ABOUT ITS
ACCOUNTING FOR EXPLORATION AND DEVELOPMENT COSTS ............................ 3

      A.     Ormat Makes A Reasonable Decision To Look To Oil And Gas Accounting
Literature For Purposes Of Accounting For Its Exploration Activities. ...................... 3

      B.     Ormat Tells Its Stockholders How It Plans To Account For Exploration And
Development Costs. ..................................................................................................... 5

      C.     Ormat Explains Its Method Of Accounting In Detail To The SEC's Division Of
Corporation Finance .................................................................................................... 7

II.     PLAINTIFFS ALLEGATIONS CONCERNING ORMAT'S CONSTRUCTION OF THE
NORTH BRAWLEY PROJECT. ....................................................................................... 8

      A.     Ormat Begins Construction Of North Brawley Expecting To Be Done By December
2008 But Warns Stockholders That The Project Is Subject To Various Risks ............. 8

      B.     Ormat Encounters Unexpected Problems At North Brawley That It Discloses To Its
Stockholders ............................................................................................................. 10

PROCEDURAL HISTORY AND PLAINTIFFS' THEORY OF FRAUD ....................................... 12

LEGAL STANDARD ......................................................................................................... 12

ARGUMENT ..................................................................................................................... 14

I.      PLAINTIFFS HAVE NOT ALLEGED A CLAIM UNDER SECTION 10(B) BASED ON
ORMAT'S DISCLOSURES CONCERNING ITS METHOD OF ACCOUNTING FOR
EXPLORATION AND DEVELOPMENT COSTS ............................................................. 14

      A.     Ormat Accurately Described Its Method Of Accounting For Exploration And
Development Costs. ................................................................................................... 14

      B.     Plaintiffs Cannot Allege Scienter Given Ormat's Accurate And Auditor Approved
Disclosure Of Its Accounting Policy. ........................................................................ 16

            1.     Ormat's Explicit Disclosures That It Had Abandoned Certain Sites And The
Lack Of Any Motive From The Alleged Fraud Undermine Any Inference Of
Scienter. ............................................................................................................ 17

i

2. Plaintiffs Cannot Overcome The Facts Undermining Scienter...................... 18

    a. Plaintiffs Cannot Overcome The Facts Undermining Scienter With Conclusory Allegations Concerning Ormat's Single Technical Violation Of Unclear Accounting Principles. .................................... 19

    b. Plaintiffs' Allegations That Ormat Paid Its Ordinary Dividend To All Stockholders Does Not Establish A Motive To Defraud. ................... 21

3. Plaintiffs' Allegations As A Whole Demonstrate That Defendants Did Not Act With Scienter. .......................................................................... 23

II. PLAINTIFFS HAVE FAILED TO ALLEGE A SECTION 10(B) CLAIM BASED ON ORMAT'S STATEMENTS CONCERNING NORTH BRAWLEY. .................................... 23

    A. Ormat's Statements Concerning North Brawley Are Protected By The Reform Act's Safe Harbor For Forward-Looking Statements. .......................................... 25

        1. Ormat's Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language Warning Its Stockholders That There Were Risks Attendant To Its Development And Construction Of The North Brawley Project. ...................................................................................... 26

        2. Ormat Did Not Have Actual Knowledge That It Would Be Unable To Complete The North Brawley Project By December 2008. .......................... 28

            a. The CAC Makes Clear That Ormat (And Others) Believed In The Viability Of The North Brawley Project. .............................................. 29

            b. Plaintiffs' Claim That Ormat Had Actual Knowledge That It Would Not Complete The North Brawley Project By December 2008 Constitutes Little More Than Speculation. ......................................... 30

                (1) Plaintiffs Cannot Rely On Unfavorable Results At A Different Project Three Decades Ago To Establish Actual Knowledge. 31

                (2) Plaintiffs Cannot Assume That Ormat's Ordinary Installation Of Sand Separators Demonstrates That It Knew It Would Not Complete The North Brawley Project In 2008. ...................... 31

                (3) Plaintiffs Cannot Rely On A Confidential Witness Who Never Worked For Ormat And Admittedly Knows Nothing About Drilling Or Testing Of Geothermal Wells. ............................. 32

                (4) Plaintiffs' Discussion Of Vaguely Described Third Party Drilling Reports Does Not Show That Ormat Knew Its Estimated Completion Date For North Brawley Was Not Achievable. .......................................................................... 33

ii

31532801

c.      Plaintiffs' CAC Considered In Its Entirety Demonstrates That Defendants Did Not Act With Scienter ............................................. 35

B.      Plaintiffs Have Not Alleged That Ormat Made Any False Or Misleading Statements About The North Brawley Project. ............................................................. 35

C.      Plaintiffs Have Not Alleged That Their Losses, If Any, Were Caused By Any Disclosures Concerning North Brawley. .................................................... 37

III.      PLAINTIFF HAS FAILED TO ALLEGE ANY CONTROL PERSON CLAIM.................. 39

CONCLUSION.......................................................................................................... 39

31532801

# TABLE OF AUTHORITIES

## CASES

Anderson v. Clow,
   No. 92-1120, 1993 WL 497212 (S.D. Cal. Sept. 17, 1993).................................................. 15

Benzon v. Morgan Stanley Distributors, Inc.,
   420 F.3d 598 (6th Cir. 2005) ............................................................................................... 16

Brody v. Transitional Hospitals Corp.,
   280 F.3d 997 (9th Cir. 2002) ......................................................................................... 15, 36

California Public Employees' Retirement System v. The Chubb Corp.,
   394 F.3d 126  (3d Cir. 2004)................................................................................................ 33

DSAM Global Value Fund v. Altris Software,
   288 F.3d 385 (9th Cir. 2002) ............................................................................................... 19

Dura Pharm., Inc. v. Broudo,
   544 U.S. 336 (2005)........................................................................................ 13, 24, 37, 38

Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. The Clorox Co.,
   353 F.3d 1125 (9th Cir. 2004) ......................................................................................... 25, 26

Gaines v. Guidant Corp.,
   No. 03-892, 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) ................................................... 18

Garfield v. NDC Health Corp.,
   466 F.3d 1255 (11th Cir. 2006) ........................................................................................... 19

Glazer Capital Management, L.P. v. Magistri,
   549 F. 3d 736 (9th Cir. 2008) ............................................................................................... 21

Gompper v. VISX, Inc.,
   298 F.3d 893 (9th Cir. 2002) ......................................................................................... 13, 16

Harris v. Ivax Corp.,
   182 F.3d 799 (11th Cir. 1999) ............................................................................................. 26

Higgnbotham v. Baxter Int'l, Inc.,
   495 F.3d 753 (7th Cir. 2007) ............................................................................................... 30

Hillson Partners Ltd. Partnership v. Adage, Inc.,
   42 F.3d 204 (4th Cir. 1994) ................................................................................................. 37

Horizon Asset Mgmt., Inc. v. H&R Block, Inc.,
   No. 08-1593, __ F.3d __, 2009 WL 2870505 (8th Cir. Sept. 9, 2009)................................. 13

In re Agribiotech Sec. Litig.,
   No. 99-144, 2000 WL 1277603 (D. Nev. March 2, 2000) ................................................... 16

In re CBT Group PLC Sec. Litig.,
    No. 98-21014, 1999 WL 1249287 (N.D. Cal. July 21, 1999) ............................................. 32

In re Credit Acceptance Corp. Sec. Litig.,
    50 F. Supp. 2d 662 (E.D. Mich. 1999) ................................................................................... 21

In re Cutera Sec. Litig.,
    __ F.3d ____, 2010 WL 2595281 (9th Cir. June 30, 2010) ............................................. 15, 25

In re Dot Hill Corp. Sec. Litig.,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ................................................................................... 38

In re DotHill Systems Corp. Sec. Litig.,
    No. 06-228, 2009 WL 734296 (S.D. Cal. March 18, 2009) ........................................... 17, 26

In re Downey Sec. Litig.,
    No. 08-3261, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ................................................. 18

In re Flag Telecom Holdings, Ltd.,
    574 F.3d 29 (2d. Cir. 2009).................................................................................................... 38

In re Foxhollow Technologies, Inc., Sec. Litig.,
    No. C 06-4595, 2008 WL 2220600 (N.D. Cal. May 27 2008) ............................................. 36

In re Geopharma, Inc. Sec. Litig.,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005).................................................................................... 21

In re GlenFed Inc. Sec. Litig.,
    42 F.3d 1541 (9th Cir. 1994) ................................................................................................. 36

In re Hardinge, Inc. Sec. Litig.,
    __ F. Supp. 2d __, 2010 WL 447397 (W.D.N.Y. Feb. 2, 2010)............................................ 22

In re Hypercom Corp. Sec. Litig.,
    No. 05-455, 2006 WL 1836181 (D. Ariz. July 5, 2006).......................................... 19, 20, 33

In re Infonet Services Corp. Sec. Litig.,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......................................................................... 27, 31

In re K-Tel International, Inc. Sec. Litig.,
    300 F.3d 881 (8th Cir. 2002) ................................................................................................. 20

In re Maxim Integrated Products, Inc. Sec. Litig.,
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................................................. 38

In re Metricom Sec. Litig.,
    Case No. 01-4085, 2004 WL 966291 (N.D. Cal. Apr. 29, 2004) .......................................... 37

In re Oak Technology Sec. Litig.,
    No. 96-20552, 1997 WL 4481868 (N.D. Cal. Aug. 1, 1997) ............................................... 36

In re Omnicon Group, Inc. Sec. Litig.,
   597 F.3d 501 (2d Cir. 2010).................................................................39

In re Redback Networks Sec. Litig.,
   No. 03-5642, 2007 WL 4259464 (N.D. Cal. Dec. 4, 2007)................................38

In re Seagate Technology II Sec. Litig.,
   No. 89-2493, 1995 WL 66841 (N.D. Cal. Feb. 8, 1995) ....................................36

In re Silicon Graphics, Inc. Sec. Litig.,
   183 F.3d 970 (9th Cir. 1999) ...........................................................passim

In re Skechers U.S.A., Inc. Sec. Litig.,
   No. CV 03-02094, 2004 WL 1080174 (C.D. Cal. May 7, 2004) .......................27

In re Splash Technology Holdings Inc. Sec. Litig.,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...................................................36

In re Stac Electronics Sec. Litig.,
   89 F.3d 1399 (9th Cir. 1996) ........................................................15, 37

In re Syntex Corp. Sec. Litig.,
   95 F.3d 922 (9th Cir. 1996) ..............................................................32

In re the Vantive Corp. Sec. Litig.,
   283 F.3d 1079 (9th Cir. 2002) ....................................................23, 29, 37

In re Wet Seal, Inc. Sec. Litig.,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...................................................17

In re Worlds of Wonder Sec. Litig.,
   35 F.3d 1407 (9th Cir. 1994) ..........................................................passim

In re Yukos Oil Co. Sec. Litig.,
   No. 04-5423, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)..............................21

Institutional Investors Group v. Avaya, Inc.,
   564 F.3d 242 (3d Cir. 2009).................................................................22

Isham v. Perini Corp.,
   665 F. Supp. 2d 28 (D. Mass 2009) .......................................................28

Kramer v. Time Warner Inc.,
   937 F.2d 767 (2d Cir. 1991).................................................................15

Limantour v. Cray, Inc.,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006).................................................33

Lipton v. Pathogenesis Corp.,
   284 F.3d 1027 (9th Cir. 2002) ..........................................................21, 39

vi

McNamara v. Pre-Paid Legal Services, Inc.,
    189 Fed. Appx. 702, 2006 WL 1966643 (10th Cir. July 14, 2006).......................17

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
    540 F. 3d 1049 (9th Cir. 2008) ..............................................................passim

Mizzaro v. Home Depot, Inc.,
    544 F.3d 1230 (11th Cir. 2008) ...............................................................13

New York State Teachers' Retirement Systems v. Fremont General Corp.,
    No. 07-5756, 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ...............................29

Paracor Finance, Inc. v. General Elec. Capital Corp.,
    96 F.3d 1151 (9th Cir. 1996) ...............................................................12, 39

Parrino v. FHP, Inc.,
    146 F.3d 699 (9th Cir. 1998) ...............................................................15

PR Diamonds, Inc. v. Chandler,
    364 F.3d 671 (6th Cir. 2004) ...............................................................19

Provenz v. Milller,
    102 F.3d 1478 (9th Cir. 1996) ...............................................................35

Raab v. General Physics Corp.,
    4 F.3d 286 (4th Cir. 1993) ...............................................................15

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004).................................................................18

Ronconi v. Larkin,
    253 F.3d 423 (9th Cir. 2001) ...............................................................13, 21, 24

Rubke v. Capitol Bancorp, Ltd.,
    551 F.3d 1156 (9th Cir. 2009) ...............................................................15

Schuster v. Symmetricon, Inc.,
    No. 94-20024, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ...........................18

South Ferry, L.P. v. Killinger,
    542 F.3d 776 (9th Cir. 2008) ...............................................................34

Teachers' Retirement System of Louisiana v. Hunter,
    477 F.3d 162  (4th Cir. 2007) ...............................................................39

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    __ U.S. __, 127 S. Ct. 2499 (2007).........................................................13, 16, 29

Whirlpool Financial Corp. v. GN Holdings, Inc.,
    67 F.3d 605 (7th Cir. 1995) ...............................................................31

Wool v. Tandem Computers, Inc.,
   818 F.2d 1433 (9th Cir. 1987) ............................................................................ 39

Young v. Dreisbach,
   182 Fed. Appx. 714 (9th Cir. 2006)................................................................... 37

Zucco Partners, LLC v. Digimarc Corp.,
   552 F.3d 981 (9th Cir. 2009) ...................................................................... passim

31532801

Defendants Ormat Technologies, Inc. ("Ormat"), Yehudit Bronicki and Joseph Tenne move to dismiss the Consolidated Amended Complaint pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act") and Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The motion is based on this notice; the accompanying memorandum of points and authorities; the Declaration of Richard H. Zelichov and exhibits thereto (Ex. __); the Request for Judicial Notice; the papers, records and pleadings in this action; such other papers that may be filed at or before the hearing on this motion; and any other matters properly before the Court.

