LAW OFFICES OF MARK WRAY
Mark Wray
608 Lander Street
Reno, Nevada 89509
Telephone:  (775) 348-8877

BERNSTEIN LIEBHARD LLP
Sandy A. Liebhard
U. Seth Ottensoser
Michael S. Bigin
10 East 40th Street
New York, NY 10016
Telephone:  (212) 779-1414

GLANCY BINKOW & GOLDBERG LLP
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| WAYNE SZYMBORSKI, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No.: 3:10-CV-00132-ECR-RAM |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| ORMAT TECHNOLOGIES, INC., YEHUDIT BRONICKI, JOSEPH TENNE, | ) ) ) | |
| Defendants. | ) ) | |
| PAUL STEBELTON, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No.: 3:10-CV-00156-ECR-RAM |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ORMAT TECHNOLOGIES, INC., JOSEPH    )
TENNE, YEHUDIT BRONICKI, YORAM      )
BRONICKI, LUCIEN Y. BRONICKI, DAN   )
FALK, JACOB J. WORENKLEIN, ROGER W. )
GALE, ROBERT F. CLARKE,             )
                                    )
                Defendants.                       )
_____  )

JOHN J. CURTIS, On Behalf of Himself and All  )    Case No.: 3:10-CV-00198-ECR-RAM
Others Similarly Situated,          )
                                    )
                Plaintiff,                         )
                                    )
                vs.                                )
                                    )
ORMAT TECHNOLOGIES, INC., JOSEPH    )
TENNE, YEHUDIT BRONICKI,            )
                                    )
                Defendants.                       )
_____  )

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................ 1

II.     LEGAL STANDARDS ....................................................................... 4

III.    PLAINTIFFS HAVE ALLEGED A SECTION 10(B) CLAIM PURSUANT TO THE
        EXCHANGE ACT CONCERNING DEFENDANTS' FALSE AND MISLEADING
        FINANCIAL STATEMENTS ............................................................. 4

        A.      Statement of Facts Regarding the Accounting Fraud ........................... 4

                1.      Ormat Is the Family Business ................................... 5

                2.      Control of Ormat Was Threatened by Gazit ............... 5

                3.      Ormat Abandoned Failed Projects ............................ 6

                4.      Accounting Treatment for Abandoned Projects ......... 6

                5.      The Accounting Fraud Is Revealed ........................... 8

        B.      Plaintiffs Have Adequately Alleged the Falsity of Statements Concerning Ormat's
                Accounting Policy ................................................................. 9

        C.      The Complaint Adequately Alleges Scienter ....................................... 12

                1.      Egregious GAAP Violations Support a Strong Inference of Scienter ..... 13

                2.      GAAP Violations Coupled with Motive Support a Strong Inference of
                        Scienter ...................................................................... 16

                3.      The Complaint in Its Totality Alleges a Strong Inference of Scienter .... 17

IV.     PLAINTIFFS HAVE ALLEGED A SECTION 10(B) CLAIM PURSUANT TO THE
        EXCHANGE ACT CONCERNING THE NORTH BRAWLEY FRAUD ................... 19

        A.      Statement of Facts Regarding the North Brawley Fraud ..................... 19

        B.      Plaintiffs' North Brawley Allegations State a Claim ......................... 26

        C.      Most of Defendants' Misstatements are Present-Tense, Factual Assertions ....... 27

D.    Defendants' Present-Tense Statements Were Made with Deliberate
      Recklessness ..................................................................................... 29

      1.    North Brawley Was Ormat's Largest Project in 2008 ........................... 30

      2.    Facts Provided by CW1 Support an Inference of Scienter ..................... 30

      3.    Defendants Had Motives to Make North Brawley Appear Successful .... 31

E.    Defendants Are Liable for Repeatedly Projecting Commercial Operations Would
      Commence at North Brawley by the End of 2008 ................................................ 31

      1.    A Showing of "No Reasonable Basis" for Making False or Misleading
            Statements Satisfies the Actual Knowledge Prong of the Safe Harbor ... 33

      2.    Any Forward-Looking Statements Were Not Accompanied by Meaningful
            Cautionary Language Related to Development and Construction of the
            North Brawley Project ........................................................................ 34

F.    Fact-Based Disputes Concerning Causation Are Improper at This Stage ........... 36

# TABLE OF AUTHORITIES

## Cases

*Berson v. Applied Signal Technology, Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................... passim

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ................................................................................... 11

*Bryant v. Avado Brands, Inc.*,
   100 F. Supp. 2d 1368 (M.D. Ga. 2000) ................................................................... 28

*Cheney v. Cyberguard Corp.*,
   No. 98-6879, 2000 WL 1140306 (S.D. Fla. July 31, 2000).................................... 12

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .................................................................................. 34

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1997) .................................................................................. 27

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ....................................................................................... 30

*Dura Pharms, Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................... 4, 41

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. The Clorox Co.*,
   353 F.3d 1125 (9th Cir. 2004) ................................................................................ 28

*Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ............................................................................ 16, 31

*Freeland v. Iridium World Commc'ns, Ltd.*,
   233 F.R.D. 40 (D.D.C. 2006)................................................................................... 37

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999).................................................................................... 13

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) .................................................................................. 34

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ................................................................................ 12

*In re Agribiotech Sec. Litig.*,
No. 99-144, 2000 WL 1277603 (D. Nev. Mar. 2, 2000) ....................................................... 11

*In re Amylin Pharm., Inc. Sec. Litig.*,
No. 01CV1455, 2003 WL 21500525 (S.D. Cal. May 1, 2003) ........................................ passim

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ..................................................................................... 33, 35

*In re ASK Computer Sys. Sec. Litig.*,
No. C-85-20207(A)-WAI, 1991 WL 138334 (N.D. Cal., Mar. 11, 1991)............................... 32

*In re Boeing Sec. Litig.*,
40 F. Supp. 2d 1160 (W.D. Wash. 1998)............................................................................... 28

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009)........................................................................................ 37

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................................... 18

*In re Cylink Sec. Litig.*,
178 F. Supp.2d 1077 (N.D. Cal. 2001) ................................................................................. 12

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................. 13, 30, 37

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .............................................................................................. 39

*In re HealthCare Compare Corp. Sec. Litig.*,
75 F.3d 276 (7th Cir. 1996) ................................................................................................. 34

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................................................... 15

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................................... 13

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)................................................................................... 28

*In re Nuko Info. Sys., Inc. Sec. Litig.*,
199 F.R.D. 338 (N.D. Cal. 2000)................................................................................. 16, 19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Peerless Sys., Corp. Sec. Litig.*,
   182 F. Supp. 2d 982 (S.D. Cal. 2002) ................................................................. 13

*In re Peoplesoft, Inc.*,
   No. C 99-00472 WHA, 2000 WL 1737936 (N.D. Cal. May 25, 2000) ................................. 29

*In re PMI Group, Inc. Sec. Litig.*,
   No. C-08-1405, 2009 WL 1916934 (N.D. Cal. Jul. 1, 2009) .............................................. 4, 36

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003) ........................................................................... 29

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ............................................................................. 27

*In re Secure Computing Corp. Sec. Litig.*,
   120 F. Supp. 2d 810 (N.D. Cal. 2000) ......................................................... 27, 28

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
   436 F. Supp. 2d 873 (N.D. Ohio 2006) ........................................................... 12

*In re UTStarcom, Inc. Sec. Litig*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................... 28, 32, 37

*In re Wash. Mut. Inc. Sec. Derivative & Erisa Litig.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009) ..................................................... 18

*Marksman Partners, LP v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 n.13 (C.D. Cal. 1996) ....................................................... 15

*Marx v. Computer Scis. Corp.*,
   507 F.2d 485 (9th Cir. 1974) ................................................................. 32, 34

*Miss. Pub. Employees Ret. Sys. v. Boston Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008) ........................................................................... 29

*Provenz v. Miller*,
   103 F.3d 1478, 1487 (9th Cir. 1996) .............................................................. 32

*Robertson v. Strassner*,
   32 F. Supp. 2d 443 (S.D. Tex. 1998) ............................................................. 28

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................................... 35

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................................. 33

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ............................................................. 34

*S. Ferry LP., No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................... 12, 18, 31, 32

*Sequel Capital, LLC v. Rothman*,
    No. 03 C 0678, 2003 WL 22757758 (N.D. Ill. Nov. 20, 2003).............................. 34

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................. 32, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 ,(2007)............................................................. passim

*Trooien v. Mansour*,
    No. 06-3197, 2008 WL 2202720 (D. Minn. May 23, 2008)............................... 34

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ............................................... 35, 38

*Zucco Partners, LLC v.* ,
    Digimarc, Corp., 552 F.3d 981 (9th Cir. 2009) ............................................. passim

## Statutes

15 U.S.C. § 78u-4(b)(1)&(2) ............................................................. 4
15 U.S.C. §78u-5(c)(1)(A)............................................................. 35
17 C.F.R. §230.175 ............................................................. 37

## Rules

Fed. R. Civ. P. 12(b)(6)............................................................. 4, 35
Fed. R. Civ. P. 9(b) ............................................................. 4

## I.    INTRODUCTION

The Consolidated Amended Class Action Complaint (the "CAC") contains two sets of allegations describing distinct series of events.  Despite the best efforts of defendants Ormat Technologies, Inc. ("Ormat" or the "Company"), Yehudit Bronicki, and Joseph Tenne (collectively, "Defendants") to urge otherwise, both state a claim for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").[1]

**The Accounting Fraud**

Ormat explores and develops geothermal resources and constructs power plants.  On February 11, 2010, the Securities and Exchange Commission ("SEC") required Ormat to restate its financial statements for the fourth quarter of 2008 ("Q4'08") and Q3'09.  The restatement was material, erasing 53% of net income for Q4'08 (representing 12.5% of year 2008's total net income) and 10% of net income for Q3'09.  ¶¶63, 66, 84.[2]  The restatements were the result of Defendants' improper use of "full cost" accounting – a method Ormat is precluded by SEC regulation from using – to conceal the costs of abandoned projects, thereby padding the Company's bottom line.  Defendants were aware of the prohibition, but defended their use of the method by stating that it best fit how they viewed their business.  ¶¶55, 59.

Further evidence of Defendants' intentional misconduct is their Class Period publication of accounting policies that used terms of art consistent with more conservative accounting methods.  Ormat misled investors by representing that it writes off expenses incurred from an

---

[1]  Lead Plaintiffs Jianxun Dong, George Umino, and the A.R.D. Investment Club, L.P. (collectively "Lead Plaintiffs" or "Plaintiffs") bring this action as a federal class action on behalf of purchasers (the "Class") of Ormat's securities between May 7, 2008 and February 24, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Exchange Act.