Defendants respectfully request that the Court hold oral argument on this Motion.

**INTRODUCTION**

Plaintiffs' Consolidated Amended Complaint ("CAC") cobbles together two wholly inadequate and completely separate sets of allegations in a vain attempt to assert claims of securities fraud against Ormat Technologies, Inc. and two of its officers.  Plaintiffs initiated this litigation by claiming that Ormat intentionally misled its stockholders concerning its method of accounting for exploration and development costs, and when they realized that this claim failed, they added in allegations concerning Ormat's forward-looking statements about when it expected to complete development and construction of a power plant at North Brawley in Imperial County, California.

Ormat's method of accounting for exploration and development costs did not reflect any effort to hide that some of Ormat's exploration activities – specifically in Buffalo Valley and Grass Valley -- had been unsuccessful.  Ormat selected a method that had been used by other companies doing geothermal exploration; it disclosed this method to its stockholders – including specifically disclosing that it capitalized all costs, including "dry hole costs," on an "area of interest" basis; and its nationally recognized independent public accountants agreed with the method Ormat chose.  Ormat also explicitly told its stockholders in a section of its 10-K describing Ormat's exploration activities that "some of the geothermal leases that we explore have been . . . abandoned"; even told its stockholders which sites it had abandoned; and its analysts acknowledged these facts by noting that "[a]dditional drilling in NV at Grass Valley and Buffalo Valley have also proven unsuccessful." Moreover, nobody benefitted from any alleged misstatements on this issue as Plaintiffs do not allege that any Defendant sold stock.  In fact, one of the defendants – Yehudit "Dita" Bronicki – actually

1

1   lost more money than anybody else when the stock price fell given that her family indirectly is the

2   largest Ormat stockholder.

3       Plaintiffs' theory of fraud concerning Ormat's disclosures about the development and

4   construction of the North Brawley project is no better.  Plaintiffs allege little more than that Ormat

5   undertook a complicated geothermal development and construction project in North Brawley;

6   provided its stockholders with its best estimates concerning when it would complete the project; but

7   ran into unexpected problems when Ormat found more sand in the underlying reservoir than

8   anticipated; and therefore did not have the power plant ramped up to full capacity in accordance with

9   its projected schedule.  This is not securities fraud but pure fraud by hindsight.  Plaintiffs theory also

10  does not account for the fact that Ormat specifically identified its statements concerning North

11  Brawley as forward-looking and warned its stockholders that it might not complete the project on

12  time because the project faced numerous risks, including but not limited to, "geothermal resource

13  risk," "operational [risks] relating to the extraction of geothermal fluids," and potentially "adverse

14  . . . geological conditions."  Their theory does not account for the fact that Ormat disclosed the

15  problems at North Brawley to its stockholders as soon as it became aware of them, and their theory

16  does not account for the fact that no Defendant benefitted from any alleged fraud.  Plaintiffs have

17  also failed to allege loss causation with respect to Ormat's statements about North Brawley because

18  they do not allege that Ormat's stock price fell when it disclosed the issues with the project.

19      In short, Plaintiffs' CAC should be dismissed.  They have not alleged a claim for securities

20  fraud based either on Ormat's disclosures concerning its method of accounting for exploration and

21  development costs or its projections concerning the development and construction of the North

22  Brawley project.

23                          **SUMMARY OF COMPLAINT**

24      Plaintiffs divide their Consolidated Amended Class Action Complaint into two separate parts

25  based on (1) their allegations concerning Ormat's method of accounting for exploration and

26  development costs; and (2) their allegations concerning Ormat's disclosures concerning the North

27  Brawley project.  Defendants will therefore summarize the CAC in two parts as well.

28

31532801

I.   **PLAINTIFFS ALLEGATIONS CONCERNING ORMAT'S DISCLOSURES ABOUT ITS ACCOUNTING FOR EXPLORATION AND DEVELOPMENT COSTS.**

   A.   **Ormat Makes A Reasonable Decision To Look To Oil And Gas Accounting Literature For Purposes Of Accounting For Its Exploration Activities.**

   Ormat explores, develops, builds, owns, operates and sells electricity from geothermal and recovered energy-based power plants throughout the world.  (CAC 2, 17).  Historically, Ormat had developed, built, owned, operated and sold electricity from power plants in areas of proven geothermal resources.  In 2006 and increasingly in 2007, Ormat expanded its activities to include the exploration and identification of geothermal resources.  (Ex. 2 at 20).  Ormat had to determine how to account for the costs of its exploration activities as there were no industry-specific accounting standards for companies engaged in geothermal exploration.  Ormat believed that its geothermal exploration activities had many similarities to oil and gas exploration.  It used technology and equipment similar to oil and gas exploration, it looked at data in locating geothermal resources similar to the data used in oil and gas exploration, and its exploration activities were administered by the same regulatory agencies such as the California Division of Oil, Gas and Geothermal Resources who approved permitting for oil and gas exploration.  (Ex. 21 at 28).  Indeed, Ormat had been describing the similarities between geothermal exploration and oil and gas exploration to its stockholders for years.  ((Ex. 1 at 11 (geothermal wells drilled "using established technology that is in some respects similar to that employed in the oil and gas industry"); Ex. 1 at 45 ("uncertainties, which vary among different geothermal reservoirs . . . are in some respects similar to those typically associated with oil and gas exploration, development and exploitation"); Ex. 2 at 13, 45 (same); Ex. 49 at 11, 71).

   Ormat thus looked to the accounting literature applicable to oil and gas exploration activities including Statement of Financial Accounting Standards ("SFAS") No. 19, <u>Financial Accounting and Reporting by Oil and Gas Producing Companies</u> and Securities and Exchange Commission ("SEC"), Rule 4-10 of Regulation S-X, <u>Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975</u>.  (CAC 55; <u>see</u> Ex. 21 at 28).  SFAS No. 19 describes the "successful efforts" method of

3

accounting for oil and gas exploration and Rule 4-10 of Reg. S-X describes the "full cost" method. (CAC 41).[1]  While there can be variations in both methods, "under the full cost concept, all costs incurred in acquiring, exploring and developing properties within a relatively large geopolitical (as opposed to geological) cost center (such as a country) are capitalized when incurred" and amortized/expensed when production in the cost center commences.  (Ex. 43 (SFAS No. 19) at ¶ 104).  And, under the "successful efforts method," exploration costs are expensed as soon as it is determined that there are not proved reserves at a well.  Full cost accounting therefore "regards the costs of unsuccessful . . . exploration activities as necessary for the discovery of reserves" and that the benefits of successful exploration activities will offset the costs of unsuccessful activities, while the successful efforts method assumes a shorter time horizon where there is no benefit from unsuccessful exploration.  (Ex. 43 (SFAS No. 19) at ¶ 102).  The basic difference then relates to when exploration costs are expensed.

Ormat determined to use the "full cost" method because it believed that it better reflected Ormat's business model.  (CAC 59).  If Ormat's exploration efforts are successful, it intends to design, build, own, operate and sell electricity from the geothermal resource and not sell the resource to someone else.  Ormat thus treats exploration costs incurred over one to two years as only a small part of the lifecycle of a geothermal plant that has a useful life between 25 and 30 years.  (Ex. 21 at

---

[1]      Both SFAS No. 19 and Rule 4-10 indicate that they do not apply to companies engaged in geothermal exploration.  See Ex. 43 (SFAS No. 19) at ¶ 6; Ex. 44 (Rule 4-10(a)(1)(ii)(C)); CAC 43.  As discussed above, there are no industry-specific accounting standards for geothermal exploration, however, and Ormat had to account for its exploration costs in some manner.  Ormat also looked at the public filings of the few other companies that had engaged in geothermal exploration.  These companies seemed to account for their exploration activities by analogy to the oil and gas industry including a number of companies that used the "full cost" method.  (CAC 42; see, e.g., Ex. 26 (Calenergy Co., Inc. Form 10-K) at 47 ("[t]he Company follows the full cost method of accounting for costs incurred in connection with exploration and development of geothermal resources.  All such costs, which include dry hole costs and the cost of drilling and equipping production wells and directly attributable administrative and interest costs, are capitalized and amortized over their estimated useful lives when production commences."); Ex. 27 (Caithness Coso Funding Corp. Form 10-K) at 23 ("costs incurred in connection with exploration and development of geothermal resources . . . , which include dry hole costs, the cost of drilling and equipping production wells, and administrative and interest costs directly attributable to the project, are capitalized and amortized over their estimated useful lives when production commences")).

1   19, 27).  Ormat also expects that the benefits obtained from successful exploration activities will be

2   adequate to recover costs for any unsuccessful exploration.  (CAC 59; Ex. 22 at 4; Ex. 2 at 32).

3       Ormat did not adopt all aspects of "full cost" accounting as defined in Rule 4-10 to the extent

4   it was inconsistent with the way Ormat operates its business.  Rule 4-10 indicates that "cost centers

5   shall be established on a country-by-country basis."  (See Ex. 44 (Rule 4-10(c)(1)) ("[c]ost-centers

6   shall be established on a country-by-country basis")).  This means that companies in the oil and gas

7   industry using "full cost" accounting capitalize all exploration costs in an entire country as long as

8   they expect that any site in the country will produce sufficient oil to recover the costs of exploration.

9   Ormat did not intend to operate the new geothermal sites it was exploring on a country-wide basis

10  and so it took a conservative approach and established its cost-centers for exploration purposes much

11  narrower.  It considered using the state of Nevada as its cost center because it was likely going to

12  share certain costs between all of its new and existing sites in Nevada, but determined to use an even

13  narrower definition.  It thus established three cost centers referred to as "areas of interest" in the state

14  of Nevada with approximately 3-4 exploration sites in each area of interest.  (CAC 59; Ex. 21 at 30;

15  Ex. 22 at 4-5, 8).  Thus, Ormat was only going to capitalize costs as long as it believed that at least

16  one of the sites grouped together in an area of interest could generate sufficient electricity to offset

17  any exploration costs for the entire area.

18      **B.**    **Ormat Tells Its Stockholders How It Plans To Account For Exploration And**

19          **Development Costs.**

20      Ormat expressly disclosed these accounting decisions to its stockholders in its Form 10-K for

21  2007 filed in March 2008 informing them that:

22      We capitalize costs incurred in connection with the exploration and development of
    geothermal resources on an ''area-of-interest'' basis. All such costs, which include dry hole

23      costs and the cost of drilling and equipping production wells and other directly attributable
    costs, are capitalized and amortized over their estimated useful lives when production

24      commences. Although we do not commence exploration activities until feasibility studies
    have determined that the project is capable of commercial production, it is possible that

25      economically recoverable reserves will not be found in an ''area of interest'' and exploration
    activities will be abandoned. In this case, capitalized exploration costs would be expensed.

26      To date, we have not abandoned any exploration projects.[2]

27  ───────────────────

28  [2]    Ormat removed this last sentence in its 2008 Form 10-K filed in March 2009.  (Ex. 3 at 76).

31532801

(CAC 22; Ex. 2 at 76).  The 10-K also identified the sites that Ormat was exploring at that time including specifically identifying Buffalo Valley and Grass Valley.  (CAC 21, 22, 24, 25; Ex. 2 at 11, 32).  Ormat's independent public accountants reviewed this Form 10-K and provided a clean audit opinion that the company's financial statements were prepared in accordance with GAAP and that it maintained effective internal controls over financial reporting.  (Ex. 2 at 101).