[2]  References to the CAC are set forth as "¶ __" herein.  Exhibits contained in the Declaration of Lionel Z. Glancy in Support of Opposition to Motion to Dismiss the Consolidated Complaint are referred to herein as "Pl. Ex. _."  Exhibits contained in the Declaration of Richard H. Zelichov in Support of Motion to Dismiss the Consolidated Complaint are referred to herein as "Def. Ex. _."

abandoned project in the period of abandonment – something it did not do with respect to the projects at issue.  ¶33.  Only after an inquiry by the SEC did Ormat admit that it had capitalized these expenses.

Defendants' motive to deceive investors stems from their desire to prevent Ormat, a business that was family-founded and controlled for more than 40 years, from being taken over by another company.  Gazit, Inc. ("Gazit") had started purchasing large quantities of Ormat's parent company's shares in early 2007.  Pl. Ex. 1.  To prevent a takeover, in late 2007, the Bronickis borrowed $157 million to buy an additional 7.6% of the parent's shares, using their holdings as collateral.  The overstatements of income during the Class Period kept the price of Ormat and its parent prohibitively high for a takeover and allowed Defendant Bronicki to receive large cash dividends without having to sell stock or compromise corporate control.  ¶¶100-19.

**The North Brawley Fraud**

On December 21, 2006, Ormat acquired leases to explore, develop and construct several power stations in Brawley, California.  The first plant, North Brawley, was initially scheduled to come online at the end of 2008, "at the earliest."  ¶121.  This project was very important to Ormat and its investors, with North Brawley's 50MW to have represented 10% of all of Ormat's megawatts under ownership by the end of 2008,[3] and its largest single plant.[4]

Ormat, as well as Yehudit and Lucien Bronicki, told investors that it takes several years of surveying, exploratory drilling and testing to develop a geothermic resource into an active power plant;[5] moreover, Ormat's approach was to "tailor make" the plant to the resource.[6]  But,

---

[3] "*The Wall Street Transcript*," Nov. 3, 2008 (Pl. Ex. 2) (interview in which Defendant Bronicki indicated that Ormat would have 500 MW under operation by year end).

[4] Only "complexes" have more MW.  *See* 2008 10-K at 9.  Pl. Ex. 3.

[5] *See* 2006 10-K at 7-9, 2007 10-K at 9-11, 2008 10-K at 9-11, and 2009 10-K at 47-54 (projects in "Development," "Construction," and "Operation" stages) (Pl. Exs. 3-6); Def. Ex. 21 (Y. Bronicki letter to SEC); "Beyond Fossil Fuels:  Lucien Bronicki on Geothermic Energy," *Scientific American*, Apr. 30, 2009 (Pl. Ex. 7).

unbeknownst to investors at the time, that was not how they approached North Brawley.  Several factors motivated this decision.  In addition to the takeover threat mounting in 2007, generous government subsidies were being offered to renewable power plants that came online by December 31, 2008. ¶¶100-19, 130.  Defendants later admitted they had no reasonable basis to "very aggressive[ly]" schedule commercial operation of the North Brawley plant by year end 2008 to qualify for the subsidies.[7]

The North Brawley site's high "solids" content caused severe clogging and Defendants were unable to operate the plant at full capacity by December 2008.  Revised target dates in 2009 came and went as costly, temporary filters were used to obtain *some* level of operation. However, Defendants did not install a permanent solution, hydrocyclones, until 2010.  Once the solids problem was solved, a second problem arose, injection capacity.  ¶¶160-77.  The plant now operates at only 50% of promised capacity.  Pl. Ex. 8.

Defendants misled investors because they gave the impression that sufficient exploration, surveying, and field development had *already taken place* such that when the plant was completed, it would operate at full capacity.[8]  When substantial delays and added costs were reported from February 2009 through late February 2010 – the same month that North Brawley was finally placed in service at a mere 17MW, Ormat's price declined and investors were damaged.  *See* Pl. Ex. 9 (chart of Class Period stock prices); *see, generally*, ¶¶160-173.

---

[6]  "Beyond Fossil Fuels, *etc*." (Pl. Ex. 7).

[7]  "If there is a lesson in it, its how complicated development of a Greenfield resource is …[O]ther people could learn from this how easy somebody claims he's going to develop a field that day produces nothing, and will be either 50MW or 100MW or 150MW in a very short time span."  ¶177 (p. 67).  Indeed, Defendants admit that Ormat only entered into the geothermal exploration part of the business in 2006.  *See* Notice of Motion and Motion to Dismiss Consolidated Complaint; Supporting Memorandum of Points and Authorities ("Def. Br.") at 3.

[8]  Only later did Defendants admit: "[W]e have…very little operational information…in our case no information about the field, and there could be a host of surprises."  ¶177 (middle of p. 65).

Defendants later conceded that tens of millions of dollars of costs would have been avoided had the site been developed "slower" (*see* ¶177, top of p. 68).

## II.   LEGAL STANDARDS

A complaint must be sustained if it states a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and … hold dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that's plausible on its face." *In re PMI Group, Inc. Sec. Litig.*, No. C-08-1405, 2009 WL 1916934, at *6 (N.D. Cal. Jul. 1, 2009) (citation omitted).

The elements of a §10(b) claim are: (1) a material misrepresentation or omission (also known as falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).[9]

A securities fraud complaint must also satisfy the requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See* 15 U.S.C. § 78u-4(b)(1)&(2) (1995).  Accordingly, a plaintiff must plead the elements of falsity and scienter with particularity.  *In re PMI Group, Inc.*, 2009 WL 1916934, at *6.

## III.   PLAINTIFFS HAVE ALLEGED A SECTION 10(B) CLAIM PURSUANT TO THE EXCHANGE ACT CONCERNING DEFENDANTS' FALSE AND MISLEADING FINANCIAL STATEMENTS.

### A.   Statement of Facts Regarding the Accounting Fraud

---

[9] Defendants contest only the elements of falsity and scienter as to the accounting fraud.  Def. Br. at 14.  As to the North Brawley allegations, Defendants only contest the elements of falsity, scienter, and loss causation.  Def. Br. at 24-25.  All other elements are conceded.

### 1. Ormat Is the Family Business

The Bronicki Family controls Ormat through its ownership of Ormat Industries, Ltd. ("Ormat Industries"). According to Ormat's proxy statement, "Lucien and [Defendant] Yehudit Bronicki founded . . . [Ormat Industries'] predecessor, Ormat Turbines Ltd., in 1965 and, together with their son, Yoram Bronicki, continue to have a substantial economic interest in our parent, Ormat Industries Ltd., . . . which, in turn, owns approximately 56.02% [25,450,000 shares] of our [Ormat's] outstanding Common Stock." ¶100. The Bronicki Family currently owns a controlling 35% of Ormat Industries through Bronicki Investments Ltd. ¶102.

The Bronicki Family not only owns and controls Ormat, they manage it as well: father, Lucien Bronicki, is Chairman of the Board and Chief Technology Officer; mother, Yehudit Bronicki, is the CEO; and son, Yoram Bronicki is President and Chief Operating Officer. ¶101.

### 2. Control of Ormat Was Threatened by Gazit

Gazit began accumulating Ormat Industries' shares in early 2007. Pl. Ex. 1 (article entitled "Gazit buys 12% of Ormat Industries")). On June 14, 2007, Gazit purchased 7% of Ormat Industries' shares increasing its ownership of Ormat Industries to 12%. *Id.* In December of 2007, Gazit launched a hostile takeover of Ormat Industries and bought shares on the open market – reaching 17% ownership. ¶¶103-04.

To prevent the takeover, the Bronicki Family purchased an additional 7.6% of Ormat Industries' shares, borrowing $157 million from Bank Hapoalim (the "Loan"), using a portion of their Ormat Industries' holdings as collateral. ¶¶103-04. In late December 2008, after a drop in the market value of Ormat Industries, Bank Hapoalim required the Bronicki Family to put up all of their holdings in Ormat Industries to secure the Loan. ¶104. The Bronicki Family complied rather than sell its shares, and Ormat and Ormat Industries remained under the Bronicki Family's

control.  ¶104.  But Gazit remained a large shareholder of Ormat Industries – waiting for the opportunity to take control of Ormat and Ormat Industries.  ¶¶114, 119.[10]

The Bronicki Family could not sell its holdings without losing control of the companies it founded.  To obtain funds to pay off the Loan, Bronicki and Ormat paid significant cash dividends based on Ormat's net income.  ¶¶105, 107 ("[T]he Company's dividend policy … targets an annual payout ratio of at least 20% of the Company's net income, subject to Board approval.").  As major shareholders, the Bronicki Family reaped much of the dividend.

### 3.    Ormat Abandoned Failed Projects

During Q4'08, Ormat abandoned geothermal projects at Buffalo Valley and Grass Valley ¶¶27-28.  A third project, Rock Hills, was abandoned in Q3'09.  ¶26. For each abandoned project, Ormat had not encountered a sufficiently high temperature resource and therefore decided to plug and abandon the slim holes and to reclaim the well pads and roads.  ¶8.

Investors were told that the decision to abandon a project is expressly delegated to senior management, specifically to Defendant Bronicki or Ormat's president, her son, Yoram.  ¶29. Prior to the abandonments, Defendant Bronicki discussed the projects at Buffalo Valley and Grass Hill with investors.  ¶24.  After abandonment, Defendants simply stopped discussing these projects.  ¶37.  They did not report any material costs incurred as a result.  ¶50.

### 4.    Accounting Treatment for Abandoned Projects

Generally Accepted Accounting Principles (GAAP) provide rules for how property, plant, and equipment should be presented in a company's financial statements.  Specifically, when a company holds assets (or in Ormat's case, a project) as a group, and one of the projects in the group is determined to no longer have any value, a write off of the abandoned, or

---

[10] After the Class Period, the Bronicki Family attempted to find an investor to repay the Loan while retaining control.  ¶114.  On July 2, 2010, Gazit attacked again issuing an open letter to investors, criticizing Ormat Industries' management and the board of directors.  ¶119.

worthless, project is required if the costs can be attributed directly to it.  Pl. Ex. 10 (ASC 360-10-35).  ASC 360-10-35 requires that an abandoned project should be completely written off in the period of abandonment, resulting in a charge to net income.

Companies that conduct oil and gas activities account for projects using SEC Regulation S-X, Rule 4-10.  This rule permits one of two accounting methods:  the successful efforts method or the full cost method.  Def. Ex. 44.  The successful efforts method is consistent with ASC 360-10-35, in that when a project is abandoned, it must be written off in the period of the abandonment.  ¶47; Pl. Ex. 10.  The full cost method, however, is a unique method for oil and gas companies.  ¶¶41, 43-46.  This method allows for capitalization of the costs of abandoned projects to be amortized later against the value of other successful projects within a country.  ¶40; Def. Ex. 44.  However, even oil and gas companies using the full cost method are required to disclose an abandoned project's cost in the notes of the financial statements.  ¶50; Def. Ex. 44.