In the fourth quarter of 2008, Ormat determined that its sites at Buffalo Valley and Grass Valley would not support commercial operations and determined not to pursue further development of these sites.  (CAC 26; Ex. 4 at 102; Ex. 22 at 8; Ex. 24 at 3, 5).  It did not, however, abandon the "area of interest" in which these sites were located as it still believed it would develop a successful geothermal plant at one or more of the other sites in such area.  Ormat, in fact, had moved one of the other sites in the same area of interest, Jersey Valley, from exploration to construction and another site in the same area of interest, McGuiness Hills, looked promising.  (Ex. 3 at 31, 32; Ex. 22 at 8).  Thus, in accordance with the accounting policy for exploration and development costs accurately explained in its 2007 Form 10-K and repeated nearly verbatim in its 2008 Form 10-K, Ormat continued to capitalize the costs associated with the exploration of these sites.  (CAC 30, 34; Ex. 3 at 76; Ex. 24 at 5).  Ormat intended to depreciate these costs when any expected plant in the "area of interest" became operational.  Once again, Ormat's independent public accountants reviewed this Form 10-K and provided a clean audit opinion that the company's financial statements were prepared in accordance with GAAP and that it maintained effective internal controls over financial reporting.  (Ex. 3 at 99).[3]

Given that Ormat had ceased exploration activities at Buffalo and Grass Valley, it specifically disclosed in the 2008 Form 10-K that it had abandoned certain sites.  In a section of the 10-K discussing Ormat's "Exploration Activity," Ormat stated that "**some of the geothermal leases that we explore have been** . . . **abandoned.**"  (Ex. 3 at 32 (emphasis added)).  Ormat also removed

---

[3]     Ormat determined to cease exploration activities at its Rock Hills site in the third quarter of 2009.  (CAC 26; Ex. 4 at 102).  As with Buffalo Valley and Grass Valley, it continued to capitalize the costs of exploration of Rock Hills because it still believed that it would develop a successful geothermal plant at one or more of the remaining sites in the area of interest in which Rock Hills was located.

1   Buffalo and Grass Valley from the list of sites that it told its stockholders it was exploring.  Thus, in

2   contrast to the 2007 10-K, Buffalo Valley and Grass Valley were not included in the list of sites

3   where Ormat was engaging in exploration activities in its 2008 10-K.  (Ex. 3 at 11, 32).[4]  Moreover,

4   Ormat's disclosures were understood by the market as the financial analysts following Ormat wrote

5   that "[a]dditional drilling in NV at Grass Valley and Buffalo Valley have also proven unsuccessful."

6   (Ex. 40 (Avondale Partners 2/26/2009 Report) at 1, 2).

7           C.      **Ormat Explains Its Method Of Accounting In Detail To The SEC's Division Of**

8                   **Corporation Finance.**

9           On September 14, 2009, the Division of Corporation Finance of the Securities and Exchange

10  Commission raised certain questions about Ormat's method of accounting for exploration and

11  development costs.  Ormat and the SEC exchanged 11 letters – 5 from the SEC and 6 from Ormat --

12  and had a number of phone calls over 6 full months.  (CAC 26-28, 54-63).  In these letters, Ormat

13  explained the basis for its accounting decisions.  It cited to multiple sources of accounting literature

14  published by the SEC, the Financial Accounting Standards Board, and Big Four accounting firm

15  PricewaterhouseCoopers.  (CAC 55; Ex. 21 at 28).  It had a lengthy and productive dialog with the

16  Division of Corporation Finance who never indicated that Ormat's decisions were unreasonable.

17  The Division of Corporation Finance ultimately, however, disagreed with how Ormat accounted for

18  exploration and development costs in certain respects and Ormat agreed to restate its accounting

19  results.  (CAC 62).  As soon as it made the decision to restate, and before it was required to file its

20  10-K, Ormat issued a press release on February 24, 2010 announcing the restatement (as well as its

21  financial results for the fourth quarter of 2009) and held a conference call on the same day.  (CAC 3,

22  63, 65, 84, 85; Ex. 20).  Ormat then filed a 10-K that documented the restatement on March 8, 2010.

23  (CAC 87).  Significantly, Ormat found no internal control deficiency as a result of the restatement

24  because "[m]anagement performed a thorough, well-reasoned evaluation when selecting its

25  _____

26  [4]      Ormat also removed Buffalo Valley and Grass Valley from the list of sites that it included on
    the slides that it uploaded to its website for analysts to review during its earnings conference calls.
27  Thus, the Exploration Update slide accompanying Ormat's November 6, 2008 conference call
    identified Buffalo Valley and Grass Valley as sites being explored, but the slides accompanying its
28  February 25, 2009 conference call did not.  (CAC 25; Ex. 31 at 9-12; Ex. 33 at 13-15).

accounting policy for exploration and development costs which included an evaluation of existing authoritative accounting guidance as well as reviewing the accounting policies disclosed by other public geothermal companies in the U.S."  Ormat's auditors agreed with this conclusion as they issued a clean audit opinion that the company's financial statements were prepared in accordance with GAAP and that it maintained effective internal controls over financial reporting.  (Ex. 4 at 121, 180-81).

On March 23, 2010, the Division of Corporation Finance indicated that they had completed their review of Ormat's Form 10-K and related filings.  The Division of Corporation Finance did not report Ormat's restatement to the SEC's Division of Enforcement who has not even opened an informal inquiry, let alone a formal inquiry or an enforcement action concerning Ormat's disclosures or accounting decisions concerning its exploration costs.  (Ex. 25).

## II. PLAINTIFFS ALLEGATIONS CONCERNING ORMAT'S CONSTRUCTION OF THE NORTH BRAWLEY PROJECT.

### A. Ormat Begins Construction Of North Brawley Expecting To Be Done By December 2008 But Warns Stockholders That The Project Is Subject To Various Risks.

Ormat began exploration activities in the North Brawley Known Geothermal Resource Area in Imperial County, California in 2006 and started drilling in the area in February 2007.  (CAC 120, 123(a)).  At the start of the class period in May 2008, Ormat expected that "construction [of the North Brawley power plant would] be completed by the end of 2008" and "estimate[d] that the North Brawley project will come on line by the end of 2008."  (CAC 146).[5]  Ormat recognized that, like some other geothermal fields it had developed, there was sand in the geothermal brine at North Brawley.  It thus installed sand separators that it believed were adequate to deal with the issue as they had been in its previous successful projects in nearby Ormesa and Heber.  (CAC 136, 177).

---

[5]     These statements were consistent with statements Ormat had made in 2006 and throughout 2007 concerning North Brawley.  (CAC 120-128).

31532801

There were, however, risks in both constructing the North Brawley plant and bringing the project on line and so Ormat warned its stockholders that the project was subject to, among other things, "equipment failures"; "geothermal resource risk" including technical concerns arising from the "geological formation"; and "construction or other project delays."  (Ex. 5 at 18-19).  Ormat further warned  that:

- The viability of our geothermal power plants depends on various factors such as the heat content of the geothermal reservoir, useful life of the reservoir (the term during which such geothermal reservoir has sufficient extractable fluids for our operations) and **operational factors relating to the extraction of the geothermal fluids**. Our geothermal power plants may experience an unexpected decline in the capacity of their respective geothermal wells. Such factors, together with the possibility that we may fail to find commercially viable geothermal resources in the future, represent significant uncertainties we face in connection with our operations.

(Ex. 5 at 23, 24).  Ormat also referred its stockholders to the risk factors in its 2007 Form 10-K filed in March 2008.  (Ex. 5 at 19, 43).  The 2007 Form 10-K expanded on the warnings in the Form 10-Q by noting that:

- Based on our current development and construction schedule, **which is subject to change at any time and which may not be met in its entirety**, we expect to declare commercial operations . . . of the 50 MW North Brawley Project by the end of 2008.  (Ex. 2 at 10, 12) (emphasis added).

- Specific factors that might cause actual results to differ from our expectations include, but are not limited to...operating risks, including equipment failures and the amounts and timing of revenues and expenses; **geothermal resource risk** (such as the heat content of the reservoir, useful life and geological formation); **construction or other project delays** or cancellations.  (Ex. 2 at 3-4) (emphasis added).

- Our exploration, development, and operation of geothermal energy resources is subject to geological risks and uncertainties, which may result in decreased performance or increased costs for our projects....The viability of geothermal projects depends on **different factors directly related to the geothermal resource**, such as the heat content (the relevant composition of temperature and pressure) of the geothermal reservoir, the useful life (commercially exploitable life) of the reservoir and **operational factors relating to the extraction of geothermal fluids**. **Our geothermal energy projects may suffer an unexpected decline in the capacity of their respective geothermal wells and are exposed to a risk of geothermal reservoirs not being sufficient for sustained generation of the electrical power capacity desired over time**.  (Ex. 2 at 45, 72).

- Our business development activities may not be successful and **our projects under construction may not commence operation as scheduled**.  We are currently in the process of developing and constructing a number of new power plants. Our success in developing a

9

31532801

particular project is contingent upon, among other things ... the timely implementation and satisfactory completion of construction....Currently, we have power plants under development or construction...**Our completion of these facilities is subject to substantial risks, including:  shortages and inconsistent qualities of equipment, material and labor; and adverse environmental and geological conditions**...Any one of **which could give rise to delays, cost overruns, the termination of the plant expansion, construction or development or the loss (total or partial) of our interest in the project under development, construction or expansion**.  (Ex. 2 at 46).

Throughout 2008, Ormat continued to believe that it would complete construction of the North Brawley power plant by the end of 2008.  Its tests on production wells showed good flow; its tests on injection wells showed sufficient injectivity; and it was making excellent progress on the power plant itself.[6]  Ormat, however, recognized that it was engaged in a complex project and continued to warn its stockholders that there were geothermal, construction and operational risks with the project and referred its stockholders back to the risk disclosures in its Form 10-K.  (Ex. 6 at 19-20, 24-26, 48; Ex. 7 at 20-21, 25-28, 50; Ex. 30).  In November 2008, Ormat felt that it had made sufficient progress that it determined to commence the "project start up phase" which usually is followed shortly by full capacity production.  (CAC 155-56).   Ormat connected production and injection wells it had drilled to the power plant it had constructed, synchronized each of the power plant units to the electrical grid, told SCE (the entity who was going to use the power from North Brawley) that it would declare initial operations on December 22, 2008, and began operations. (CAC 124; Ex. 7 at 20-21, 26-27; Ex. 54).

**B.**    **Ormat Encounters Unexpected Problems At North Brawley That It Discloses To Its Stockholders.**

The initial operations, however, did not go according to plan.[7]   While Ormat had substantially completed construction of the plant and had actually produced electricity that was

---

[6]    Production wells pull geothermal fluid up from an underground reservoir so that it can be used to generate electricity; injection wells return the fluid to the reservoir after it is used to generate electricity.

[7]    Market analysts understood that complex geothermal development projects such as North Brawley often are subject to technical problems and start-up delays.  (See, e.g., Ex. 39 (Avondale Partners 2/25/2009 Report) at 1 (noting that the ramp-up delay at North Brawley that Ormat disclosed in February 2009 was "not a surprise"); Ex. 42 (Thomas Weisel 10/2009 Report) at 11

(Footnote continues on next page.)

1   transmitted to the electrical grid, Ormat encountered certain problems in reaching full capacity.  (Ex.

2   53).  After spending a short time trying to determine what went wrong, Ormat disclosed on February

3   25, 2009 that it had found "larger than expected quantities of sand within the geothermal reservoir"

4   that impacted operations.  (CAC 160, 161; Ex. 16; Ex. 32).  Ormat implemented a number of

5   solutions that it believed would control these issues and hoped that these solutions would allow it to

6   reach capacity in "the second quarter of 2009."  (CAC 160, 161; Ex. 16; Ex. 32).

7       Ormat unfortunately continued to have problems in reaching capacity at the plant throughout

8   2009 and kept its stockholders fully apprised concerning those problems, its theories as to why it

9   was having problems, the solutions it was trying to implement and the attendant delays.  It disclosed

10  in May 2009 that there was yet another "three-month delay from our previous schedule" meaning

11  that the North Brawley project would not "reach[] full capacity [until] towards the end of the third

12  quarter" of 2009.  (CAC 164-166; Ex. 34; Ex. 8 at 21-22, 24-27, 44).  In August 2009, Ormat

13  indicated that it would only be able to start ramping up the plant in October, (CAC 167; Ex. 35), and

14  in November 2009, it noted a further delay to reaching full capacity to the first quarter of 2010 based

15  on when it would receive equipment that had been successful in removing solids during "[a] one-

16  month test of a single well."  (CAC 168; Ex. 36).

17      Ormat's installation at multiple wells of the equipment that had been successful in removing

18  solids at a single well unexpectedly did not solve all of Ormat's problems at North Brawley.  While

19  the equipment removed solids from each of the wells on which it was installed, it did not allow the

20  plant to reach full capacity.  Ormat thus told its stockholders of its evolving understanding of the

21  issues on February 9, 2010 by informing them that "it appears that even with the solids in check, the

22  injection capacity of some of the wells is disappointing and the Company is evaluating how to

23  increase injection capacity and bring the plant to its rated design."  (CAC 171; Ex. 28).  It essentially

24  repeated this same information in a press release and conference call on February 24, 2010 (CAC

25  173; Ex. 37), and then after conducting further analysis told its stockholders during its analyst and

26  (Footnote continued from previous page.)

27  (The sediment problem and associated delay at North Brawley is "not a surprise; in fact, it is the
    norm in the geothermal industry")).

28

11

1   investor meeting on April 9, 2010 that it now believed that the problems at North Brawley were

2   caused not just by the issues with sand which was what Ormat thought throughout 2009 but also by

3   "interference" between adjacent wells (CAC 177).[8]   Ormat further explained that it could not have

4   discovered the interference issues until it had controlled the issues with sand.  (CAC 177).