Geothermal companies are specifically excluded from the definition of oil and gas activities under Rule 4-10 and are not permitted to use full cost accounting for their financial statements.  ¶43.

During the Class Period, Ormat's accounting method for Property, Plant and Equipment costs was represented as follows:

> We capitalize costs incurred in connection with the exploration and development of geothermal resources on an "area-of-interest" basis.  All such costs, which include dry hole costs and the cost of drilling and equipping production wells and other directly attributable costs, are capitalized and amortized over their estimated useful lives when production commences.  Although we do not commence exploration activities until feasibility studies have determined that the project is capable of commercial production, it is possible that economically recoverable reserves will not be found in an "area of interest" and

exploration activities will be abandoned.   In this case, capitalized exploration costs would be expensed.

¶¶34, 72.  Ormat did not define the term "area-of-interest" in its SEC filings, but it is used in FAS 19 interchangeably with the term "project" when discussing the successful efforts approach. ¶35; Def. Ex. 43.

Contrary to the above-quoted policy, when the projects at Buffalo Valley, Grass Valley, and Rock Hills were abandoned, Ormat did not write off the capitalized exploration costs.  ¶¶39, 42.  Instead, Ormat used the full cost method and capitalized the costs of these projects to other successful projects in Nevada.  ¶42.  The result of this decision was to overstate net income by 53.6% in Q4'08 and 10% in Q3'09.  ¶84.  The inflated net income figures reported to investors buoyed Ormat's stock price and increased the dividend payments proportionately to the overstatements of net income.  ¶¶86, 109-10, 112-13.

5.      The Accounting Fraud Is Revealed

On September 14, 2009, the SEC sent Ormat a letter expressing concerns it had regarding Ormat's disclosures.  ¶54.  The SEC asked, *inter alia*, for an explanation of how Ormat capitalizes costs on an area-of-interest basis "including explaining how you determine an area of interest and your basis in GAAP for using this methodology."  ¶54.  On October 12, 2009, Ormat admitted that it used the full cost method -- analogizing its business to the oil and gas industry -- and that it had abandoned three projects during the Class Period.  ¶¶55-57.

After further investigation, on February 11, 2010 the SEC stated that Ormat's use of the full cost method was inappropriate (¶¶58-62) and required Ormat to "restate your financial statements to write off all projects that you have determined are not economically feasible and reflect the expense in the period in which you made this determination, consistent with the guidance in ASC 360-10-35."  ¶62.  On February 24, 2010, Ormat issued its Q4'09 and fiscal

2009 results and disclosed that is would restate its financials.  ¶84.  The market reacted negatively and the market price of Ormat's shares fell.  ¶86.  On March 8, 2010, Ormat filed its 2009 10-K with the SEC, which included the restatement.  ¶87.

**B.    Plaintiffs Have Adequately Alleged the Falsity of Statements Concerning Ormat's Accounting Policy**

In accordance with the PSLRA, Plaintiffs pled falsity with particularity by specifically alleging each false and misleading statement and providing the reasons, with supporting facts, why each statement was materially false and misleading.  ¶¶66-83; *see Zucco Partners, LLC v. Digimarc, Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (articulating standard).

Defendants, however, challenge the falsity of one statement concerning Ormat's accounting policy for exploration costs.  Def. Br. 14.  This statement, published in Ormat's 2008 10-K, informed investors "it is possible that economically recoverable reserves will not be found in an 'area-of-interest' and exploration activities will be abandoned.  **In this case, capitalized exploration costs would be expensed.**"  ¶72 (emphasis added).  Plaintiffs alleged that this policy was false and misleading because Ormat did not expense capitalized exploration costs for projects it abandoned.  ¶73.

Defendants argue that the accounting policy was not false because it did not require a write-off of costs for abandoned projects, but only for an abandoned area-of-interest.  Defendants support this argument by explaining that Ormat defined an area-of-interest as larger than a project.  Def. Br. at 6.[11]  But the accounting policy led investors to believe that an area-of-interest was a project.  For example, Ormat did not define "area-of-interest" publicly.[12]  Ormat

_____

[11] However, Defendants ask the Court to assume their conclusion:  Defendants cite to Jersey Valley and McGuiness Hills as other, active, sites in the same area of interest as abandoned Buffalo Valley and Grass Valley sites.  However, the Jersey Valley and McGuiness Hills projects are described on different pages of the SEC filing with no indication that Ormat included them in the same area-of-interest as each other or any other active or abandoned sites.

[12] Defendants do not dispute the secrecy of its internal area-of-interest formulation. Ormat provided maps of its areas-of-interest to the SEC under seal.  Def. Ex. 23; ¶35.  Notably, the SEC

indicated that an "Area-of-Interest" was an accounting term by placing it in quotes and stating it was a "basis" for its accounting policy.  This term is discussed by the FASB when discussing the Area of Interest Approach at Statement of Financial Accounting Standards No. 19 ("FAS 19").[13] *See* Def. Ex. 43 (FAS 19) at ¶¶190-92; ¶35.  In FAS 19, the FASB uses the terms area-of-interest and project interchangeably and states that the terms have the same meaning in the industry. Def. Ex. 43 (FAS 19) at ¶191 (stating that "lines drawn to circumscribe an area-of-interest, or as some would say a project"); *see also id.* at ¶192.[14]

Additionally, Ormat's description of its accounting policy signaled that an area-of-interest is synonymous to a project.  Ormat's accounting policy stated that "[a]lthough we do not commence exploration activities until feasibility studies have determined that **the project is capable of commercial production**, it is possible that economically recoverable reserves will not be found in an "area of interest" and exploration activities will be abandoned."  ¶34 (emphasis added).  Thus, the policy indicates that the success of the project determined whether exploration activities were abandoned.  An area-of-interest is just a reference to the location of "the project."  Moreover, Defendants conditioned investors to believe that failure of a project triggered a write-off by assuring investors in its 2008 10-K that "[t]o date, we have not abandoned any exploration projects" immediately thereafter stating "[i]n this case, capitalized exploration costs would be expensed." ¶33.[15]  *See Berson v. Applied Signal Technology, Inc.*,

commented that Ormat's areas-of-interest determinations were unclear. ¶¶60-61.  Indeed, the Financial Accounting Standards Board ("FASB") explicitly rejected the "area-of-interest approach" as too "arbitrary." ¶35; Def. Ex. 43 at ¶¶190-92.

[13]  The Area-of-Interest Approach was *rejected* by FAS 19, even for oil and gas activities. Def. Ex. 43 (FAS 19) at ¶190.

[14]  Defendants' argument that FAS 19 ¶272 glossary definition of a Field defines an area-of-interest as broader than a single project is not correct.  The definition uses the plural form of the term - "areas-of-interest" - to refer to multiple projects; at best the definition is unclear to a reader of the financial statements.  Def. Br. 15 n.11; Defs. Ex. 43 at ¶ 272.

[15]  This sentence was removed from the 2009 10-K, leaving investors to believe that with respect to any projects that were abandoned, the costs were expensed, but that the expenses were

527 F.3d 982, 987 (9th Cir. 2008) (Finding a statement misleading where it was open to interpretation by a reasonable investor.  Noting "[a]bsent undisputed evidence that these were terms of art that investors would have understood . . ., we cannot find, as a matter of law, that defendants disclosed . . . [the truth].")[16]

Defendants' remaining arguments about why Ormat's accounting policy was not false misstate the CAC's allegations.  The CAC does not allege that Ormat misled "shareholders into believing that Ormat had not ceased exploration activities at any site by March 2, 2009."  Def. Br. 14.  In fact, the CAC notes that Ormat discussed the projects in 2008 and that certain language was dropped from its public disclosures.[17]  ¶¶21-28, 34, 37.  Defendants, however, were required to disclose material costs of abandoned projects to ensure Ormat's fair presentation of its financial statements.  ¶¶74-75, 80.  Thus, the CAC alleges that Ormat's accounting policy was false and misleading because it represented that when a project was abandoned, Ormat would write-off expenses, but Ormat did not. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statements are misleading if they represent that "a state of affairs that differs in a material way from the one that actually exists.").

Accordingly, Plaintiffs have adequately pled why each statement at issue was materially false and misleading.[18]

_____

immaterial.  Accordingly, knowledge that certain projects may have failed (*see* Def. Br. at 1) does not undermine the falsity of the accounting policy and financial statements.

[16]  At most, the term "area-of-interest" implied a grouping of assets consistent with ASC 360-10-35.  In fact, the full cost method does not use the term "area-of-interest" but instead uses the term "cost centers" that "shall be established on a country by country basis."  Def. Ex. 44.

[17]  Defendants use this straw man to accuse Plaintiffs of "hiding" statements from the Court and selecting misleading portions of documents (Def. Br. at 15) in the CAC.  The CAC, however, does not allege any false statement based upon Defendants' obfuscation of the abandoned projects' location. ¶¶66-83.

[18]  Defendants argue that the restatement did not establish the falsity of its earlier financial filings because Ormat had previously disclosed it employed an area-of-interest approach, citing *In re Agribiotech Sec. Litig.*, No. 99-144, 2000 WL 1277603, at *5-6 (D. Nev. Mar. 2, 2000).  Def. Br. at 16 n.12.  However, *Agribiotech* did not involve a restatement.  "By definition ... a restatement

### C.     The Complaint Adequately Alleges Scienter

Defendants possess the requisite scienter under §10(b) when they act either intentionally or with deliberate recklessness. *S. Ferry LP., No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008); *Berson*, 527 F.3d at 987.   A defendant is deliberately reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (internal quotations and citation omitted).

The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 322 (2007).   An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing inference." *Id.* at 324, 328 (emphasis in original).   The inference of scienter need not be more likely than a plausible opposing inference: a tie goes to the plaintiff in that instance. *Id.* at 324.   Also "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citation omitted).

Here, the CAC adequately alleges Defendants acted with the requisite scienter when issuing materially false and misleading financial statements to investors.

---

says that the prior financial statement was false." *In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006) (internal quotations and citation omitted); *see also In re Cylink Sec. Litig.*, 178 F. Supp.2d 1077, 1084 (N.D. Cal. 2001).   Moreover, as explained in *Cheney v. Cyberguard Corp.*, No. 98-6879, 2000 WL 1140306, at *6 (S.D. Fla. July 31, 2000), disclosure is not a substitute for accuracy: "Because, defendant argues, the Company made a full disclosure of its accounting practices, there were no omissions or misrepresentations in the Company's publicly disclosed documents.   Defendant's reasoning is not persuasive.   Even though the 10-Q said revenue is recognized when the product is shipped, the 10-Q omitted to say that when the product is shipped to a reseller, the reseller does not have to pay the Company unless it actually sells the product.   The 10-Q also omitted and misrepresented the fact that this practice violates GAAP."