5                    **PROCEDURAL HISTORY AND PLAINTIFFS' THEORY OF FRAUD**

6          Plaintiffs barely waited for the ink to dry on Ormat's press release announcing the

7   restatement on February 24, 2010 before claiming that they had been defrauded into purchasing

8   Ormat's stock at artificially inflated prices.   Stockholders purporting to represent a class of

9   stockholders who purchased Ormat stock between May 7, 2008 and February 24, 2010 thus filed

10  three lawsuits alleging claims under the Securities Exchange Act of 1934 on March 9, 2010,

11  March 18, 2010 and April 9, 2010.  Each of these lawsuits alleged claims only in connection with

12  Ormat's restatement which first affected the fourth quarter of 2008 but each nonetheless asserted

13  claims on behalf of a class going back to May 2008.

14         Plaintiffs filed their consolidated amended class action complaint on July 9, 2010 when they

15  apparently realized for the first time that they could not bring a claim for the entire class period

16  based on the restatement because the restatement only affected the fourth quarter of 2008 and third

17  quarter of 2009.  Plaintiffs thus searched through Ormat's filings and made up another claim to try to

18  save their case alleging that Ormat misled its stockholders concerning a project at North Brawley in

19  Imperial County, California.

20                                    **LEGAL STANDARD**

21         Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule § 10b-5

22  promulgated thereunder, 17 C.F.R. § 240.10b-5, require a plaintiff to allege that the defendant

23  (1) made a misrepresentation or omission (2) of material fact (3) with scienter (4) upon which the

24  plaintiff justifiably relied, and (5) which caused injury to the plaintiff.  See Paracor Finance, Inc. v.

25  General Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996); Dura Pharm., Inc. v. Broudo, 544

26  _____

27  [8]      "Interference" refers to the fact that that pumping geothermal fluid down one injection well
    sometimes causes problems and poor performance in adjacent wells due to pressure and other
28  geologic forces.

12

31532801

U.S. 336, 341-42 (2005).  Claims under Section 10(b) and Rule 10b-5 are also governed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "Reform Act").

Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."  Under the Reform Act, the plaintiff must "plead with particularity both falsity and scienter" as to each defendant and each allegedly false statement.  Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001); Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008) (plaintiffs must allege scienter as to each defendant and each allegedly false statement); Horizon Asset Mgmt., Inc. v. H&R Block, Inc., No. 08-1593, __ F.3d __, 2009 WL 2870505, at *2-3 (8th Cir. Sept. 9, 2009) (same).  To plead falsity, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

To plead scienter in the Ninth Circuit, the Reform Act requires a plaintiff to "plead, in great detail, facts that [at least] constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999); see also 15 U.S.C. § 78u-4(b)(2).  "Deliberate recklessness" is "no less than a degree of recklessness that strongly suggests actual intent."  Id. at 979.  Moreover, with respect to any forward-looking statement, a plaintiff must allege "actual knowledge."  15 U.S.C. § 78u-5(c)(1)(B).  In determining whether a complaint meets these exceptionally high standards, "the court must take into account plausible opposing inferences" and a "complaint will survive [a motion to dismiss] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S. Ct. 2499, 2509-10 (2007); see also Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002).

Complaints that fail to meet these standards "shall" be dismissed.  15 U.S.C. 78u-4(b)(3)(A).

**ARGUMENT**

I.   **PLAINTIFFS HAVE NOT ALLEGED A CLAIM UNDER SECTION 10(B) BASED ON ORMAT'S DISCLOSURES CONCERNING ITS METHOD OF ACCOUNTING FOR EXPLORATION AND DEVELOPMENT COSTS**

Plaintiffs challenge to Ormat's disclosures concerning how it accounted for exploration and development costs fails for two separate and independent reasons.  First, Plaintiffs have failed to allege that Ormat's description of how it accounted for its exploration costs was false or misleading, and second, Plaintiffs have failed to allege that the Defendants acted with scienter with respect to either its description of its method of accounting or how it actually accounted for such costs.

A.   **Ormat Accurately Described Its Method Of Accounting For Exploration And Development Costs.**

Ormat's Form 10-K for 2008 filed in March 2009 accurately described Ormat's exact method for accounting for its exploration and development costs.  It indicated that Ormat capitalized costs on an "'area of interest' basis."  It indicated that these costs included "dry hole costs and the cost of drilling and equipping production wells and other directly attributable costs."  It indicated that if Ormat abandoned an "area of interest," it would expense capitalized exploration costs.  Every statement was accurate and Ormat followed this policy exactly.  Ormat still has not abandoned any of its three "areas of interest" – even if it has ceased exploration activities at a few sites within certain of its "areas of interest" -- and Plaintiffs do not and cannot allege that it has.  For this reason alone, Plaintiffs claim concerning the Form 10-K must be dismissed.

Plaintiffs, however, try to twist this entirely accurate description of Ormat's method of accounting by arguing that it somehow misled Ormat's stockholders into believing that Ormat had not ceased exploration activities at any site by March 2, 2009.  Ormat, however, explicitly told its stockholders in the very same 10-K that Plaintiffs challenge that "**some of the geothermal leases that we explore have been**, and will be, **abandoned**."  (Ex. 3 at 32 (emphasis added))[9].  Plaintiffs

---

[9]    Ormat did not include this same sentence in its 2007 Form 10-K filed in March 2008 because it had not abandoned any sites at that point.  In any event, Plaintiffs do not and cannot challenge Ormat's 2007 Form 10-K as the class period does not start until after it was filed.

14

obviously hide this statement from the Court even though it was included in a clearly marked section of the Form 10-K describing Ormat's "Exploration Activity" because they know it completely undermines their theory of fraud.  See, e.g., Rubke v. Capitol Bancorp, Ltd., 551 F.3d 1156, 1163 (9th Cir. 2009) (no Section 10(b) claim where company disclosed the information the plaintiffs claim was not disclosed); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1419 (9th Cir. 1994) (same); Anderson v. Clow, No. 92-1120, 1993 WL 497212, at *4 (S.D. Cal. Sept. 17, 1993); Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993) (plaintiff cannot claim company failed to disclose information in annual report where information disclosed on the same day in a press release).[10]

Plaintiffs seeming further theory that Ormat had a duty to disclose exactly which sites it had chosen not to pursue further has no legal basis.  The Ninth Circuit has made it plain that "Rule 10b-5 . . . prohibit[s] only misleading and untrue statements, not statements that are incomplete."  Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002); see also In re Cutera Sec. Litig., __ F.3d ___, 2010 WL 2595281, at *3 (9th Cir. June 30, 2010).  Furthermore, Ormat actually did inform its stockholders that it was no longer pursuing exploration activities at Buffalo Valley and Grass Valley.  Ormat removed Buffalo Valley and Grass Valley from the lists of sites it was exploring in the 2008 Form 10-K filed in March 2009 (Ex. 3 at 11, 32) and from the slides accompanying its February 25, 2009 conference call, (Compare CAC 25 and Ex. 31 at 9-12 with Ex. 33 at 13-15).  Finally, contrary to Plaintiffs' theory that Ormat's stockholders did not know this information, the analysts following Ormat specifically noted in early 2009 that "[a]dditional drilling in NV at Grass Valley and Buffalo Valley have also proven unsuccessful."  (Ex. 40 (Avondale Partners 2/26/2009 Report) at 1, 2).[11]

---

[10]   Courts take judicial notice of the entirety of SEC filings that plaintiffs claim are false or misleading in cases alleging securities fraud precisely to prevent the plaintiffs from filing "complaints that quoted only selected and misleading portions of such documents" as Plaintiffs did here.  See, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998); In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

[11]   Plaintiffs' subsidiary argument that an "area of interest" is not a defined term so that they understood it to refer to a single site is contradicted by their own CAC.  Plaintiffs acknowledge that the phrase "area of interest" comes from SFAS 19 and the glossary in that pronouncement is clear that an "area of interest" is broader than a single site.  (See Ex 43 (SFAS 19) at ¶ 272 ("[t]he

(Footnote continues on next page.)

15

In short, there was nothing false or misleading about Ormat's description of its accounting policy for exploration costs. It not only disclosed the policy, it also disclosed that it had abandoned exploration at certain sites and removed the sites it was no longer exploring from the relevant lists.[12]

### B.  Plaintiffs Cannot Allege Scienter Given Ormat's Accurate And Auditor Approved Disclosure Of Its Accounting Policy.

Plaintiffs have also failed to allege scienter as to Ormat's description concerning its accounting for exploration and development costs or how it accounted for such costs. As discussed above, Plaintiffs must plead in great detail particularized facts that give rise to a strong inference of deliberate recklessness suggesting "actual intent." Furthermore, in attempting to allege scienter, Plaintiffs must also overcome facts that undermine any inference of scienter. Tellabs, Inc., 127 S. Ct. at 2509-10 ("the court must take into account plausible opposing inferences" and a "complaint will survive [a motion to dismiss] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged"); see also Gompper, 298 F.3d at 897.

---

(Footnote continued from previous page.)

geological terms 'structural feature' and 'stratigraphic condition' are intended to identify localized geological features as opposed to the **broader** terms of basins, trends, provinces, play, **areas-of-interest**, etc.") (emphasis added)).

[12]     Plaintiffs claim that Ormat's restatement establishes the falsity of its financials rings somewhat hollow here where Ormat specifically told its stockholders that it accounted for its exploration costs on an "area of interest" basis. See, e.g., In re Agribiotech Sec. Litig., No. 99-144, 2000 WL 1277603, at *5-6 (D. Nev. March 2, 2000) (no claim of securities fraud where company told stockholders its method of accounting even if the method of accounting violated GAAP). If this violates GAAP as Plaintiffs now claim then Ormat's stockholders knew long before February 2010 that Ormat's financials were incorrect. Benzon v. Morgan Stanley Distributors, Inc., 420 F.3d 598, 608-09 (6th Cir. 2005).

16

31532801

1.      **Ormat's Explicit Disclosures That It Had Abandoned Certain Sites And The Lack Of Any Motive From The Alleged Fraud Undermine Any Inference Of Scienter.**

Tellabs instructed courts that they must take into account plausible opposing inferences in analyzing scienter, and the facts undermining scienter here make it impossible to conclude that Defendants acted to defraud Ormat's stockholders.  This information includes:

- In direct contravention of Plaintiffs' theory that Ormat tried to hide that it had ceased exploration activities at certain sites, it explicitly disclosed that "**some of the geothermal leases that we explore have been** . . . **abandoned**."  (Ex. 3  at 32 (emphasis added)).  It further removed these sites from the publicly disclosed lists of sites it was exploring and provided warnings to its stockholders that it did not expect to succeed in developing every site it explored."  These facts alone rebut any inference of scienter as a company attempting to defraud its stockholders does not describe the alleged fraud to them.  See McNamara v. Pre-Paid Legal Services, Inc., 189 Fed. Appx. 702, 713, 2006 WL 1966643, at *8 (10th Cir. July 14, 2006) (no scienter where company essentially disclosed challenged conduct).[13]

- Ormat's nationally-recognized independent public accountants reviewed and approved Ormat's publicly filed financial statements thereby further supporting Ormat's view that its method of accounting for exploration and development costs was reasonable.  (Ex. 3 at 99); see Metzler Investment GMBH v. Corinthian Colleges, Inc., 540 F. 3d 1049, 1069 (9th Cir. 2008) (affirming dismissal of securities complaint where it "did not allege that Corinthian's external auditors counseled against the practice"); see also Worlds of Wonder, 35 F.3d at 1425-26.

- Unlike almost every other case asserting claims of securities fraud, Plaintiffs do not allege that the defendants took advantage of the allegedly inflated stock price to sell stock at

---

[13]     In re DotHill Systems Corp. Sec. Litig., No. 06-228, 2009 WL 734296, at *9 (S.D. Cal. March 18, 2009) (disclosure of precise risk of which plaintiffs complain "negates an inference of scienter"); see also Worlds of Wonder, 35 F.3d at 1425 ("detailed risk disclosure . . . negates an inference of scienter"); In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007) (risk disclosures "negate an inference of scienter").

17

inflated prices.   See, e.g., Worlds of Wonder, 35 F.3d at 1427-28 (lack of stock sales "conclusively rebut[s] an inference of scienter"); In re Downey Sec. Litig., No. 08-3261, 2009 WL 2767670, at *14 (C.D. Cal. Aug. 21, 2009).  Indeed, Plaintiffs' acknowledge that Dita Bronicki is part of a family that indirectly is the largest Ormat stockholder and therefore lost more money than anybody else when Ormat's stock price fell.  Downey, 2009 WL 2767670, at *14; Schuster v. Symmetricon, Inc., No. 94-20024, 2000 WL 33115909, at * 7 (N.D. Cal. Aug. 1, 2000).

- Ormat disclosed early that it was going to restate its financial results as soon as it had made that determination.  It could have waited until it filed its Form 10-K in March 2010 but issued a press release and held a conference call on February 24, 2010 to disclose the restatement and the amounts of the restatement.  See, e.g., Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004) ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements"); Gaines v. Guidant Corp., No. 03-892, 2004 WL 2538374, at *16 (S.D. Ind. Nov. 8, 2004).