12

1.       **Egregious GAAP Violations Support a Strong Inference of Scienter**

GAAP violations have been found to be strong evidence of scienter when the violations are egregious.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("Violations of GAAP standards can also provide evidence of scienter."); *In re Peerless Sys., Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 991 (S.D. Cal. 2002) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999)); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves.").

Here, Defendants deliberately applied Rule 4-10's full cost method to account for abandoned geothermal projects, despite Defendants' knowledge that this accounting method was not permitted for geothermal activities.  In fact, Defendants tried to convince the SEC that Ormat's full cost method accounting should be permitted because it best fit Ormat's business.  ¶59; Def. Ex. 21 at 47 (Defendant Bronicki's letters to the SEC, which referred the SEC to Tenne for more information).  But the SEC firmly disagreed: "We do not believe it is appropriate to analogize to full cost accounting.  ASC 932 (formally SFAS 19) and Rule 4-10 of Regulation S-X specifically exclude geothermal activities from their scope.  We believe that full cost accounting should only be applied or analogized to oil and gas activities.  Please restate …."  The restatement revealed that as a result of Defendants improperly employing the full cost method, Ormat's net income was overstated by 53% during the Q4'08 (12.5% for FY'08) and by 10% in Q3'2009.  ¶¶63, 66, 84.

Moreover, it is undisputed that other geothermal companies account for abandoned projects in accordance with ASC 360-10-35, as required by the SEC.  ¶¶48-49.  Defendants, however, told the SEC otherwise, claiming that because there was no geothermal industry standard, Ormat and several peers followed "an approach that we believe is similar in certain

13

respects to the full cost method of accounting that is used in the oil and gas industry." ¶59. Defendants did not disclose the names of these other companies to the SEC. Now, in support of their motion to dismiss, Defendants cite the 10-Ks of CalEnergy (Def. Ex. 26) and Caithness Coso Funding Corp. (Def. Ex. 27). Surprisingly, these other geothermal companies stopped publicly reporting by the year 2000 and 2005 (respectively), well before Ormat's correspondence with the SEC. *See* Pl. Exs. 11-14 (Notices of Termination of Registration SEC Form 15 and EDGAR records searches). Further, the outdated 10-K's do not specifically discuss the accounting treatment of abandoned projects. *Compare* Def. Exs. 26-27 to ¶48 (Razor Techs, Inc. 2009 10-K). Contrary to Defendants' contentions, the apparent geothermal industry standard is to account for abandoned projects as the SEC required of Ormat after its investigation – project by project.[19] Accordingly, Defendants' reliance on accounting policies of defunct companies, that do not specifically address abandonment of projects, further demonstrates Defendants' scienter.

Defendants also violated GAAP by publishing a false and misleading accounting policy, designed to mislead investors to believe Ormat timely wrote off costs for abandoned projects. Defendants' concealment of the truth, that Ormat accounted for abandoned projects pursuant to the full cost method and used secret groupings of assets to capitalize rather than write off expenses, supports a finding of scienter. Indeed, given that only Defendant Bronicki or her son could made the determination concerning abandonment, and the former authored letters to the SEC explaining Ormat's position (¶¶27, 29; *see also* Def. Ex. 21 (referring the SEC to Tenne)), the issue is of such prominence "that it would be 'absurd to suggest' that top management

---

[19] Defendants also knew they had alternatives to the full cost method. The successful efforts method permitted for oil and gas companies by Rule 4-10 is consistent with GAAP's general rules for accounting for Property, Plant, and Equipment at ASC 360-10-35. Defendants instead chose the full cost method reserved for oil and gas companies that makes financial statements less transparent. ¶45.

unaware. . . " *Berson*, 527 F.3d at 989. Moreover, Defendants Tenne and Bronicki certified the accuracy and GAAP compliance of the false financial statements.[20]

Defendants' claim that Ormat's auditors' issuance of a clean audit opinion somehow absolves Defendants of fraud (Def. Br. at 17) is incorrect. In light of Ormat's publication of a policy it did not follow, there is no evidence that the auditors knew Defendants' secret definition of area-of-interest or that they approved using the full cost method. Rather, it is likely that auditors were also misled by Defendants.[21] Moreover, if the accountants knew Defendants were employing the full cost method, Rule 4-10 requires the reporting entity to disclose the amounts capitalized for each abandoned project. Def. Ex. 44 p. 10. Instead, there was no specific disclosure of the abandoned projects' costs in Ormat's 2008 10-K.[22]

Accordingly, use of the full cost method was a clear violation of GAAP that materially misstated Ormat's financial statements. Defendants' actions are strong evidence of scienter.

---

[20] While not alone sufficient to raise a strong inference of scienter, false Sarbanes-Oxley certifications can support an inference of scienter. *Zucco Partners*, 552 F.3d at 1004.

[21] Moreover. Ormat is "responsible for the adequacy and accuracy of the disclosure in its filing…" Def. Ex. 21 at 2. *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008) ("To hold otherwise would shift to the accountants the responsibility that belongs to the courts."); *Marksman Partners, LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996)("The fact that Chantal's independent auditor may have approved the accounting methods will not shield Chantal from liability for deception such methods may have caused.").

[22] Similarly, the argument that the SEC did not make a finding of scienter and took time to investigate the GAAP violations before requiring a restatement does not negate any inference of scienter. Def. Br. at 20. The SEC is not required to make a finding of scienter; moreover, it is prudent for the SEC to investigate thoroughly before requiring a company to restate its financial statements. The SEC indicated throughout the process that Ormat's responses were not clear and/or responsive. *E.g.,* Def. Ex. 21 (Nov. 25, 2009, Ormat response at 3-4, quoting SEC Nov. 17, 2009, letter: "[I]t remains unclear to us that it would be appropriate under GAAP to not impair the poorly performing geothermal resources within an area of interest.")

2.      **GAAP Violations Coupled with Motive Support a Strong Inference of Scienter**

In addition to the intentional and deliberately reckless GAAP violations alleged, the Complaint alleges a strong motive for Defendants to overstate Ormat's net income. GAAP violations coupled with allegations of motive for personal gain have been found sufficient to plead scienter. *Tellabs*, 551 U.S. at 325 (stating that while motive is not required, "personal gain may weigh heavily in favor of a scienter inference."); *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 344 (N.D. Cal. 2000) (GAAP violations with motive to inflate revenue to consummate takeover provided strong inference of deliberate recklessness).

While a profit motive is usually demonstrated by insider stock sales, here, Defendants inflated net income to collect higher dividend payments. Ormat is publicly traded, but it has remained a family controlled business. In December 2007, the Bronicki Family survived Gazit's hostile takeover attempt by purchasing another 7.6% of Ormat Industries shares and pledging some shares as collateral for the Loan; when the stock's price dropped in late 2008, the family's entire holdings were required to secure the Loan. ¶104. The Bronicki Family needed cash to repay the Loan,[23] but insider selling was not an option as control of Ormat would be lost. Defendants knew, however, they could get cash without dilution of ownership by payment of cash dividends; Ormat's dividends were awarded by the Board based upon a percentage of net income. This incentivized Defendants to use improper accounting to increase Ormat's net income. ¶¶105, 107, 116. Improper use of the full cost method overstated net income by approximately 53% during Q4'08 and 10% during Q3'09.

Defendants' attempts to evade a point so obvious it was reported in the press – that dividend payments were made to assist the Bronicki Family to pay down the Loan (¶116) – fall flat. While "routine business motives" may be an insufficient basis to give rise to scienter for accounting fraud (Def. Br. at 21 & n.17), the retention of control of a family business by

---

[23] *E.g., Globes Online* reported: "if they [the Bronicki Family] cannot repay the loan…they could lose half their holding in the company, leaving it open to another takeover attempt." ¶115.

shareholder-managers is hardly a routine business motive for Ormat or its other investors. Defendants also claim Ormat could have paid the same annual dividends based upon application of Ormat's "at least 20% of net income" dividend policy to the restated figures. Def. Br. at 22. Maybe so, but it would be an admittedly larger percentage of net income, *id.*, paid by a company with falling a share price. ¶104. Moreover, dividends are paid on a quarterly basis, with the $0.07 per share following Q4'08 being Ormat's highest in two years. Pl. Ex. 3 (2008 10-K at 63). As a percentage of the $0.26 EPS originally reported, *id.* at 146, $0.07 was in line with a dividend of at least 20% of net income; in contrast, payment of $0.07 on the restated figure of $0.12, would have raised investors' eyebrows. *See* Pl. Ex. 6 (2009 10-K at 177).

Defendants' final challenge is that the dividend increase was insubstantial compare to the total amount of the Loan. Def. Br. at 23. This point is irrelevant. Every dollar was critical for the Bronicki Family to keep Gazit at bay. *See Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("The ultimate profitability of a course of conduct is not conclusive of intent.") Accordingly, the motive to manipulate net income provides a strong inference of scienter.

### 3.    The Complaint in Its Totality Alleges a Strong Inference of Scienter

Especially when combined with the scienter allegations concerning North Brawley (*see* pp. 30-35, below), the CAC as a whole demonstrates that Defendants acted either intentionally or with deliberate recklessness in deceiving investors with respect to Ormat's accounting. *See Tellabs*, 551 U.S. at 326 (when assessing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").

Here, the CAC provides a strong inference of scienter by alleging:

•      Defendants issued a false and misleading accounting policy, telling investors that it would expense abandoned projects, but did not do so, based on a secret definition of "area-of-interest," one that conflicted with accounting terminology used in the policy;

•      Defendants knowingly employed the full cost accounting method that was only

available for oil and gas activities, not geothermal projects, when appropriate accounting methods were available and used by Ormat's peers;

• Defendants told the SEC that other geothermal companies used the full cost method, but have only presented evidence of two companies that were not reporting to the SEC in 2009; and

• Defendants were motivated to keep the share price and net income of Ormat artificially high to prevent a takeover and keep the Loan collateralized.

Additionally, scienter is established because it is reasonable to conclude that high-ranking corporate officers had knowledge of the abandonment of core operations and how abandonment affected Ormat's financial statements. *S. Ferry*, 542 F.3d at 784. Here, Defendants discussed the projects during conference calls and in SEC filings prior to their abandonment (¶¶22-25) and the decision to abandon each of the three projects must have been made by Defendant Bronicki or her son. ¶29. Defendant Bronicki also explained to the SEC the basis for Ormat using the disallowed full cost method (¶¶55-57; 59, 61), and Defendant Tenne, the CFO, signed financial statements, discussed periodic financial results during conference calls (¶¶68, 81), and was responsible for Ormat's accounting policy. Both Defendants Bronicki and Tenne certified that the financial statements and the accounting policies were presented in accordance with GAAP. ¶¶74, 75, 78, 80.