Each of these facts strongly weigh in favor of dismissal regardless of Plaintiffs' other allegations and alone indicate that the Court should dismiss the CAC.

### 2. Plaintiffs Allegations Do Not Support A Strong Inference Of Scienter.

Plaintiffs have barely made any effort to try to allege scienter.  Indeed, Plaintiffs rely solely on (1) Ormat's restatement, conclusory claims about the proper accounting based on partial quotes from Ormat's correspondence with the Division of Corporation Finance, and some SOX certifications; and (2) a tortured theory of motive based not on stock sales but dividends that were paid not just to the Defendants but to every Ormat stockholder.  These allegations do not give rise to a strong inference of scienter, especially in light of the facts that undermine any inference of scienter.

31532801

1
2
3

      a.     Plaintiffs Cannot Overcome The Facts Undermining Scienter With Conclusory Allegations Concerning Ormat's Single Technical Violation Of Unclear And Complicated Accounting Principles.

4
5

Plaintiffs' discussion of Ormat's restatement, the accounting rules and some SOX certifications do not establish scienter.

6
7
8
9
10
11
12
13

First, Plaintiffs reliance on Ormat's restatement goes nowhere because the "mere publication of a restatement is not enough to create a strong inference of scienter." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1000 (9th Cir. 2009); DSAM Global Value Fund v. Altris Software, 288 F.3d 385, 390 (9th Cir. 2002) ("mere publication of inaccurate accounting figures, or failure to follow GAAP" does not establish Section 10(b) claim. There are numerous cases throughout the Ninth Circuit and the rest of the country where a company has restated its financials and courts have dismissed claims for securities fraud. See, e.g., Digimarc, 552 F.3d at 1000; Corinthian Colleges, Inc., 540 F. 3d at 1069; Altris Software, 288 F.3d at 390.

14
15
16
17
18
19
20
21
22
23
24

Second, plaintiffs can only allege scienter based on a purported failure to follow GAAP where the GAAP violation was so pervasive, egregious and glaring that the person must have been aware of it. See, e.g., Corinthian Colleges, 540 F. 3d at 1069 (technical GAAP violations do not establish scienter); Altris Software, 288 F.3d at 390 (GAAP violations give rise to scienter only where "an egregious refusal to see the obvious").[14] It is not enough to allege that there were violations of complicated accounting rules. In re Hypercom Corp. Sec. Litig., No. 05-455, 2006 WL 1836181, at *8 (D. Ariz. July 5, 2006); PR Diamonds, 364 F.3d at 688. It is not enough to allege that there were internal disagreements about the accounting practice at issue or that certain people in the organization suggested a different method be used, Corinthian Colleges, 540 F.3d at 1069, and it is not enough to allege that one of the defendants was the CFO of a company because that "would result in a conclusion that scienter is sufficiently alleged whenever a CFO is named in a securities

25

26
27
28

---

[14]    See also Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (there must be "glaring accounting irregularities"); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 685, 686, 688 (6th Cir. 2004) (accounting problems must be "pervasive and egregious" to support inference of scienter).

31532801

1    class action involving a GAAP violation," <u>Hypercom</u>, 2006 WL 1836181, at *8.  Moreover, GAAP

2    "are far from a canonical set of rules that will ensure identical accounting treatment of identical

3    transactions" and "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives

4    to management."  <u>In re K-Tel International, Inc. Sec. Litig.</u>, 300 F.3d 881, 890 (8th Cir. 2002).

5        Plaintiffs must thus allege that Ormat engaged in deliberate, intentional and egregious

6    violations of obvious accounting rules.  They have not come close to meeting this standard in the

7    CAC.  As an initial matter, there are no industry-specific accounting standards or generally accepted

8    accounting principles for geothermal exploration and therefore no obvious rules that Ormat could

9    have violated.  (<u>See</u> Ex. 43 (SFAS No. 19) at ¶ 6; Ex. 44 (Rule 4-10(a)(1)(ii)(C)); CAC 43).[15]

10   Moreover, Ormat had to account for its exploration costs in some manner and it was reasonable to

11   look to the standards applied in the oil and gas industry given that it had told its stockholders that its

12   exploration activities were similar in many respects to the exploration activities of oil and gas

13   companies.  Furthermore, Ormat chose one of the two recognized standards in the oil and gas

14   industry – full cost accounting -- because other companies engaged in geothermal exploration had

15   done so.  Ormat, however, modified the standard to conform to the way Ormat ran its business

16   thereby narrowing its definition of a cost center from the entire United States to relatively discrete

17   areas within Nevada. Moreover, Plaintiffs do not allege that anybody at Ormat suggested at the time

18   that it made its accounting decisions that they were wrong and Ormat's independent public

19   accountants approved these decisions by providing a clean audit opinion on Ormat's 10-Ks.  Finally,

20   and perhaps most importantly, the Division of Corporation Finance of the SEC never indicated that

21   Ormat's accounting method was unreasonable and certainly never suggested that the method was

22   "deliberately reckless" or "egregious."  Rather, it took the Division of Corporation Finance over six

23   months, 11 letters, hundreds of questions, and multiple phone calls before it even concluded that

24   Ormat's accounting decisions were incorrect in certain respects only.  In short, Plaintiffs' effort to

25   allege that Ormat engaged in an egregious violation of GAAP is absurd.

26   _____
     [15]    Plaintiffs can only allege that Ormat should have used "successful efforts" accounting as
27   detailed in SFAS 19 by ignoring that SFAS 19, like Rule 4-10, contained an exclusion for companies
     engaged in exploration of geothermal resources.  (<u>See</u> Ex. 43 (SFAS No. 19) at ¶ 6; Ex. 44 (Rule 4-
28   10(a)(1)(ii)(C)); CAC 43).

                                            20

1    Third, as the Ninth Circuit has recognized, Plaintiffs' reliance on SOX certifications "add

2    nothing" to the "scienter calculus."  <u>Digimarc</u>, 552 F.3d at 1004; <u>Glazer Capital Management, L.P.</u>

3    <u>v. Magistri</u>, 549 F. 3d 736, 747-48 (9th Cir. 2008).[16]

4              b.    <u>Plaintiffs' Allegations That Ormat Paid Its Ordinary Dividend To All</u>

5                    <u>Stockholders Does Not Establish A Motive To Defraud</u>.

6    Plaintiffs have also tried to bolster their inadequate allegations of deliberate recklessness with

7    an unpersuasive theory of motive.  Plaintiffs allege that the Defendants accounted for Ormat's

8    exploration costs incorrectly in order to report higher net income for two quarters so that they could

9    pay themselves a higher dividend in order to pay down a loan.  There are numerous problems with

10   this theory.  First, the theory applies only to one of the Defendants as there is no allegation that

11   either Ormat or Mr. Tenne were paid dividends or had loans to repay, and indeed, the lack of any

12   motive by the CFO in a case alleging an accounting misstatement undermines a claim of scienter.

13   <u>See</u>, <u>e.g.</u>, <u>In re Credit Acceptance Corp. Sec. Litig.</u>, 50 F. Supp. 2d 662, 677-78 (E.D. Mich. 1999);

14   <u>Ronconi</u>, 253 F.3d at 436.   Second, the Ninth Circuit has held that motive allegations are

15   insufficient, in and of themselves, to create a strong inference of scienter.  <u>Silicon Graphics</u>, 183

16   F.3d at 979.  Third, generic allegations that Defendants acted to pay down debt or increase their

17   compensation have been rejected by every court to have considered them as "routine business

18   objectives, [that] without more, cannot normally be alleged to be motivations for fraud."  <u>Lipton v.</u>

19   <u>Pathogenesis Corp.</u>, 284 F.3d 1027, 1038 (9th Cir. 2002).[17]

20   _____

21   [16]    Plaintiffs cannot allege scienter as to Mrs. Bronicki by arguing that she must have known that
     the SEC would disagree with Ormat's method of accounting for exploration costs because either she

22   or Ormat's President was required to approve the decision to stop exploration at a particular site.
     (CAC 29, 97(b)).  First, Plaintiffs do not allege that it was Mrs. Bronicki as opposed to somebody

23   else who made the decision to stop exploration activities at Buffalo Valley, Grass Valley or Rock
     Hills.  Second, as discussed in the text, Plaintiffs do not explain how anybody, let alone Mrs.

24   Bronicki with no accounting training, was expected to understand the complicated accounting issues
     raised in the CAC, in the correspondence with the SEC, and in this motion.  Third, Ormat did

25   disclose that it had ceased exploration activities at certain sites and that is all Plaintiffs allege that
     Mrs. Bronicki might have known.  (Ex. 3 at 32).

26

27   [17]    <u>In re Yukos Oil Co. Sec. Litig.</u>, No. 04-5423, 2006 WL 3026024, at *19 (S.D.N.Y. Oct. 25,
     2006) (the receipt of dividends in the amount of $1.2 billion did not give rise to an inference of

28   scienter); <u>In re Geopharma, Inc. Sec. Litig.</u>, 399 F. Supp. 2d 432, 451 (S.D.N.Y. 2005) ("a desire to
     (Footnote continues on next page.)

1    Fourth, Plaintiffs conduct their "analysis" that Ormat overpaid the amount of its dividend

2    based on several incorrect assumptions.  Plaintiffs look at Ormat's quarterly restated results, but they

3    allege that Ormat's dividend policy looked at the dividend on an annual basis.  (CAC 107).  Thus,

4    Plaintiffs allegations concerning how Ormat's restatement affected net income in two quarters are

5    irrelevant.  Also, even if Defendants had originally used the restated numbers, Ormat could have

6    declared the same dividend.  Plaintiffs' claim that Ormat's dividend was capped at 20% of annual

7    net income is false as Plaintiffs themselves allege that Ormat's dividend policy was "target[ed] an

8    annual payout ratio of **at least** 20% of the Company's net income, subject to Board approval."

9    (CAC 107) (emphasis added).  Indeed, Ormat's total dividend for 2009 of $0.30 still constituted less

10   than 20% of its **restated** earnings per share of $1.51 (Exs.  17-20) and Ormat's total dividend for

11   2008 of $0.22 was only 22% of Ormat's **restated** earnings per share of $0.98 (Exs. 13-16, 20).[18]  In

12   addition, Plaintiffs offer no facts to establish that Ormat Industries as the stockholder to whom

13   Ormat Technologies paid the dividend simply passed through the dividend income from Ormat

14   Technologies to its stockholders.

15   Fifth and finally, even if Plaintiffs' theory did not suffer from each of the flaws discussed

16   above, the reduction in the amount of the dividends that would have been received by the Bronickis

17   would have been a modest $300,000 (or $100,000 per member of the family).[19]  This is obviously

18   _____

(Footnote continued from previous page.)

19   reduce [] debt" did not give rise to an inference of scienter); In re Hardinge, Inc. Sec. Litig., __ F.

20   Supp. 2d __, 2010 WL 447397, at * 17 (W.D.N.Y. Feb. 2, 2010) (same); Institutional Investors
     Group v. Avaya, Inc., 564 F.3d 242, 279 (3d Cir. 2009) (same).

21   [18]   Neither number is unusual or suspicious because Ormat had paid a 28.6% dividend in 2007,

22   (Exs. 9-12 (Ormat paid $0.20 annual dividend on EPS of $0.70)).  See, e.g., Digimarc, 552 F.3d at
     1005-06 (motive allegations like stock sales only constitute circumstantial evidence of scienter when

23   unusual or suspicious and must be out of line with historical practices); Corinthian Colleges, 540

24   F.3d at 1066-67 (same).  Ormat's payment of a dividend of 28.6% of its net income in 2007 also
     shows that 20% was not a cap.

25   [19]   The restatement reduced net income for the fourth quarter of 2008 and third quarter of 2009

26   by $7.7 million.  (CAC 85).  Plaintiffs allege that Ormat's dividend was capped at 20% of net
     income.  (CAC 107).  The Bronickis collectively owned 35% of Ormat Industries which owned

27   56.02% of Ormat Technologies.  (CAC 100, 102).  Thus, a $7.7 million reduction in net income
     would result only in approximately $300,000 less in dividend income being paid to the Bronickis

28   based on the following calculation $7.7 million x 0.20 as maximum dividend as a percentage of net

(Footnote continues on next page.)

22

immaterial in comparison to the $157 million loan that they allegedly needed to pay down with dividend income (CAC 103), and courts have held that plaintiffs have not alleged scienter where defendants have acted to benefit themselves in amounts much larger than $300,000.  See, e.g., Metzler Investment GMBH v. Corinthian Colleges, Inc., 540 F. 3d 1049, 1067 (9th Cir. 2008) (no scienter where stock sales totaled $33 million); In re the Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) (no scienter where stock sales totaled $36.4 million).

In short, Plaintiffs' purported theory of motive – the desire to increase the dividend to pay down debt -- cannot give rise to any inference of scienter in any case, and Plaintiffs have not alleged anything unusual or suspicious about the dividend payments in this case.