Accordingly, Defendants knew they were deceiving investors by reporting a false and misleading accounting policy and by inflating net income through using the full cost accounting method for abandoned projects. *In re Wash. Mut. Inc. Sec. Derivative & Erisa Litig.*, 694 F. Supp. 2d 1192, 1211 (W.D. Wash. 2009) (allegations raise a strong inference of scienter where defendant's statements demonstrate that he was deeply familiar with company's underwriting guidelines); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1194 (C.D. Cal. 2008) (finding inference of scienter appropriate by taking into consideration a defendant's job position, duties, and access to corporate reports).

18

Defendants' list of innocent inferences that purportedly negate scienter is not persuasive. Def. Br. at 17-18. First, Ormat's claim that it did not hide that various projects were abandoned is beside the point – the case is about improper accounting following abandonment, not the fact of abandonment.[24] Second, the fact that Ormat's accountants certified the financials during the Class Period is inapposite because the CAC alleges that the accounting policy appeared accurate as written, but was applied in contravention to GAAP and the policy itself. Third, the fact that Defendants did not sell stock does not negate scienter because it is completely consistent with the motive alleged. *See In re Nuko Info.*, 199 F.R.D. at 344-45 (where motive alleged suggests the defendants would not sell stock, the absence of insider trading has little bearing on scienter). Fourth, the fact that Ormat did not wait until its annual report was due to be filed to restate its financial results is not evidence of a voluntary good deed. Ormat restated 13 days after the *SEC required it to restate*, and announced the restatement on February 24th, the usual date Ormat announced financial results year after year. ¶¶ 66, 84.

Thus, the CAC has adequately alleged a strong inference of scienter that overcomes Defendants' competing inferences. The §10(b) accounting fraud allegations should be sustained.

## IV.   PLAINTIFFS HAVE ALLEGED A SECTION 10(B) CLAIM PURSUANT TO THE EXCHANGE ACT CONCERNING THE NORTH BRAWLEY FRAUD

### A.   Statement of Facts Regarding the North Brawley Fraud

Within the power generation segment of its business, Ormat enters into leases or subleases that permit the Company to "explore, develop, operate and maintain" geothermic fields. *E.g.*, 2006 10-K at 17. Pl. Ex. 4. To inform investors of the progress of various projects, Ormat's SEC filings divided them into three categories, "Projects in Operation," "Projects under Construction," and "Projects in Development." *See Id*. at 7-9; 2007 10-K at 9-11; 2008 10-K at

---

[24] Any inference from this fact would favor Plaintiffs: by not discussing the abandoned projects or breaking out costs, investors were led to believe the costs were immaterial.

9-11; 2009 10-K at 47-54 (Pl. Exs. 3, 5-6).  Greater detail about the various activities undertaken

in the initial exploration and development stage was provided by Defendant Bronicki in response

to an inquiry by the SEC:

> Our exploration activities begin with the process of identifying potential geothermal resources. **It normally takes us one to two years from the time we start active exploration of a particular geothermal resource to the time we have an operating production well** …
>
> **Our determination of economic feasibility is based on the following process.** We evaluate historic geologic and geothermal information and databases, and at times receive additional information from other industry participants. The next step is the creation of a digital, spatial geographic information systems database containing all pertinent information, including thermal water temperature gradients derived from historic drilling, geologic mapping information (formations, structure, topography, etc.), and any available archival information about the geophysical properties of the potential resource. We also assess other relevant information, such as infrastructure (roads, transmission), natural features (springs, lakes, etc.), and man-made features (old mines, wells, etc.). If our initial assessment indicates that an economically feasible geothermal reservoir is probable, we then initiate obtaining rights to the land …
>
> **Following the acquisition of land rights to the potential geothermal resource**, we conduct surface water analyses and soil surveys to determine proximity to possible heat flow anomalies and up-flow/permeable zones and augment our digital database with the results of those analyses. We then initiate a suite of geophysical surveys (e.g., gravity, magnetics, resistivity, magnetotellurics and spectral surveys) to assess surface and sub-surface structure (faults, fractures, etc.) and develop a roadmap of fluid-flow conduits and overall permeability. All pertinent geophysical data are then used to create three dimensional geothermal reservoir models that are used to identify drill locations.
>
> **Before we initiate exploratory drilling**, we make a further determination of the feasibility of the potential resource based on the results of the above-described process, particularly the results of the geochemical and geophysical surveys …
>
> The main types of exploration, development and drilling costs we incur include:

> Geological, geochemical and geophysical studies;
> Drilling of temperature gradients;
> Drilling of slim holes;
> Access roads to drilling locations;
> Full size production and/or injection wells; and
> Flow tests.
>
> Once we have confirmed the viability of the geothermal resource through our exploration and development activities, we then proceed to drilling a production well on the property and commence construction of the geothermal plant.

Def. Ex. 21 at 27-28 (emphasis added).  Ormat's Chief Technology Officer, co-founder Lucien

Bronicki, provided a timetable for completion of all stages of the process:

> **Now, to build a power plant, our approach is to tailor-make the power plant to the resource.** So it takes some engineering into do it, but I would say this is negligible. **From the moment you have the permits to go on a site until you complete the plant and start it up is in the range of one year.  But to explore the resource, which is done with geophysical methods similar to what is done in oil and gas, is more complex and takes longer.**
>
> We need three elements, really, to have a good resource. One is to have heat. This is relatively easy to detect. But you need two other things. You need water, which is the element that brings the heat from the depths to the surface. And you need rocks which are the edge of fractures, a fault or a permeable, so that this water can flow, so that when you drill a well the water tends to flow into the well and come out. Then, of course, you also have to reinject it back. Both need permeability or a fault.  **And this exploration takes time.**
>
> So, if we leave aside the site permitting, which also takes time, then **exploration activities are something on the order of three years. And with the field development it may be even up to four years.**

Pl. Ex. 7 (emphasis supplied).  Compared to this deliberate process, the North Brawley project

was rushed and, as a result, fraught with problems.  Ormat's initial exploration of the site,

previously abandoned by Chevron and Unocal/Southern California Edison more than 20 years

earlier, apparently did not occur until "early 2006".  Def. Ex. 48.  This being the case,

commencement of commercial operation for Ormat's biggest plant to date by the end of 2008 does not mesh with the Bronickis' time lines.

Yet all of Defendants' public statements concerning North Brawley through 2007 and 2008 spoke of a project proceeding according to plan.  Ormat first announced that it executed leases covering the site in late December 2006.  ¶121.  Without even first being listed in the "Projects in Development" phase, by the time of the filing of the 2006 10-K, just a few months later, Ormat reported North Brawley was already a "project under construction" by February 2007.[25]  ¶123(a); Pl. Ex. 4 at 8.[26]

By the end of Q1'07, Defendants informed investors: "We expect the construction to be completed by the end of 2008."  ¶123(b).  Less than two months later, in early July, 2007, Ormat reported a "milestone" agreement, execution of a 20-year contract with Southern California Edison ("SCE") to provide 50MW of power from the North Brawley site.  ¶124.  The Q2'07 10-Q, filed in August, 2007, reported that during the first half of 2007, Ormat purchased two new drilling rigs, one of which was "currently being used for the drilling [of] Brawley production wells."  ¶125 & n.1.   The Q2'07 10-Q also reported that "the North Brawley project will come on line by the end of 2008."  By March 2008, Defendants reported that commercial operation

---

[25]  In fact, the 2007 10-K, at 32 (Pl. Ex. 5), reported that: "The North Brawley project is our first project that has advanced from exploration activities to project construction phase." "Exploration activity" is an earlier stage than "development."

[26]  By comparison, leases for the Grass Valley and Buffalo Valley projects were listed in the "Developmental Inventory" section of Ormat's 2005 10-K at 28-29 (Pl. Ex. 15).  By the end of 2006, both were listed as "Projects under Development," with primary exploration commenced at both locations and temperature holes drilled at Grass Valley.  Pl. Ex. 4 at 28-29.  By the end of 2007, both were listed as "Projects under Development" boasting 20-year power supply contracts commencing upon commercial operation; however, the projects were not expected to come online until "after 2009."  Pl. Ex. 5 at 11.  As Defendants later admitted upon restatement, Ormat finally decided to abandon the projects Q4'08.  ¶87.  Similarly, the Rock Hills project, which was listed in the 2006 and 2007 10-K (both at 32) (Pl. Exs. 4-5), as being in the "exploratory" stage, was not abandoned until Q3'09.  ¶87.

was on schedule for late 2008, that construction work was at "an advanced stage," and that "key power plant equipment has arrived at the site." ¶127.

When the Class Period commenced, in May 2008, Ormat's Q1'08 10-Q provided the same status report as several months earlier.   ¶146.  It also reported, at 22 (Pl. Ex. 16), that the California Public Utilities Commission had approved Ormat's 20-year contract with SCE.   The May 7, 2008, conference call with investors Defendants twice indicated that Ormat was "on track" to add 50 MW at North Brawley by the end of 2008.  Pl. Ex. 17 (5/7/08 Transcript at 2, 3).

The Q2'08 10-Q, filed on August 6, 2008, now stated that the "majority" of the power plant equipment was on site, confirmed the expected completion date of 2008 and noted that both "construction work and drilling activity are at an advanced stage."   ¶149.  Again, during the conference call with investors Defendants stated that various projects, including the 50MW North Brawley plant, were "on track" or "on schedule."    Pl. Ex. 18 (8/6/08 Transcript at 2, 3).

In November 2008, less than two months before the scheduled completion date, Defendants continued to report progress.  The Q3'08 10-Q added that the ongoing construction and drilling activities "are proceeding in parallel with the project's start up phase."   Again, Defendants confirmed:  "We expect to complete these activities by the end of 2008."  ¶154.  In both an early November interview and during the Q3'08 conference call, defendant Bronicki stated that completion of various projects (including 50 MW at North Brawley) would bring Ormat's portfolio to approximately 500 MW by the end of the year.  ¶156 and Pl. Ex. 2.

Although Defendants attach (improperly, on a pleading motion) the declaration of initial operations and an invoice to SCE indicating operations indeed commenced in late December 2008, Def. Exs. 53 and 54, no public announcement regarding the heralded North Brawley project was made before late February 2009.  On the eve of the Q4'08 conference call, one analyst was concerned that guidance would be disappointing, in light of the fact that there was "no update on the start up of the 50MW North Brawley plant."  ¶159.