**3.  Plaintiffs' Allegations As A Whole Demonstrate That Defendants Did Not Act With Scienter.**

Considered in its entirety and even assuming Plaintiffs alleged falsity, the CAC does not give rise to strong inference of scienter.  As discussed above, Plaintiffs' hodge podge of allegations and unsupported theory of motive cannot overcome that (1) Ormat explicitly disclosed that "some of the geothermal leases that we explore have been . . . abandoned" and even disclosed the sites that it had abandoned; (2) Ormat's independent public accountants issued clean audit opinions supporting Ormat's view that its accounting treatment for exploration and development costs was reasonable; (3) Plaintiffs do not allege that any Defendants sold Ormat stock and one of the Defendants lost more money than anybody else when Ormat's stock price fell; and (4) Ormat immediately disclosed the restatement as soon as it had made a determination to restate.

**II.  PLAINTIFFS HAVE FAILED TO ALLEGE A SECTION 10(B) CLAIM BASED ON ORMAT'S STATEMENTS CONCERNING NORTH BRAWLEY.**

Plaintiffs' effort to state a claim for securities fraud based on Ormat's statements concerning North Brawley attempts to resurrect a theory – "fraud by hindsight" – that courts routinely rejected even before passage of the Reform Act.  Plaintiffs acknowledge that Ormat undertook a complicated

---

(Footnote continued from previous page.)

income x 0.56 as the percentage of Ormat Technologies owned by Ormat Industries x 0.35 as the percentage of Ormat Industries owned by the Bronickis.

31532801

geothermal development and construction project in Imperial Valley, California that was subject to numerous fully disclosed risks.  Ormat had been successful in developing such projects in the past and brought all of its expertise, energy and resources to the project.  Ormat provided its stockholders with its best estimates concerning the timetable for completion and ramp up of the North Brawley project, but Ormat nonetheless encountered unexpected problems at North Brawley that caused it to miss its projected timetable.  This is not securities fraud.  As the Ninth Circuit noted quite plainly "[p]roblems and difficulties are the daily work of business people [and] that they exist does not make a lie out of any of the alleged false statements" and "[a]lleging in substance that [a company] underestimated [its problems] does not make out a fraud case."  Ronconi v. Larkin, 253 F.3d 423, 430, 433-34 (9th Cir. 2001).  Plaintiffs knowingly invested in a company that attempts the difficult task of generating clean electricity by drilling production and injection wells in active geothermal areas and routing them through to a power plant that converts geothermal brine and steam into energy.  When one of the plants developed and constructed by that company runs into problems, the stockholders do not get to claim fraud.  The securities laws do not constitute a scheme of investment insurance.  See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 345 (2005).

In addition to its overall implausibility, Plaintiffs' theory concerning North Brawley suffers from three specific independent legal defects.  First, Plaintiffs' primary attack on Ormat's public statements about North Brawley seems to be that Ormat misled its stockholders concerning the timetable for when the North Brawley project would be complete and fully operational.  This challenge, however, fails because Ormat's projections, predictions, and expectations concerning when the North Brawley project would be complete and ramped up to full capacity constitute forward-looking statements protected by the Reform Act's safe harbor for forward looking statements.  Indeed, Congress enacted the Reform Act to encourage companies to provide such forward-looking information without fear of being subject to lawsuits alleging securities fraud when its projections turned out to be inaccurate.  See, e.g., S. Rep. 104-98 (reprinted at 1995 U.S.C.C.A.N. 679) at 684, 694-97; H.R. Conf. Rep. 104-369 (reprinted at 1995 U.S.C.C.A.N. 730) at 741-745.  Second, even if the Reform Act's forward looking statement safe harbor does not apply, Plaintiffs have not alleged that Ormat made any false or misleading statements concerning North Brawley.

24

1    Third, Plaintiffs have not alleged that their losses, if any, were caused by the revelation of any

2    "truth" concerning North Brawley.

3        A.    **Ormat's Statements Concerning North Brawley Are Protected By The Reform**

4              **Act's Safe Harbor For Forward-Looking Statements.**

5        The Reform Act provides companies that make forward-looking statements with a two

6    pronged "safe harbor" from liability for projections.   These two prongs are independent of one

7    another.   Thus, a company cannot be liable under Section 10(b) if it **either** makes forward-looking

8    statements that are identified as such and are accompanied by "meaningful cautionary language" **or**

9    makes forward-looking statements without "actual knowledge" that the statements were false or

10   misleading.   See In re Cutera Sec. Litig., __ F.3d __, 2010 WL 2595281, at *7 (9th Cir. June 30,

11   2010).

12       Ormat's projections concerning when the North Brawley plant would be complete and fully

13   ramped up fall within the Reform Act safe harbor.   For purposes of the safe harbor, "[f]orward-

14   looking statements" include statements containing projections of the company's revenues, income,

15   earnings per share, management's plans or objectives for future operations including plans or

16   objectives relating to the products or services of the company, or predictions of future economic

17   performance.   15 U.S.C. § 78u-5(i)(1); see also Employers Teamsters Local Nos. 175 and 505

18   Pension Trust Fund v. The Clorox Co., 353 F.3d 1125, 1132 (9th Cir. 2004).   In addition, statements

19   of the assumptions underlying or relating to these types of statements also fall within the meaning of

20   "forward-looking statements."   15 U.S.C. § 78u-5(i)(1); Clorox, 353 F.3d at 1132.   Ormat's

21   statements concerning the timetable for the completion and ramp up of the North Brawley plant, its

22   capacity when fully ramped up and its expectations that it would resolve the technical challenges it

23   confronted relating to sand in the geothermal reservoir  squarely fall within the safe harbor.  (CAC

24   146, 149, 156, 157, 160, 161, 163, 164, 165, 166, 167, 168, 169, 171).   Indeed, Ormat specifically

25   identified these statements as forward-looking in the SEC filings, press releases, and conference

26   calls that Plaintiffs challenge.  (Ex. 5  at 18; Ex. 6 at 19; Ex. 7 at 20; Ex. 30 at 1; Ex. 16 at 3; Ex. 32

27   at 1; Ex. 3 at 3; Ex. 8 at 21; Ex. 34 at 1; Ex. 35 at 1; Ex. 36 at 1).

28

25

31532801

Each of the two independent prongs of the safe harbor protects Ormat's projections concerning when it would complete construction and ramp up production at the North Brawley plant. These projections were accompanied by meaningful cautionary statements that warned of the specific risks to which the North Brawley project was subject. In addition, Plaintiffs' reliance on a failed project in North Brawley in the early 1980s and the speculation of a confidential witness who never even worked for Ormat does not suffice to plead with particularity that Ormat had actual knowledge of the falsity of its projections. For each of these reasons, the CAC must be dismissed.

1. **Ormat's Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language Warning Its Stockholders That There Were Risks Attendant To Its Development And Construction Of The North Brawley Project.**

Ormat's projections were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). A company need not identify the exact risk that ultimately resulted in the forward-looking statement not being realized. Rather, as explained by Congress:

> The Conference Committee expects that the cautionary statements identify important factors that could cause results to differ materially – but not all factors. Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor.

1995 U.S.C.C.A.A.N. 679, 743 (emphasis added). Thus, although "boilerplate" risk warnings (for example, a statement that "our projections might not come true") are insufficient, the requirement of "meaningful cautionary statements" is not particularly demanding. In fact, the cautionary statement must simply identify risk factors of similar significance to the factor that caused the projection to be untrue. See, e.g., Clorox, 353 F.3d at 1133 (affirming summary judgment based on cautionary language prong of safe harbor because CFO "identified important problems . . . that could cause her estimate . . . to be off"); Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999) ("when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward"); DotHill, 2009 WL 734296, at *12-13.

26

31532801

1    Two steps are therefore required to determine whether a forward-looking statement was

2    accompanied by meaningful cautionary language.  In the first step, one must determine why the

3    plaintiffs allege that defendants' forward-looking statement turned out to be inaccurate.  In the

4    second step, one must determine whether the risk disclosures accompanying defendants' forward-

5    looking statement were of similar significance to the risk that the plaintiffs allege caused the

6    forward-looking statement not to be accurate.[20]

7    For example, in In re Skechers U.S.A., Inc. Sec. Litig., No. CV 03-02094, 2004 WL 1080174

8    (C.D. Cal. May 7, 2004), aff'd 273 Fed. Appx. 626 (9th Cir. April 10, 2008), the defendant company

9    made positive predictions concerning its future earnings in a series of press releases.  Id. at *1, 5.

10   These projections, however, turned out to be inaccurate when demand for the company's products

11   softened.  In response, the company issued revised projections noting the "generally weak domestic

12   retail sales environment within apparel and footwear sectors."  Id. at *2.  The plaintiffs brought a

13   Section 10(b) claim alleging that the company knew of the softening demand before it issued its

14   positive projections because the company's "clients typically ordered the company's shoes months

15   in advance."  Id. at *2.  The district court dismissed the plaintiffs' complaint based on the forward-

16   looking statement safe harbor.  The court held that although the defendant did not warn its investors

17   of the identical risk that caused the projections to be inaccurate – softening demand for the

18   company's products – it provided sufficient warnings including that "a decrease in sales during the

19   back-to-school or holiday selling season, change in customer demands and fashion trends . . . and

20   decreased demand by industry retailers" might cause the predictions to fail.  Id. at *5.

21   Here, Plaintiffs allege that Ormat's projections concerning completion, ramp up to capacity

22   and ability to overcome operational challenges at North Brawley turned out to be inaccurate because

23   of complications related to the geothermal reservoir at North Brawley.  (CAC 177).  Specifically,

---

[20]    Ormat's forward-looking statements are also insulated from liability under the bespeaks-caution doctrine as Ormat specifically warned its stockholders of the risks that could cause it not to complete and ramp up the North Brawley project on the anticipated schedule.  This provides another independent basis to dismiss the CAC.  See In re Infonet Services Corp. Sec. Litig., 310 F. Supp. 2d 1080, 1091-93 (C.D. Cal. 2003) (granting motion to dismiss a Section 10(b) claim alleging that forward-looking statements were misleading based on the bespeaks caution doctrine); Worlds of Wonder, 35 F.3d at 1414 (9th Cir. 1994).

31532801

1   Plaintiffs allege that Ormat encountered problems with sand in the geothermal reservoir and that

2   there was interference between injection wells when the wells were operated together.  (CAC 177).

3   Ormat, however, warned of risks virtually identical – and certainly of similar significance – to these

4   risks by specifically describing that the technical problems in extracting geothermal fluids could

5   result in delays and unanticipated costs.  For example, Ormat repeatedly cautioned investors that the

6   viability of its geothermal development projects depends on "different factors directly related to the

7   geothermal resource, such as...operational factors relating to the extraction of geothermal fluids."

8   (Ex. 3 at 3-4, 44-61, 69-72;  Ex. 2 at 3-4, 44-61, 71-72).  Ormat made clear to investors that its

9   "geothermal energy projects may suffer an unexpected decline in the capacity of their respective

10  geothermal wells and are exposed to a risk of geothermal reservoirs not being sufficient for sustained

11  generation of the electrical power capacity desired over time."  Id.  In addition, the Company warned

12  investors that its geothermal development projects "may not commence operation as scheduled" and

13  that its completion of new geothermal projects "is subject to substantial risks, including adverse

14  environmental and geological conditions...which could give rise to delays, cost overruns, the

15  termination of the plant expansion, construction or development or the loss (total or partial) of

16  [Ormat's] interest in the project under development, construction or expansion."  (Ex. 3 at 46-47;

17  Ex. 2 at 46).

18        Given that these are the exact reasons Plaintiffs allege that Ormat was not able to complete

19  and ramp up the North Brawley project on time, the first prong of the safe harbor insulates Ormat's

20  public statement from liability.  See also Isham v. Perini Corp., 665 F. Supp. 2d 28, 39 (D. Mass

21  2009) (company's estimates concerning completion schedule for construction project protected by

22  safe harbor).

23        **2.      Ormat Did Not Have Actual Knowledge That It Would Be Unable To**

24              **Complete The North Brawley Project By December 2008**.

25        Ormat's statements concerning North Brawley are also insulated from liability by the second

26  prong of the safe harbor which protects an entity or person making a forward-looking statement

27  without "actual knowledge" that the statement was false or misleading when made.  15 U.S.C.

28  § 78u-5(c)(1)(B)(i).  Indeed, to avoid dismissal of a Section 10(b) claim based on forward-looking

28

1   statements, a plaintiff "must have alleged facts that would create a strong inference that the

2   defendants made the forecasts with 'actual knowledge . . . that the statement[s were] false or

3   misleading' at the time made." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1091 (9th Cir. 2002).

4   This standard is the most demanding state of mind requirement in the Reform Act – even more

5   demanding than the strict "deliberate or conscious recklessness" standard applied to non-forward-

6   looking statements in this Circuit. See id. at 1085.  Moreover, as the Supreme Court made clear in

7   Tellabs, Plaintiffs must also overcome facts that undermine any inference of scienter.

8              a.    The CAC Makes Clear That Ormat (And Others) Believed In The

9                    Viability Of The North Brawley Project.

10      Plaintiffs allegations make clear that the facts undermining scienter – facts that must be

11  considered after Tellabs -- clearly outweigh the vague allegations discussed below that Plaintiffs use

12  to attempt to allege actual knowledge.