On February 25, 2009, Ormat announced year-over-year and quarter-over-over quarter

increases in net revenues, net income, and earnings per share.  Pl. Ex. 19 (press release).

Although this positive news was well-received, to be sure, analyst reports noted, however, that

the delayed ramp up of North Brawley until Q2'09 led to lower revenue guidance than consensus

estimates.[27]   Pl. Ex. 20 (Feb. 25, 2009, Avondale Partners report).   Looking ahead to the

conference call, one said: "Q4 was definitely stronger than expected, but we believe the light

guidance and project delays will be a bigger focus for investors."[28]   The analyst also noted that

delays in projects coming on line could jeopardize confidence in management.  *Id.*  Although

defendant Bronicki stated that "unexpected" sand conditions that slowed ramp up were being

addressed, and would abate over time, Ormat's stock price declined by $1.64 on February 26,

2009.  ¶161; Pl. Ex. 9.  Ormat's March 2, 2009, filing of the 2008 10-K first quantified the

additional capital investment necessary to "finalize the construction" of North Brawley – $25

million.  ¶163.  And the price again was sharply down, by $2.17 that day.  Pl. Ex. 9.

On May 11, 2009, although another delay, to Q3'09, was announced, Defendants stated

that mitigation measures had been "successfully implemented" on the surface and one of three

additional injection wells had been drilled.  Defendants explained that once the problem was

understood, it took time to source the equipment.  An analyst from RBC Capital Markets was not

concerned: "The issue with this particular site is an example of the dynamic nature of geothermal

development, just as ORA's response reflects its ability to execute on its strategic vision. A 3-

month delay with no impact on output and no significant impact on capital spending on the

project is barely a blip on ORA's longer-term screen."  Pl. Ex. 21.  By describing the problem as

solved and just awaiting the necessary equipment, Defendants buoyed investors.

However, by November 5, 2009, investors knew that a relatively simple fix would not

take place.  After another short delay was announced in August, Defendants admitted that the

---

[27]  The upper end of guidance was $9M below analysts' consensus.  Pl. Ex. 20.  One analyst had
slated North Brawley to contribute $32M to revenues.  ¶159.

[28]  Of course, Ormat later admitted that the net income and EPS figures were inflated.

problem was not solved and that Ormat had tested three different methods of sand removal before ordering equipment it hoped would arrive to treat 70% of the flow by the end of 2009. ¶168.  Shares declined sharply the next day, resulting in a loss of $2.29 per share.  Pl. Ex. 9.

On February 9, 2010, Ormat announced that North Brawley had been placed in service, at 17 MW.  As earlier explained, during the February 25, 2009, conference call (Pl. Ex. 22 at 3), this allowed Ormat to apply for either a tax credit or a 30% grant offered by the government; however, Defendants elected to defer any application until capital costs were known. ¶171. During the February 24, 2010, Q4'09/FY'09 conference call, Defendants gave many more details about the problems at North Brawley, explaining that injectivity capacity was low, even after expensive and temporary sand filtering efforts had succeeded.  Not only was a lackluster 40% of the flow treated, and installation of permanent filtration equipment delayed, but a number of steps would have to be undertaken to correct the new injection capacity problem, at an expected cost of an additional $15-30M.  ¶174.  The Class Period ends with a $2.17 price decline between February 23rd and 25th, with multiple analysts highlighting the problems at North Brawley.[29]

Defendants' retrospective *mea culpa* on April 9, 2010, was nothing short of extraordinary.  In a stark and complete contrast to the positive statements made throughout 2007 and 2008, Defendants explained that Ormat faced a breathtaking chronology of problems from the outset, admitting to: setting a "very aggressive completion schedule" to take advantage of the government subsidies, having "no information about the field," encountering a "host of surprises," dealing with startup problems on a project "on a scale …that was never done before, certainly not by us," realizing after a year of production problems that there were "two issues"

---

[29]  *See, e.g.,* Pl. Exs. 23-24 (Pritchard, 2/24/10: "The North Brawley delay and issues are one of the major concerns for the electricity segment for 2010"; RBC Capital Markets, 2/24/10: "The plant is currently operating at ~20MW and work continues to increase capacity to 50MW. ORA is conducting several avenues of repair and enhancement including better filtration, cleaning, and the addition of new wells.")

that caused injectivity capacity to decline – sand clogging *and* interference among wells required them to be re-drilled at different spacing, and employing expensive makeshift sand-filtering solutions for more than a year until installing a hydrocyclone in March 2010.  Defendants ruefully stated that others should learn a lesson about claiming the ability to develop a Greenfield resource to 50MW "in a very short time span."  Defendants further conceded that had they followed all of the steps detailed above, they could have handled "unexpected" issues:  "[a]ll this work could have been done and would have been much less painful … in a slower development process" because ordering and customizing a hydrocyclone ("we haven't invented anything"), would, "in a slower development process [be] not so much of an issue."  ¶177.

### B.    Plaintiffs' North Brawley Allegations State a Claim

Defendants primarily argue that because theirs is a "complicated" business, if investors are generally warned that projected commercialization may be delayed by on-site problems, there can be no securities fraud claim when "unexpected" events cause a delay.  Def. Br. at 2; 23-35.  However, most of the statements at issue, *see* p. 26, above, are factual assertions, made with deliberate recklessness, which misled investors to believe that the 50MW plant at North Brawley was on track for commercialization by the end of 2008.  The PSLRA's safe harbor provides no defense.

Recognizing this, Defendants weakly assert that investors were not misled because a plant was built and produced *some* power by December 2008.  Def. Br. at 35-37; Def. Exs. 53, 54.  Untrue.  The plant was not placed into service until early this year – at only 17MW (¶171) – and costly construction, drilling and modifications are still ongoing.  ¶173; Pl. Ex. 8 (Sept. 20, 2010, Press Release).  This occurred because management knew, from "hundreds of years of experience in the energy business,"[30] that Ormat's business *is* complicated and requires methodical exploration, development and construction *prior to* operation.  *See* pp. 21-22, above.

---

[30]  *See* Pl. Ex. 2 (Nov. 3, 2008, Yehudit Bronicki interview)

Instead, Ormat adopted a "very aggressive schedule" ¶177 (top of p. 65), concealing from investors that the stated exploration and development process was not followed.  Investors were misled to believe that when construction was completed in late 2008, the start up phase would be "followed shortly by full capacity production" as is "usually" the case.  Def. Br. at 10.  Contrary to their representations, Defendants did not properly investigate site conditions or customize the plant from the start.  ¶177.[31]

Defendants are also liable to investors with respect to the projected December 2008 target date for commercial production.  The cited risk warnings (Def. Br. at 9-10): (a) are too generic and (b) do not convey the risk posed by not following the methodical process described in Ormat's SEC filings.  Also, Defendants later admitted they had no basis for their projection.

Loss causation is adequately alleged.  When the risks posed by the fraud materialized – *i.e.*, hard-to-solve problems arose that Defendants admitted they could have addressed more cost-effectively *before* building the plant had they developed the site more "slow[ly]" –  Ormat's share price declined.   Pl. Exs. 9, 20-21, 23-24 (stock price chart and negative analyst reports concerning North Brawley disclosures).  Defendants' contention (Def. Br. at 38-39) that a long conference call on February 24, 2010, described by Defendant Bronicki as an "active, thorough discussion" (Pl. Ex. 25, 2/24/09 Transcript at 23) revealed nothing about North Brawley not already contained in a one-page February 9, 2010, press release (announcing that the plant had been placed in service), not only raises a question of fact, but is not supported by the record.

### C.    Most of Defendants' Misstatements Are Present-Tense, Factual Assertions

Carving out an exception to liability for false or misleading statements of fact, the PSLRA provides a statutory "safe harbor" for certain forward-looking projections.  *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 817-18 (N.D. Cal. 2000).  To be protected,

---

[31]   Actions contrary to expressed policy and prior practice can be proof of recklessness.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001); *see also Cooper v. Pickett*, 137 F.3d 616, 629 (9th Cir. 1997).

statements must be "of the plans and objectives of management for future operations." *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *6 (S.D. Cal. May 1, 2003).[32] Statements indicating a company is "on track" or "on schedule" to meet expectations are statements of "current business conditions," not forward-looking projections. *Secure Computing*, 120 F. Supp. 2d at 818; *see also In re UTStarcom, Inc. Sec. Litig*, 617 F. Supp. 2d 964, 971-72 (N.D. Cal. 2009); *Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1382 (M.D. Ga. 2000); *Robertson v. Strassner*, 32 F. Supp. 2d 443, 450 (S.D. Tex. 1998) ("developments are presently progressing on the original construction schedule" not forward-looking). Nor are such statements protected "assumptions" underlying a forward-looking projection. *Amylin*, *supra*, *id*. Otherwise, "[v]irtually any factual assertion by a business entity [is] subject to safe harbor protection." *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998).[33]

Prior to the Class Period, Ormat stated it would place the 50MW North Brawley plant in service at the end of 2008. Through November 2008, Defendants made materially misleading statements regarding timely progress towards completion of the 50MW North Brawley project, none of which revealed any problems ofaln-site, that Ormat was not proceeding methodically, or that it was not tailoring the plant to the resource.[34] *See* pp. 23-24, above (quoting ¶¶123(a), 125

---

[32] *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. The Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir. 2004) (Def. Br. at 25-26), is inapposite because the *Clorox* plaintiffs did not challenge that the statements made by defendants were forward-looking.

[33] Similarly, "it is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (citations omitted) ("Based on the momentum we have experienced during the first nine months and the strong order backlog, we continue to expect our percentage growth in 2000 over 1999 will be in the low 40's" is actionable).

[34] For example, Defendants initially installed (ineffective) sand separators because that type had worked elsewhere. ¶177 (middle of p. 66). They later admitted the hydrocyclones installed in early 2010 had been available and could have been timely ordered customized from the outset; "in a slower development process, this is not so much of an issue." ¶177 (top of p. 68). *See also* ¶167 (p. 60) (same partial admission).

& n.1, 127, 146, 149, 154, 156 & Pl. Exs. 2, 16-18 ).  Statements of current business condition made during the Class Period are excluded from safe harbor protection.

### D. Defendants' Present-Tense Statements Were Made With Deliberate Recklessness[35]

As explained at pp. 13 and 18, above, to adequately allege a strong inference of scienter, as required by the PSLRA,[36] plaintiffs must allege that defendants acted with deliberate recklessness as to the possibility of misleading investors.