13      First, Plaintiffs acknowledge that SCE, an electricity provider in Southern California, entered

14  into a Power Purchase Agreement with Ormat whereby it would purchase 50MW of clean energy

15  output from the North Brawley project.  (CAC 124).  The PPA undermines any effort to allege

16  scienter because (1) the contract contains penalty clauses requiring Ormat to make payments to

17  cover SCE's replacement costs for any shortfall in the amount of energy that Ormat failed to provide

18  from North Brawley and Ormat would not have agreed to such penalties if it did not believe it could

19  complete the project in a timely manner, (Ex. 2 at 50); and (2) the fact that SCE, which had previous

20  experience with a geothermal plant in Brawley in the 1980s, entered into the PPA undermines any

21  suggestion in the CAC that Ormat knew that the technical issues associated with geothermal

22  developments in North Brawley could not be overcome 30 years later.

23      Second, Plaintiffs admit that throughout 2009 Ormat disclosed multiple delays with its

24  projects and detailed the problems that Ormat was having in ramping up North Brawley to full

25  capacity.  Ormat's willingness to disclose these problems to its stockholders undermines any

26  inference of actual knowledge or deliberate or conscious recklessness.  See Part I.B.1 above; see also

27  New York State Teachers' Retirement Systems v. Fremont General Corp., No. 07-5756, 2009 WL

28  3112574, at *14 (C.D. Cal. Sept. 25, 2009) ("[t]he public disclosure of the company's problems and

its efforts to address those problems (no matter how inadequate the effort ultimately proved to be) weighs against a conclusion that, taken together, the individual Defendants; knowingly or recklessly made misleading public statements").[21]

Third, Plaintiffs admit that Ormat continued to put significant resources into the North Brawley project throughout 2008 and 2009 thereby demonstrating their belief in the project.  (CAC 146, 154, 164); see Worlds of Wonder, 35 F.3d at 1425.  This is especially true because, fourth, as discussed above, unlike almost every other case asserting claims of securities fraud, Plaintiffs do not allege that the Defendants took advantage of the allegedly inflated stock price to sell stock at inflated prices.  Courts have noted that such an absence of stock sales undermines an inference of scienter and this is even more true here where Defendants saw no personal benefit from their decision to continue to expend resources on the North Brawley project.

           b.     <u>Plaintiffs' Claim That Ormat Had Actual Knowledge That It Would Not Complete The North Brawley Project By December 2008 Constitutes Little More Than Speculation.</u>

In any event, with or without the facts undermining scienter discussed above, Plaintiffs' effort to allege that Defendants had actual knowledge that Ormat could not complete the North Brawley plant by the end of 2008 fails.  Plaintiffs' extremely creative speculation based on a failed geothermal power plant built in Brawley in the early 1980s, Ormat's installation of sand separators at North Brawley around May 2008, and a confidential witness (and documents possibly obtained from the confidential witness) does not show actual knowledge.[22]

---

[21]     Plaintiffs' seeming claim that Ormat took too long to disclose various problems that it encountered at North Brawley is wrong.  As discussed, Ormat frequently updated its stockholders as soon as it had some understanding as to the problems it faced.  See Higgnbotham v. Baxter Int'l, Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("[m]anagers . . . are entitled to investigate for a reasonable time, until they have a full story to reveal").

[22]     Plaintiffs also allege that Ormat encountered more sand than it expected, did not bring the project on line in 2008, redrilled certain wells in 2009, and that the plant is still not at full capacity.  These allegations, however, constitute improper fraud by hindsight barred by the Reform Act.  See, e.g., Silicon Graphics, 183 F.3d 970, 988 (9th Cir. 1999); Vantive, 283 F.3d at 1084-85.

1            (1)      Plaintiffs Cannot Rely On Unfavorable Results At A Different

2                          Project Three Decades Ago To Establish Actual Knowledge.

3         Plaintiffs' allegations that SCE/Unocal experienced technical problems at another geothermal

4 project in the Brawley region approximately 25 to 30 years ago do not show actual knowledge that

5 Ormat would not be able to complete the North Brawley project as projected.  First, Plaintiffs'

6 argument based on this project indicates that this information was publicly available to everyone

7 including Ormat's stockholders and therefore such information cannot give rise to a fraud claim for

8 alleged failure to disclose.  See, e.g., Whirlpool Financial Corp. v. GN Holdings, Inc., 67 F.3d 605,

9 609 (7th Cir. 1995) (companies need only disclose firm specific information and do not need to

10 disclose information already in public domain); In re Infonet Services Corp. Sec. Litig., 310 F. Supp.

11 2d 1080, 1097 n.14 (C.D. Cal. 2003).[23]  Second, Plaintiffs do not allege that Ormat developed the

12 same resource in North Brawley as SCE/Unocal tried to develop in 1980, and the publicly available

13 facts show that SCE/Unocal was attempting to develop a deep, super-high temperature resource with

14 high salinity and high levels of heavy metals while Ormat is developing a shallower, lower-

15 temperature resource with substantially lower salinity and levels of heavy metals.  (See, e.g., Ex. 48).

16 Third, Plaintiffs' assumption that the SCE/Unocal experience from 1980 demonstrates that Ormat

17 had to know that it could not succeed in 2008 assumes no technological advancements in 28 years of

18 geothermal exploration.  Indeed, SCE itself recognized that there was a tremendous difference

19 between its efforts in the 1980s and Ormat's development of North Brawley in 2008 as it signed a

20 PPA to purchase power from the North Brawley project.

21            (2)      Plaintiffs Cannot Assume That Ormat's Ordinary Installation

22                          Of Sand Separators Demonstrates That It Knew It Would Not

23                          Complete The North Brawley Project In 2008.

24         Plaintiffs' claim that Ormat installed sand separators at North Brawley in the summer of

25 2008 does not show actual knowledge that Ormat could not meet its projections concerning the

---

27   [23]      Plaintiffs' information seems to come from a number of publicly available government and

28 private publications.  (See Exs. 45-47).

31532801

1    North Brawley project.  As discussed above, there was nothing unusual about Ormat's decision to

2    install sand separators at North Brawley.  It had used sand separators at its previous successful

3    projects located close to North Brawley in Heber and Ormesa.  Heber generates 92 MWs of

4    electricity and Ormesa generates 57 MWs of electricity thereby providing further support for

5    Omrat's belief that it could build a 50 MW plant at North Brawley.  (Ex. 4 at 35-36, 40-41).

6    Moreover, there is nothing fraudulent about a company recognizing that it has certain issues,

7    planning to remedy those issues, and still believing that it can complete a project or reach capacity

8    by an estimated date.  See, e.g., In re Syntex Corp. Sec. Litig., 95 F.3d 922, 930 (9th Cir. 1996); In re

9    CBT Group PLC Sec. Litig., No. 98-21014, 1999 WL 1249287, at *3 (N.D. Cal. July 21, 1999).[24]

10                  (3)      Plaintiffs Cannot Rely On A Confidential Witness Who Never

11                           Worked For Ormat And Admittedly Knows Nothing About

12                           Drilling Or Testing Of Geothermal Wells.

13          Plaintiffs also try to rely on a purported confidential witness to establish that Ormat had

14   actual knowledge that it would not complete the North Brawley project by the end of 2008.  A

15   complaint relying on confidential witnesses must (a) describe the witnesses with sufficient

16   particularity to establish their reliability and personal knowledge of the facts alleged, and

17   (b) establish that the proffered confidential witness statements are indicative of scienter.  See

18   Digimarc, 552 F.3d at 995-96 (rejecting confidential witness allegations where the purported sources

19   were not employees of the defendant issuer).  Cornithian Colleges, 540 F.3d at 1069 n.3 (rejecting

20   confidential witness allegations that did not convey sufficient information to support a strong

21   inference of scienter).  Confidential witness allegations are insufficient as a matter of law where the

22   source is not in a position to know the facts alleged or simply reports unreliable hearsay or

23

24   [24]      Plaintiffs' discussion of the PTC is a complete red herring because, as the CAC fails to point
25   out, the tax credit at issue was extended through 2010 by the Emergency Economic Stabilization Act
     of 2008 signed by President Bush on October 3, 2008 and then further extended through 2013 by the
26   American Recovery and Reinvestment Act signed by President Obama on February 17, 2009.  (Ex. 3
     at 70).  Furthermore, the PTC gave Ormat a real incentive to complete the project by the end of 2008
27   and not a reason to say that it would complete the project by the end of 2008 if it did not believe that
     it could do so.
28

                                                 32

1    conclusory opinions.  Id. at 996-98; see also California Public Employees' Retirement System v. The

2    Chubb Corp., 394 F.3d 126, 148-156  (3d Cir. 2004).

3         Here, CW1's assessment is fatally defective for numerous reasons.  CW1 did not work for

4    Ormat but for a company employed merely to lay electrical conduit.  (CAC 138).  CW1 was "not

5    involved with drilling or testing of wells."  (CAC 138).  CW1 does not explain why or how an

6    electrical contractor is qualified to opine on reasonable completion schedules for complex

7    geothermal engineering projects.  (CAC 138)  Also, CW1 ceased working at North Brawley in

8    September 2008 and thus has no knowledge concerning what efforts Ormat planned for or engaged

9    in the fourth quarter of 2008 to complete construction of the plant and drilling wells.  (CAC 138).

10   CW1 does not offer any facts that anybody at Ormat shared his apparent uninformed view that the

11   plant was behind schedule as he does not allege that he ever actually communicated with a single

12   person employed by Ormat.  (CAC 138).  CW1 does not offer any facts that the plant could not be

13   completed by the end of 2008.  And finally, CW1 never spoke to, communicated with, or even met

14   any of the Defendants and so can offer absolutely nothing concerning the state of mind of any of the

15   Defendants.  See, e.g., Limantour v. Cray, Inc., 432 F. Supp. 2d 1129, 1142-44, 1149 (W.D. Wash.

16   2006) (holding that information from confidential witness cannot establish a defendant's knowledge

17   if confidential witnesses do not describe "what specific information was presented" to defendant);

18   Hypercom, 2006 WL 1836181, at *7.

19        In short, Plaintiffs' reliance on CW1 frankly shows how little that they can muster to support

20   their claims concerning North Brawley.

21                         (4)    Plaintiffs' Vaguely Described Third Party Drilling Reports

22                                Does Not Show That Ormat Knew Its Estimated Completion

23                                Date For North Brawley Was Not Achievable.

24        Plaintiffs' final effort in their attempt to establish that Ormat had actual knowledge that it

25   would not complete the North Brawley plant by the end of 2008 relies on some alleged "third party"

26   drilling reports.  These reports, however, are so vaguely described that Plaintiffs have not established

27   that these reports actually exist and/or include information Plaintiffs attribute to them.  See, e.g.,

28   Silicon Graphics, 183 F.3d at 984-85.  Plaintiffs do not indicate which third party drilling companies

33

produced the reports, where were they filed, what dates they purport to cover, why were they prepared, who prepared them, and how Plaintiffs obtained them (if they actually exist).  Even if the reports were described with sufficient particularity, Plaintiffs' allegations about what these reports purportedly demonstrate are insufficient to show that the plant could not be finished by the end of 2008.  Thus, Plaintiffs' claim that three wells supposedly took over 100 days to drill (and they did not)[25] do not demonstrate that Ormat could not complete the North Brawley project in 2008.  Plaintiffs do not allege that the three wells were not complete in 2008 (and they were); do not allege that delays (if any) at only 3 wells would interfere with the project going on-line by the end of 2008 because they do not indicate how many wells were needed to operate the plant, Corinthian Colleges, 540 F.3d at 1063 (problems at one campus do not demonstrate problems at other 87 campuses); and do not allege that, even if there were delays, Ormat could not have brought in additional construction equipment to complete the project in 2008.  Indeed, as discussed above, **Ormat actually sold power from North Brawley to SCE in 2008**.  Finally, Plaintiffs have not alleged that these third party reports were ever provided to any of the Defendants and thus at most indicate that some unknown third parties – but not the Defendants – may have believed that there were possible delays at North Brawley.  Cf.  Digimarc, 552 F.3d at 998 (internal disagreements at company concerning particular issue not sufficient to demonstrate that defendants had scienter).[26]

---

[25]     Plaintiffs have not described the reports on which they rely with sufficient particularity for Defendants to identify what reports Plaintiffs reference, but the actual drilling reports for the three wells Plaintiffs identify show that they took 30, 56 and 25 days to drill and were complete by early October 2008.  (See Exs. 50-52).