Usually, a strong inference of scienter is pled by reference to circumstantial evidence, "for it is rare that perpetrators of a fraud would confess outright."  *In re Peoplesoft, Inc.*, No. C 99-00472 WHA, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000).  This is that rare case. Defendants' April 2010 *mea culpa* – admitting to both utter ignorance about the North Brawley site and tremendous arrogance, in telling investors they were turning an undeveloped resource into to a 50MW plant "in a very short time span" – is quoted in four pages of the complaint (¶¶176-77) and highlighted at pp. 26-27 above.  The fact that Defendants candidly admitted their earlier positive statements were made with deliberate recklessness to their accuracy does not mean that Plaintiffs allege "fraud-by-hindsight."  Def. Br. at 23.  Under *Tellabs*, "all allegations" are considered, including admissions and subsequent revelations.  *Miss. Pub. Employees Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 89-93 (1st Cir. 2008) (*Tellabs* limits fraud-by-hindsight doctrine);  *S. Ferry*, 542 F.3d at 785 & n.3 (same).

A later statement may be indicative of scienter if it directly contradicts or is inconsistent with the earlier statement.  *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003). Here, the piecemeal revelations in 2009 and 2010, *e.g.*, ¶¶161, 163, 168, 173, as well as the April

---

[35] Defendants improperly conflate the deliberate recklessness and actual knowledge standards. Def. Br. at 35 n. 27.

[36] The inference must be "cogent and at least as compelling" as any opposing inference drawn from the facts alleged.  *Tellabs,* 551 U.S. at 324.

9, 2010, confession, ¶176-77 (discussed at pp. 25-27 above) constitute powerful evidence of scienter.  Defendants implicitly and expressly admitted they had *no basis whatsoever* for stating or implying that the North Brawley project was progressing towards commercial operation of a 50MW power plant by the end of 2008.

### 1.      North Brawley Was Ormat's Largest Project in 2008

Where the statements at issue concern the core operations of a company, that fact supports the inference that senior management knew or should have known the statements were false when made.  *S. Ferry*, 542 F.3d at 784; *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *see also Berson*, 527 F.3d at 988-89 ("absurd to suggest" defendants unaware of "prominent" facts).  At 50MW, North Brawley represented: the largest project under construction (¶6), Ormat's largest single plant (¶120), Ormat's largest power sale to its largest customer (¶124), and would represent 10% of Ormat's 500 MW portfolio by the end of 2008.  *See also* ¶122, Pl. Ex. 2.  North Brawley's importance to Ormat supports an inference of scienter.

### 2.      Facts Provided by CW1 Support an Inference of Scienter

Scienter allegations may be based upon witnesses with personal knowledge of the information provided.  *In re Daou Sys.*, 411 F.3d at 1015-16.  Specifically, the "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* (citation omitted). Neither names, *id.*, nor precise job titles are required.  *Zucco Partners,* 552 F.3d at 996 n.3.  To measure reliability, courts look to "'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged … the coherence and plausibility of the allegations…the reliability of the sources, and similar indicia.'"  *Id.* at 995 (citing *Daou* at 1015-16).

Here, CW1's employer was contracted by Ormat to lay electrical conduit lines for the North Brawley plant.  ¶138 n.3.[37]  A critical part of CW1's job function was to monitor construction progress at North Brawley to keep track of milestones, both to prevent his company from being penalized and to achieve bonuses under the contract with Ormat. *Id.* at ¶138(a). CW1 confirms that the compressed schedule had not run smoothly, as Defendants' statements had indicated.  As of September 2008, despite Ormat's scrambling to come online by December 2008, only one-third of the wells had been installed.[38]  *Id.*  CW1's allegations support a strong inference of scienter.

### 3.	Defendants Had Motives to Make North Brawley Appear Successful

In addition to the desire to fend off a hostile takeover from Gazit, which started buying up Ormat shares just after the North Brawley leases were signed, *see* pp. 6, 16-18, *supra*, Defendants admitted that they were motivated by the government subsidies which had originally required start up by December 31, 2008.  ¶177 (top of p. 65).  Defendants' contention that Plaintiffs ignore that the deadline was extended in October 2008 (Def. Br. at 32 n.24) misses the boat: by then they had already chosen to take and conceal various short-cuts that they later lamented.[39]  In any event, investors would have viewed Ormat's business prospects less favorably (at least prior to the extension) had Defendants publicized short-cuts taken at North Brawley which put Ormat's chances of obtaining a more than $100 million subsidy in jeopardy.

### E.	Defendants Are Liable for Repeatedly Projecting Commercial Operations Would Commence at North Brawley by the End of 2008

---

[37]  Contrary to Defendants' assertion (Def. Br.. at 32), in *Zucco*, two CWs were rejected because they were not employed in, nor had knowledge of events during, the Class Period – not because they were contractors, rather than Digimarc employees.  *Zucco* at 996-97.

[38]  The prior month, Ormat described drilling activity as "at an advanced stage." ¶149.

[39]  Also, the argument that motive was eliminated when the deadline was ultimately extended at the eleventh hour is an improper claim of "innocence by hindsight."  *See Green Tree*, *supra, id.*

Defendants concede (Def. Br. at 35) that projections can be "factual" misstatements if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy. *Provenz v. Miller*, 103 F.3d 1478, 1487 (9th Cir. 1996); *accord Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010).[41]   While they may be protected to an extent to by the PSLRA's safe harbor provision, projections must have a "reasonable basis."   *Provenz*, 103 F.3d at 1488 (citations omitted).   Additionally, while projections may incorporate some level of uncertainty, "the uncertainty of a projection for a given period declines as the end of the period approaches." *Marx*, 507 F.2d at 489.

Defendants had no reasonable basis for belief in their statements, made as late as November 2008, regarding the timeline for completion of the North Brawley plant.   Defendants admittedly had no prior experience taking a geothermal project all the way from the exploration phase to saleable power, had very little or no operational information about the field, did not customize the equipment to the site's features,[42] and were operating on a previously abandoned well site.  *See* pp. 22-24, 26-27, *supra*.   Defendants' attempt to characterize their statements as innocently incorrect because "unexpected problems" arose (Def. Br. at 24) is disingenuous; statements made with no reasonable basis are "actionable under the federal securities laws." *Amylin*, 2003 WL 21500525, at *9.   Furthermore, under *Marx*, the level of uncertainty the law

---

[41] *See also UTStarcom*, 617 F. Supp. 2d at 972; *Marx v. Computer Scis. Corp.*, 507 F.2d 485, 489 (9th Cir. 1974) (projections must have "sound factual or historical basis"); *In re ASK Computer Sys. Sec. Litig.*, No. C-85-20207(A)-WAI, 1991 WL 138334, at *4 (N.D. Cal., Mar. 11, 1991) (determination of whether projections were made in good faith is a factual issue).

[42]  Defendants twice admitted that had they done proper site testing and development, they could have custom-built equipment using then-existing technology and avoided the problems that arose.  *See* ¶167 ("it doesn't require breakthrough technology…the problem that we have is…it's really a development project that in an ideal case should be done before you build your full-fledged facility"); ¶177 ("All this work could have been done and would have been much less painful, could have been done in a slower development process of that well field.   Our hydrocyclone … we haven't invented anything …. we required testing on a pilot unit before the designer or supplier could size it to our conditions.").

will tolerate in statements that the 50MW North Brawley plant would come online by the end of 2008, declined over time.   Defendant Bronicki's November 2008 statements and the contemporaneous Q3'08 10-Q filing could not have been made with any reasonable belief that a 50 MW plant would start up and come on line by the end of 2008.  (¶¶154-57; Pl. Ex. 2).

Defendants claim events constituting the "perfect storm" coalesced to make their "best estimates" for commercialization of North Brawley incorrect. ¶176; Def. Br. at 24.   To the contrary, the repeated projection was made with no basis at all.   As explained in *Ronconi v. Larkin*, 253 F.3d 423, 433 (9th Cir. 2001), a prediction made by a meteorologist that "'the storm is passing and it will be sunny tomorrow,' when it in fact continues to snow the next day, may be bad forecasting," it "is not necessarily a lie."   However, a statement that "it will be sunny tomorrow," made when one has not even consulted any weather forecast (and all predict storm activity), is a statement made with no reasonable basis, and is actionable.

### 1.    A Showing of "No Reasonable Basis" for Making False or Misleading Statements Satisfies the Actual Knowledge Prong of the Safe Harbor

A forward-looking statement falls outside the safe harbor if "the defendants (1) did not genuinely believe the [] statement, (2) *actually knew that they had no reasonable basis for making the statement*, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement," *Slayton*, 604 F.3d at 775 (emphasis added) (citing *Tellabs* 551 U.S. at 323, and *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  In *Slayton*, at the Court's request, the SEC analyzed application of the statutory safe harbor and concluded that a person has "actual knowledge" that a "statement of projection or expectation is misleading if the person knows that he or she has no reasonable basis upon which to make the statement," "or no basis at all."  Brief for the SEC in *Slayton*, 604 F.3d 758 ("SEC Brief"), at 2-3, 11;[43]  *see also*

---

[43] The SEC reasoned: "A statement of prediction or expectation … contains at least three implicit factual assertions, including (i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.  If the speaker actually knows that

*Sequel Capital, LLC v. Rothman*, No. 03 C 0678, 2003 WL 22757758, at \*10 (N.D. Ill. Nov. 20, 2003) ("[A] plaintiff must allege 'specific facts which illustrate that [the] predictions lacked any reasonable basis.'") (quoting *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996)); *Trooien v. Mansour*, Civil No. 06-3197(JRT/FLN), 2008 WL 2202720, at \*5 (D. Minn. May 23, 2008) (Plaintiffs "need not show that [defendants] had ***actual*** knowledge that these specific revenue predictions were false at the time they were made," only that they "lacked a reasonable basis for any predictions of future revenue.") (emphasis in original).

Defendants clearly had no reasonable basis for stating that North Brawley would be completed and online in the end of 2008.  Defendants had never before seen a project all the way from exploration to development to construction to production.[44]  However, having been involved in every aspect of the industry for decades, they knew what they should have found out – but didn't.  Instead, with "little operational data on the field," they set a "very aggressive completion schedule" for the project and hastily constructed the plant, continuing to drill right through the start up phase.  Yet, Defendants baselessly continued to assure investors throughout the Class Period that the plant would "come on line by the end of 2008." *E.g.* ¶¶146, 149, 154.

### 2.    Any Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language Related to Development and Construction of the North Brawley Project

To qualify for safe harbor protection, a forward-looking statement must be accompanied by "*meaningful* language identifying important factors that could cause actual results to differ

---

any of the implicit representations is false, then the speaker knows that the statement is misleading."  SEC Brief at 11-12.  Thus, a forward-looking statement made "where any of these implicit representations is false is actionable under the antifraud provisions of the federal securities laws," under the actual knowledge standard. *Id.* (citing *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir. 2001) (*en banc*); *Rubinstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994); *In re Apple*, 886 F.2d at 1113; *Marx* 507 F.2d at 489-92)).