[26]     Plaintiffs also seemingly attempt to allege scienter for the named Defendants based on their claims that the North Brawley project was important to Ormat.  (CAC 16).  As discussed in the text, however, Plaintiffs have not alleged that anybody at Ormat actually knew (or acted with conscious disregard) that the North Brawley plant would not be completed on time and at its full operational capacity.  It is therefore impossible for the named Defendants to have known either.  In addition, the Ninth Circuit has specifically detailed the circumstances when a plaintiff's allegations concerning management's role with the company's "core operations" impact the scienter analysis.  In so doing, the court has reaffirmed the rule that plaintiffs cannot allege scienter merely by alleging that management must have known of a misstatement.  See Digimarc, 552 F.3d at 1000; see also South Ferry, L.P. v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008) (effort to allege scienter based on "core operations inference" "will usually fall short of the PSLRA standard").  The primary exception to this rule applies only when "general allegations about management's role in a corporate structure

(Footnote continues on next page.)

34

1
2
       c.     Plaintiffs' CAC Considered In Its Entirety Demonstrates That Defendants Did Not Act With Scienter

3       In short, Plaintiffs have not alleged that Defendants had actual knowledge that they could not
4 complete the North Brawley project as projected.  Plaintiffs vague speculation based on SCE's
5 experience 30 years ago, Ormat's ordinary installation of sand separators at North Brawley in 2008,
6 and information from a confidential witness who never worked for Ormat and who left the North
7 Brawely site three months before the end of 2008 do not show actual knowledge that Ormat's
8 projections were false when made.  This conclusion is buttressed further by Defendants tremendous
9 efforts to complete the project without obtaining any personal benefit, SCE's support for the project,
10 and Defendants' fulsome disclosure of the problems facing the North Brawley project as soon as
11 they had enough information to provide Ormat's stockholders with meaningful disclosures.

12
13 **B.**    **Plaintiffs Have Not Alleged That Ormat Made Any False Or Misleading Statements About The North Brawley Project.**

14       Even if the Court determines that the Reform Act safe harbor does not apply for some reason,
15 Plaintiffs have still failed to allege that Defendants made any false or misleading statements.[27]  In
16 order to plead that a projection or opinion or belief is false or misleading, a plaintiff must allege facts
17 with particularity that show either that (1) the statement was not actually believed, (2) there is no
18 reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to
19 undermine the statement's accuracy.  See Provenz v. Milller, 102 F.3d 1478, 1487 (9th Cir. 1996); In
20 re Wells Fargo Sec. Litig., 12 F.3d 922, 930 (9th Cir. 1993).  In other words, plaintiffs "must allege

21 (Footnote continued from previous page.)

22
23 and the importance of the corporate information about which management made false or misleading statements . . . are buttressed with detailed and specific allegations about management's exposure to factual information within the company."  Digimarc, 552 F.3d at 1000.  Plaintiffs have not alleged
24 that this exception applies.  Indeed, North Brawley was only one of 24 geothermal and recovered energy plants that Ormat was either operating, constructing, or developing at year-end 2007.  (Ex. 2
25 at 9-10).  Collectively, these 24 plants and development projects had a "generating capacity" or "projected generating capacity" of between 686MW and 722MW (with North Brawley's projected
26 50MW total accounting for approximately 7%).  (Ex. 2 at 9-11).  In addition, Plaintiffs have alleged no facts about the named Defendants "exposure to factual information within the company."

27
28 [27]    Plaintiff have also failed to allege that Defendants acted with "deliberate recklessness" for the same reasons that they have failed allege actual knowledge.  See Part II.A.2.

31532801

1  facts showing that Defendants lacked a reasonable basis for their predictions" or opinions.  In re Oak

2  Technology Sec. Litig., No. 96-20552, 1997 WL 4481868, at *6 (N.D. Cal. Aug. 1, 1997).[28]

3      Plaintiffs have not done that with respect to either Ormat's 2008 or 2009 statements

4  concerning North Brawley.[29]  As discussed above, Plaintiffs' allege nothing of the sort with respect

5  to Ormat's statements in 2008 as they merely claim that Ormat experienced some problems in

6  completing and ramping up the project.  Plaintiffs never allege facts showing that Defendants did not

7  believe that Ormat could not overcome those problems and complete the project by the end of 2008.

8  Plaintiffs also do not allege facts indicating that Defendants' belief in the project was not reasonable

9  or that the Defendants were aware of facts indicating that Ormat could not complete the project in

10  2008.  Indeed, until Ormat ran into problems in its initial operations of the plant in late 2008,

11  Defendants had no reason to believe that Ormat would not complete and have North Brawley on-line

12  by the end of 2008.  See Part II.A.2 above.

13      Plaintiffs also made no effort to allege that Defendants did not believe or have a reasonable

14  basis for the statements they made in 2009.  Plaintiffs only allege that these statements were

15

16  [28]  Plaintiffs' CAC makes it impossible to determine whether the CAC challenges any
statements that do not constitute projections, opinions or statements of belief.  The CAC simply
17  includes large block quotes from Ormat's press releases and conference calls and claims that the
entire quote is allegedly misleading for the same reasons.  See, e.g., In re Splash Technology
18  Holdings Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001); In re GlenFed Inc. Sec.
Litig., 42 F.3d 1541, 1554 (9th Cir. 1994).  In any event, if Plaintiffs do challenge any such
19  statements, as discussed above, they have failed to "specify each statement alleged to have been
misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the
20  statement or omission is made on information and belief, the complaint shall state with particularity
all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Plaintiffs also must allege that a
21  statement is misleading and not just that it is incomplete.  Transitional Hospitals, 280 F.3d at 1006.

22  [29]  Plaintiffs' proposed class period runs from May 7, 2008 through February 24, 2010, yet the
CAC includes numerous paragraphs challenging statements made by Ormat both prior to and after
23  the proposed class period (CAC 121, 123-129, 172-177).  Obviously, such statements cannot form
the basis for a securities fraud complaint (because investors could not have relied on statements
24  made prior to the class period and post-period statements could not have caused any losses).  See In
re Foxhollow Technologies, Inc., Sec. Litig., No. C 06-4595, 2008 WL 2220600, at *17-19, n. 10
25  (N.D. Cal. May 27 2008) (statements before or after the class period not actionable); In re Seagate
Technology II Sec. Litig., No. 89-2493, 1995 WL 66841, at *4 (N.D. Cal. Feb. 8, 1995) ("(i)n a
26  securities class action lawsuit, liability cannot attach to statements either made before or after the
class period").

27

28

36

31532801

misleading for failure to disclose well interference issues (CAC 170), and the CAC offers no facts indicating that Ormat learned of the well interference issues before it disclosed those facts in early 2010.  Indeed, Plaintiffs assertion that Ormat's statements in 2009 were misleading because Ormat learned of the interference issues in 2010 and therefore must have known about them earlier constitute inadequate fraud by hindsight barred by the Reform Act.  See, e.g., Silicon Graphics, 183 F.3d at 988; Vantive, 283 F.3d at 1084-85.  Plaintiffs have further failed to allege that Ormat's 2009 statements were false or misleading because they admit that Ormat consistently disclosed delays in the North Brawley project throughout 2009 and therefore fail to explain how these statements misled anybody into purchasing Ormat stock.  Thus, for example, how was a stockholder misled into buying Ormat stock by statements that Ormat found "larger than expected quantities of sand in the geothermal reservoir," that Ormat had another "three-month delay," or another "four month" delay.  Under similar circumstances, courts have rejected claims of securities fraud by noting that a company's public modification of its "deployment schedule" by disclosing further delays in its build-out are not materially misleading.  See In re Metricom Sec. Litig., Case No. 01-4085, 2004 WL 966291, at *30 (N.D. Cal. Apr. 29, 2004), aff'd sub nom.  Young v. Dreisbach, 182 Fed. Appx. 714 (9th Cir. 2006); see also Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 218 (4th Cir. 1994) (cautionary language usually "not the stuff of which securities fraud claims are made"); In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1405-07 (9th Cir. 1996).

   **C.**   **Plaintiffs Have Not Alleged That Their Losses, If Any, Were Caused By Any Disclosures Concerning North Brawley.**

   In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 343-43 (2005), the Supreme Court held that plaintiffs asserting claims under Section 10(b) and Rule 10b-5 may not simply allege that misstatements by the defendants artificially inflated the price of the issuer's securities.  Instead, plaintiffs must plead and prove that a curative or corrective disclosure revealed to the market the truth regarding an earlier false statement or omission, and that the disclosure of the truth caused the issuer's stock price to decline significantly or otherwise caused plaintiffs' to suffer a cognizable economic loss.  Id. at 347; see also Corinthian Colleges, 540 F.3d at 1062 ("the complaint must allege that the defendant's 'share price fell significantly after the truth became known'"); In re

31532801

Maxim Integrated Products, Inc. Sec. Litig., 639 F. Supp. 2d 1038, 1045 (N.D. Cal. 2009) (plaintiffs must "(1) identify the fraudulent statement that causes the stock price to increase, (2) identify the statements or acts which revealed to the market that the statement was fraudulent, and (3) show a stock price decline after the revelation").

Here, Plaintiffs' make no attempt at all to plead any facts showing a stock price decline caused by the release of any curative or corrective disclosure regarding the North Brawley project. Rather they merely allege that certain of Defendants' positive statements concerning North Brawley inflated the price of Ormat's stock during the class period. (CAC 148, 151). It is exactly this kind of "loss causation" pleading that Dura rejected and alone constitutes reason to dismiss Plaintiffs' claims concerning North Brawley.

Moreover, the only stock price decline discussed in the CAC was purportedly caused by Ormat's disclosure on February 24, 2010 that it was going to restate its financial results to change its method of accounting for exploration and development costs in certain respects and not by any disclosure of the truth concerning North Brawley. (CAC 84-86).[30] In addition, Plaintiffs cannot try to cure their failure to allege loss causation with respect to North Brawley by attempting to allege that Ormat's stock price drop after February 24, 2010 also resulted from disclosures concerning North Brawley. Ormat did not reveal any new information concerning North Brawley on February 24, 2010 that it had not already revealed on February 9, 2010. (CAC 171). Given that the prices of listed stocks are presumed only to move on the disclosure of new information under the efficient market theory, the revelation of old information could not have caused Ormat's stock price to decline. See, e.g., Teachers' Retirement System of Louisiana v. Hunter, 477 F.3d 162, 187 (4th Cir.

---

[30]     Plaintiffs assert that Ormat's statements in 2009 both constitute materially misleading statements and partially curative disclosures. They do not, however, allege that Ormat's stock price fell in response to any of these statements, and, in any event, courts have noted that plaintiffs cannot argue that Ormat's 2009 statements revealed the truth regarding technical issues and delays at North Brawley while simultaneously contending that those same statements constituted affirmative misrepresentations (CAC 170). See In re Flag Telecom Holdings, Ltd., 574 F.3d 29, 41 (2d. Cir. 2009) ("Plaintiffs cannot have it both ways. They cannot allege that Defendants made a certain misstatement... and simultaneously argue that the misstatement itself constituted a corrective disclosure."); In re Dot Hill Corp. Sec. Litig., 594 F. Supp. 2d 1150, 1164 (S.D. Cal. 2008); In re Redback Networks Sec. Litig., No. 03-5642, 2007 WL 4259464, at *5 (N.D. Cal. Dec. 4, 2007).

2007) (cited favorably in <u>Corinthian Colleges</u>, 540 F.3d at 1063); <u>In re Omnicon Group, Inc. Sec. Litig.</u>, 597 F.3d 501, 512 (2d Cir. 2010).

In short, Plaintiffs' Section 10(b) claim related to Ormat's disclosures concerning North Brawley must be dismissed for failure to allege loss causation.

## III.   PLAINTIFF HAS FAILED TO ALLEGE ANY CONTROL PERSON CLAIM.

Plaintiffs' control person claim under Section 20(a) must be dismissed.  To state a Section 20(a) claim, a plaintiff must allege both a primary violation of the securities laws, <u>see</u> <u>Lipton</u>, 284 F.3d at 1035 n.15, and must plead facts with specificity concerning each defendant's ability to exercise control over the activity on which the primary violation is based, <u>see</u> <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1440 (9th Cir. 1987).  Plaintiffs have not done so.  As discussed above in Parts I and II, it has failed to state a claim for violation of Section 10(b).  In addition, Plaintiffs have merely attempted to allege control by each of the individual defendants based on their positions as officers of Ormat.  This does not suffice.  <u>See</u> <u>Paracor</u>, 96 F.3d at 1163 ("person's being an officer or director does not create any presumption of control").

## CONCLUSION

For the reasons set forth above, the CAC should be dismissed.

DATED:  August 13, 2010               KATTEN MUCHIN ROSENMAN LLP


                                      By: <u>*/s/ Bruce G. Vanyo*</u>
                                          Bruce G. Vanyo
                                          (admitted *pro hac vice*)
                                          Richard H. Zelichov
                                          (admitted *pro hac vice*)
                                          KATTEN MUCHIN ROSENMAN LLP
                                          2029 Century Park East, Suite 2600
                                          Los Angeles, California 90067
                                          Telephone:    (310) 788-4400
                                          Facsimile:    (310) 788-4471

31532801

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLLAND & HART LLP
Matthew B. Hippler, Esq.
Nevada State Bar No. 7015
mhippler@hollandhart.com
Tamara Jankovic, Esq.
Nevada Bar No. 9840
tjankovic@hollandhart.com
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Telephone (775) 327-3000
Facsimile (775) 786-6179

Attorneys for Defendants

40