[44]  ¶120; 2007 10-K, at 32 (Pl. Ex. 5).

materially from those in the forward-looking statement." *Amylin*, 2003 WL 21500525, at \*7 (citing 15 U.S.C. §78u-5(c)(1)(A)) (emphasis in original).[45]   Vague or "boilerplate disclaimers" are insufficient:  warnings must be "'substantive and tailored to the specific future projections, estimates, or opinions…which plaintiffs challenge.'"   *Id.*   For cautionary language to be meaningful, it must "adequately disclose the risks involved and the assumptions upon which the optimistic, forward-looking language is based." *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1122 (C.D. Cal. 2005) (finding cautionary language regarding FDA approval of a new product inadequate when it could apply to any business that sells products to consumers).

"Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).   Thus, safe harbor coverage "does not (nor should it) apply where the cautionary statement is itself misleading."  SEC Brief at 10.  For example, in *Amylin*, defendants repeatedly stated that they expected Amylin's new drug, Symlin, to be approved by the FDA – despite having evidence from several studies that the drug had problems which would prevent its timely approval.  2003 WL 21500525, at \*8.  These statements were accompanied by cautionary statements that "results from our clinical trials may not be sufficient to obtain regulatory clearance" and "the FDA may also require additional testing."   Even though the *exact* risk warned of in these cautionary statements eventually came to pass – test results did not support Symlin getting FDA approval, and it did not – the court summarily found these "cautionary statements" to not contain meaningful cautionary language, especially given that the defendants already had "information tending to seriously undermine the accuracy of its statements" about Symlin.  *Id.* (citing *In re Apple*, 886 F.2d at 1113); *see also Yanek*, 388 F. Supp. 2d at 1123 (general risk factors that are

---

[45]  The statutory safe harbor is "based on aspects of SEC Rule 175 [17 C.F.R. §230.175] and the judicial[ly] created 'bespeaks caution' doctrine."  H.R. Conf. Rep. No. 104-369, at 43 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730.  The safe harbor and "bespeaks caution" doctrine (Def. Br. at 20 n.27) are therefore subject to the same legal analysis.

not specific to the actual company and the challenges it is currently facing do not "meaningfully address the risks").

Here, as in *Yanek*, the cautionary statements Defendants cite as insulation for their baseless projections concerning North Brawley's commercial operation are too general, *i.e.*, warnings regarding "operational factors," "construction or project delays," "shortages and inconsistent equipment," (Def. Br. at 9-10) and could be used to insulate any company with construction projects.  Additionally, while it is true that Ormat issued risk warnings that its business involves highly technical matters, *i.e.*, relating to the viability of a geothermal resource and the ability to extract geothermal fluids, any one of which could ruin a project – either before construction or after some period of operation (*id.*)  – Defendants also stated that they undertook proper exploration, testing and development to avoid such untoward consequences.[46]  Ormat also touted its vertical integration, boasting "Our intimate knowledge of the equipment that we use in our operations allows us to operate and maintain our projects efficiently and to respond to operational issues in a timely and cost-efficient manner."  Pl. Ex. 5 (2007 10-K at 18).  However, as in *Amylin*, Defendants knew something that undermined their risk warnings, to wit, they were not conducting adequate testing such that they could timely use known equipment to address the problems at North Brawley.  The risk warnings were thus misleading and inadequate.

### F.   Fact-Based Disputes Concerning Causation Are Improper at This Stage

"The Ninth Circuit recently emphasized that a plaintiff must only allege 'facts that, if taken as true, plausibly establish loss causation.'"  *PMI Group*, 2009 WL 1916934, at *11 (citing *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) and *Berson*, 527 F.3d at 989-90)).  Allegations of price declines following the revelation of a company's true situation are

---

[46] *E.g.,* 2007 10-K at 21 ("[W]e carry out several tests followed by exploratory drilling first to validate and then to quantify the size of the potential geothermal resource.  Resource validation and exploratory drilling is a long process … as it may necessitate the drilling of shallow temperature-gradient wells, ''slim holes'', exploration wells, and production-sized exploration wells.  We do not expect to succeed in developing every resource …") (Pl. Ex. 5).

sufficient.  *See Daou*, 411 F.3d at 1027.  When a concealed risk materializes, plaintiff need not plead it was the sole reason for the decline.  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).  In any event, "[l]oss causation 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'"  *In re Gilead*, 536 F.3d at 1057; *Daou*, 411 F.3d at 1026.  Here, in addition to the end-of-Class Period price drop associated with the restatement, risks posed by Defendants' misstatements materialized when North Brawley did not come online as scheduled due to problems caused by not developing the project in accordance with stated practice, problems which are taking years and tens of millions of dollars to remedy.

Defendants' analysis depends upon the incorrect assumption that there was only one price decline, following the February 24, 2010, FY'09 earnings release and conference call.  Def. Br. at 38.  However, the CAC alleges partial disclosures.  ¶¶160-69.  Moreover, "[t]he Supreme Court stopped short of requiring plaintiffs to prove that they sold after a complete, corrective disclosure resulting in a large price decline.  Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."  *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 & n.9 (D.D.C.2006) (citing cases); *UTStarcom*, 617 F. Supp. 2d at 977 (discusses walking down stock price).  This is exactly what occurred here:  Ormat sat quietly for two months after the December 2008 target date and then issued a series of explanations for two three-month delays and then longer, more indefinite delays thereafter.  The price declined several times when investors came to realize that North Brawley's severe problems would not soon be fixed.[47]

On February 25, 2009, Ormat announced increases in revenues, income, and EPS; analysts noted, however, that the delayed ramp up of North Brawley led to lower revenue

---

[47]  Plaintiffs do not, as Defendants contend, allege the same statements which constitute partial revelations of concealed risks also constitute false statements.  *See* Def. Br. at 38 n.30.  Until the solids problem was solved, and Ormat was no longer "pouring sandbags into [the] injection well" (¶167), Ormat did not realize there was an injection capacity issue due to poor well spacing.  ¶177 (bottom of p. 65, top of p. 66).  Different risks were revealed at different times.

guidance than expected.  *See* p. 25-26 & n.38, *supra*.  Although Defendant Bronicki attempted to assure investors that the sand problem could be handled, and would resolve over time, Ormat's price declined on February 26, 2009, by $1.64.  ¶161, Pl. Ex. 9.  On March 2, 2009, Ormat's filing of the 2008 10-K informed investors of the cost – an additional $25 million – to "finalize the construction" of North Brawley.  Ormat explained that the plant required modification before coming on line in the second quarter of 2009.  ¶163.  The price again was sharply down that day, by $2.17 from the prior close.  Pl. Ex. 9.

On November 5, 2009, Ormat stated that it had tested several methods of sand removal and had new equipment "on order" that would treat 70% of the flow by the end of 2009.  ¶168. Shares plummeted the next day, resulting in a loss of $2.29 per share.  Pl. Ex. 9.

On February 9, 2010, Ormat issued a press release announcing North Brawley had been placed in service (and was eligible for government funding); however a new problem had arisen – injection capacity.  ¶171.  During a lengthy February 24, 2010, conference call, Defendants discussed the restatement and problems at North Brawley, explaining that efforts towards a multi-step solution would come at a cost of another $15-30M.  ¶173; Pl. Ex. 25 (2/24/10 Transcript at 3, 6, 10, 16,  The Class Period ends with a $2.17 price decline from February 23rd to 25th, with analysts discussing, *inter alia,* the North Brawley saga.  *See* n.29, *supra*.  In compliance with *Dura*'s Rule 8 "notice pleading" standard, *see* 544 U.S. at 347, the CAC provides Defendants with adequate notice of the relevant connection between investor losses and the materialization of the risks concealed by not following Ormat's stated procedures regarding the exploration, development and construction of geothermal plants.[48]

### CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss should be denied.

---

[48] Defendants main argument for dismissal of the § 20(a) claim, that a predicate §10(b) claim has not been stated (Def. Br. at 39) fails for the reasons stated above.  Additionally, control was alleged based upon actions and statements, *see, e.g.* p. 19, not merely corporate titles.

DATED:  September 27, 2010       **GLANCY BINKOW & GOLDBERG LLP**

*s/ Michael Goldberg*
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

BERNSTEIN LIEBHARD LLP
Sandy A. Liebhard
U. Seth Ottensoser
Michael S. Bigin
10 East 40th Street
New York, NY 10016
Telephone:  (212) 779-1414

LAW OFFICES OF MARK WRAY
Mark Wray
608 Lander Street
Reno, Nevada 89509
Telephone:  (775) 348-8877

*Attorneys for Plaintiffs*

1

2

**PROOF OF SERVICE BY ELECTRONIC POSTING**
**AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

3

     I, the undersigned, say:

4

5

     I am a citizen of the United States and am employed in the office of a member of the Bar of a United States District Court.  I am over the age of 18 and not a party to the within action.  My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California  90067.

6

     On September 27, 2010, I caused to be served the following document:

7

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

8

9

     By posting the document to the ECF Website of the United States District Court for the District of Nevada, for receipt electronically by the following parties:

10

**See Attached Service List.**

11

And  by US mail to all known non-ECF registered parties.

12

**See Attached Service List.**

13

14

     I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 27, 2010, at Los Angeles, California.

15

16

                     *S/ Michael Goldberg*
                     Michael Goldberg

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:10-cv-00132-ECR-RAM

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael S. Bigin**
  bigin@bernlieb.com

- **Lionel Z. Glancy**
  INFO@GLANCYLAW.COM,hobbit99@aol.com,cturner@glancylaw.com

- **Marc L. Godino**
  mgodino@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com

- **Matthew B. Hippler**
  mhippler@hollandhart.com,btoriyama@hollandhart.com,cpulsipher@hollandhart.com,carnold@hollandhart.com,bcozens@hollandhart.com,intaketeam@hollandhart.com,RenoFedEC

- **Tamara Jankovic**
  tjankovic@hollandhart.com,lford@hollandhart.com,intaketeam@hollandhart.com

- **Seth Ottensoser**
  ottensoser@bernlieb.com

- **Joseph R. Seidman , Jr**
  seidman@bernlieb.com

- **Howard G. Smith**
  legul2010@aol.com

- **Bruce G Vanyo**
  bruce@kattenlaw.com

- **Mark D Wray**
  staff@markwraylaw.com,mwray@markwraylaw.com

- **Richard Zelichov**
  richard.zelichov@kattenlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Sandy Abraham Liebhard
.Bernstein Liebhard LLP
10 East 40th Street
22nd Floor
New York, NY 10016
```