HOLLAND & HART LLP
Matthew B. Hippler
Nevada State Bar No. 7015
mhippler@hollandhart.com
Tamara Jankovic
Nevada Bar No. 9840
tjankovic@hollandhart.com
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Telephone (775) 327-3000
Facsimile (775) 786-6179

KATTEN MUCHIN ROSENMAN LLP
Bruce G. Vanyo
bruce@kattenlaw.com
(admitted *pro hac vice*)
Richard H. Zelichov
richard.zelichov@kattenlaw.com
(admitted *pro hac vice*)
2029 Century Park East, Suite 2600
Los Angeles, California 90067-3012
Telephone (310) 788-4400
Facsimile (310) 788-4471

Attorneys for Defendants
Ormat Technologies, Inc.,
Yehudit Bronicki and Joseph Tenne

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WAYNE SZYMBORSKI, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ORMAT TECHNOLOGIES, INC., YEHUDIT BRONICKI, JOSEPH TENNE,<br><br>Defendants. | CASE NO.: 3:10-CV-00132-ECR-RAM<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED** |

31540524

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| PAUL STEBELTON, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ORMAT TECHNOLOGIES, INC., JOSEPH TENNE, YEHUDIT BRONICKI, YORAM BRONICKI, LUCIEN Y. BRONICKI, DAN FALK, JACOB J. WORENKLEIN, ROGER W. GALE, ROBERT F. CLARKE,<br><br>Defendants. | **CASE NO:  3:10-CV-00156-ECR-RAM** |
| JOHN J. CURTIS, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ORMAT TECHNOLOGIES, INC., JOSEPH TENNE, YEHUDIT BRONICKI,<br><br>Defendants. | **CASE NO. 3:10-CV-00198-ECR-RAM** |

31540524

# **TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 2

    I.      PLAINTIFFS HAVE NOT ALLEGED A CLAIM BASED ON ORMAT'S METHOD OF ACCOUNTING FOR EXPLORATION AND DEVELOPMENT COSTS ........................................................................ 2

        A.    Ormat Accurately And Fully Disclosed Its Method of Accounting for Exploration and Development Costs. ................................................ 2

        B.    Plaintiffs Cannot Allege Scienter Given Ormat's Accurate And Auditor Approved Disclosure Of Its Accounting Policy ...................... 5

            1.    Ormat Made A Reasonable, Auditor Supported Decision Concerning How To Account For Its Exploration And Development Costs. ......................................................... 5

            2.    Plaintiffs Do Not Allege That Any Defendant Received Any Personal Benefit From Ormat's Method Of Accounting. ...................... 9

            3.    Plaintiffs' Allegations As A Whole Demonstrate That Defendants Did Not Act With Scienter. ................................. 10

    II.     PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM BASED ON ORMAT'S STATEMENTS CONCERNING NORTH BRAWLEY ....................... 11

        A.    Plaintiffs Cannot Amend Their Complaint In an Opposition Memorandum. ..................................................................... 11

        B.    Plaintiffs Have Not Alleged That Ormat's Present Tense Or Predictive Statements Were False Or Misleading. ......................... 12

        C.    Ormat's Statements Concerning North Brawley Are Protected By The Reform Act's Safe Harbor For Forward-Looking Statements. ............... 15

            1.    Ormat's Statements Were Forward Looking. ...................... 16

            2.    Ormat's Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language ................................. 17

            3.    Defendants Did Not Have Actual Knowledge, Nor Were They Deliberately Reckless in Not Knowing, That Ormat Would Be Unable To Complete The North Brawley Project By December 2008. ...................................................... 18

                a.    The Core Operations Inference Does Not Apply ................... 20

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b.      Plaintiffs Cannot Plead Fraud by Hindsight. .......................... 21

c.      Plaintiffs Cannot Plead Actual Knowledge Based on Statements from a Single, Unidentified Witness Who Was Not Employed by Ormat. ................................................................ 22

d.      Plaintiffs' CAC Considered In Its Entirety Demonstrates That Defendants Did Not Act With Scienter. ................................. 23

D.      Plaintiffs Have Not Alleged That Their Losses, If Any, Were Caused By Any Disclosures Concerning North Brawley. .............................................24

III.      Plaintiffs Have Failed To Allege Any Control Person Claim......................................25

CONCLUSION....................................................................................................................... 25

31540524

1

## TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

Berson v. Applied Signal Technology, Inc.,
    527 F.3d 982 (9th Cir. 2008) ................................................................ 20

5

6

Bullion Monarch Mining, Inc. v. Newmont USA Ltd.,
    No. 3:08-CV-0227-ECR, 2010 WL 2985496 (D. Nev. July 23, 2010) ................................. 3

7

DSAM Global Value Fund v. Altris Software,
    288 F.3d 981 (9th Cir. 2002) .................................................................. 6

8

9

Dura Pharm., Inc. v. Broudo,
    544 U.S. 336 (2005).......................................................................... 24

10

Garfield v. NDC Health Corp.,
    466 F.3d 1255 (11th Cir. 2006) ............................................................... 6

11

12

Gissin v. Endres,
    __ F. Supp. 2d __, 2010 WL 3468508 (S.D.N.Y. Sept. 1, 2010) ............................... 16

13

14

In re AgriBioTech Sec. Litig.,
    No. 99-144, 2000 WL 1277603 (D. Nev. Mar. 2, 2000) ................................. 4, 12

15

In re Amilyn Pharm., Inc. Sec. Litig.,
    No. 01-CV1455, 2003 WL 21500525 (S.D. Cal. May 1, 2003)........................... 17

16

17

In re Aspeon, Inc. Sec. Litig.,
    168 F. App'x. 836 (9th Cir. 2006) ............................................................ 6

18

19

In re Atlas Mining Co., Sec. Litig.,
    670 F. Supp. 2d 1128 (D. Idaho 2009) ...................................................... 4

20

In re Copper Mountain Sec. Litig.,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ...................................................... 16

21

22

In re Credit Acceptance Corp. Sec. Litig.,
    50 F. Supp. 2d 662 (E.D. Mich. 1999).......................................................9

23

24

In re Cutera Sec. Litig.,
    610 F.3d 1103 (9th Cir. 2010) ......................................................... 18, 19

25

In re Cylink Sec. Litig.,
    178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..................................................... 4

26

27

In re Flag Telecom Holdings, Ltd.,
    574 F.3d 29 (2d Cir. 2009).................................................................. 25

28

iii

In re Geopharma, Inc. Sec. Litig.,
399 F. Supp. 2d 432 (S.D.N.Y. 2005)..................................................................... 10

In re Hypercom Corp. Sec. Litig.,
No. 05-455, 2006 WL1836181 (D. Ariz. July 5, 2006)........................................... 5

In re Lockheed Martin Corp. Sec. Litig.,
272 F. Supp. 2d 944 (C.D. Cal. 2003) ................................................................... 10

In re Manville Forest Products Corp.,
89 B.R. 358 (Bankr. S.D.N.Y. 1988) aff'd,
99 B.R. 543 (S.D.N.Y. 1989) aff'd,
896 F.2d 1384 (2d Cir. 1990)................................................................................... 3

In re Medicis Pharm. Corp. Sec. Litig.,
689 F. Supp. 2d 1192 (D. Ariz. 2009) ..................................................................... 6

In re PEC Solutions, Inc. Sec. Litig.,
418 F.3d 379 (4th Cir. 2005) ................................................................................ 23

In re Pixar Sec. Litig.,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) ................................................................ 22

In re PXRE Group, Ltd., Sec. Litig.,
600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009)
aff'd sub nom. Condra v. PXRE Group Ltd.,
357 F. App'x. 393 (2d Cir. 2009) .......................................................................... 19

In re Read-Rite Corp.,
335 F.3d 843 (9th Cir. 2003) ................................................................................ 21

In re Silicon Graphics, Inc. Sec. Litig.,
183 F.3d 970 (9th Cir. 1999) ........................................................................... 5, 21

In re Skechers U.S.A., Inc. Sec. Litig.,
No. CV 03-02094, 2004 WL 1080174 (C.D. Cal. May 7, 2004),
aff'd 273 Fed. Appx. 626 (9th Cir. April 10, 2008)............................................. 18

In re Splash Tech. Holdings, Inc. Sec. Litig.,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................ 12

In re Syntex Corp. Sec. Litig.,
95 F.3d 922 (9th Cir. 1996) .................................................................................. 22

In re Vantive Corp. Sec. Litig.,
283 F.3d 1078 (9th Cir. 2002) .............................................................................. 19

In re Worlds of Wonder Sec. Litig.,
35 F.3d 1407 (9th Cir. 1994) .................................................................................. 9

31540524

Institutional Investors Group v. Avaya, Inc.,
  564 F.3d 242 (3d Cir. 2009)........................................................ 10, 16, 17

Marx v. Computer Scis. Corp.,
  507 F.2d 485 (9th Cir. 1974) .............................................................. 18

May v. Borick,
  1997 WL 314166 (C.D. Cal. Mar. 3, 1997)......................................... 12

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
  540 F.3d 1049 (9th Cir. 2008) ....................................................... passim

Palmer v. Fuqua,
  641 F.2d 1146 (5th Cir. 1981) .............................................................. 3

Paracor Finance, Inc., v. General Elec. Capital Corp.,
  96 F.3d 1151 (9th Cir. 1996) .............................................................. 25

Plevy v. Haggerty,
  38 F. Supp. 2d 816 (C.D. Cal. 1998) .................................................. 10

Ronconi v. Larkin,
  253 F.3d 423 (9th Cir. 2001) ........................................................ 15, 22

Rubke v. Capitol Bancorp Ltd.,
  551 F.3d 1156 (9th Cir. 2009) ............................................................ 13

S. Ferry LP, No. 2 v. Killinger,
  542 F.3d 776 (9th Cir. 2008) .............................................................. 20

Santa Fe Indus., Inc. v. Green,
  430 U.S. 462 (1977)........................................................................... 15

Searls v. Glasser,
  64 F.3d 1061 (7th Cir. 1995) .............................................................. 23

Slayton v. Am. Express Co.,
  604 F.3d 758 (2d. Cir. 2010)........................................................ 18, 19

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  551 U.S. 308 (2007)........................................................................ 5, 23

United States v. Arthur Young & Co.,
  465 U.S. 805 (1984)............................................................................. 8

United States v. Hawkins,
  No. 04-106, 2005 WL 1660984 (N.D. Cal. July 11, 2005) .................... 7

Zucco Partners, LLC v. Digimarc Corp.,
  552 F.3d 981 (9th Cir. 2009) ........................................... 6, 20, 21, 22

31540524

## INTRODUCTION

Plaintiffs' defense to the Motion to Dismiss is to change their story.  With regard to the restatement claim, the Consolidated Amended Complaint ("CAC") alleges that the method of accounting used and disclosed by defendant Ormat Technologies, Inc. ("Ormat") was inappropriate. Plaintiffs now contend that the method disclosed by Ormat was, in fact <u>appropriate</u>, but that Ormat "secretly" did not follow that method.  They even suggest that Ormat's auditors were fooled, and did not know – though it was publicly disclosed – that Ormat had abandoned some sites and had not expensed them.   In the absence of any accounting rule specifically applicable to geothermal companies, Ormat did its best to select the most analogous rule, its independent auditors agreed, and Ormat then fully and accurately disclosed the method selected.  This is not securities fraud.

With regard to North Brawley, Plaintiffs seem largely to abandon the allegations of the CAC and now base their claim on statements found in exhibits attached to their Opposition.  Then, without any factual basis whatsoever, they accuse Ormat of not properly investigating the site, not following their own standard procedures, and taking unidentified "shortcuts."  The facts show the contrary. Moreover, in the end, North Brawley is only about some predictive statements upon which Plaintiffs cannot state a claim for a host of reasons including that Ormat provided power to Southern California Edison by the end of 2008 as it predicted and it is not fraud for a company to run into unexpected problems that affect the development of complicated project.

Finally, Plaintiffs offer no plausible reason why Ormat's Chief Executive Officer ("CEO") Yehudit Bronicki or Chief Financial Officer ("CFO") Joseph Tenne (together, "Individual Defendants") (with Ormat, "Defendants") would have committed securities fraud.  There were no material stock sales during the relevant period, only massive stock purchases by the Bronickis.  The best that Plaintiffs could do was spin a story that the Bronickis engaged in fraud to earn an extra $300,000 in dividends so that they could "pay off" a loan of over $150,000,000.  Aside from the fact that this amount is insufficient to support any inference of motive or scienter, the pleadings show that Ormat had the discretion to grant the dividends in any event.

Plaintiffs do not request leave to amend in their Opposition, but presumably the arguments that Plaintiffs set forth for the first time in that document represent their best efforts at saving their

1

1    deficient claims.  They have failed and Plaintiffs' CAC should be dismissed with prejudice.  In the

2    words of an independent financial analyst that Plaintiffs referenced in the CAC, "management has

3    [run] Ormat to the benefit of all shareholders."  (Ex. 39; Pl. Ex. 20 at 4).

4                                        ARGUMENT

5    I.     PLAINTIFFS HAVE NOT ALLEGED A CLAIM BASED ON ORMAT'S METHOD

6            OF ACCOUNTING FOR EXPLORATION AND DEVELOPMENT COSTS

7            A.     Ormat Accurately And Fully Disclosed Its Method of Accounting for

8                   Exploration and Development Costs.

9            Defendants have shown that Ormat accurately disclosed its method of accounting for

10   development and exploration costs.  (MtD at 14).  It disclosed that it capitalized costs on an "'area of

11   interest' basis," that these capitalized costs included "dry hole costs and the cost of drilling and

12   equipping production wells and other directly attributable costs," and that if it abandoned an "area of

13   interest" it would expense those previously capitalized exploration costs.  In addition to disclosing

14   its method of accounting, Ormat also disclosed that "some of the geothermal leases that we explore

15   have been, and will be, abandoned."  (MtD at 14 (citing Ex. 3 at 32)).  Ormat further informed

16   stockholders that the abandoned sites included Buffalo Valley and Grass Valley.  (Ex. 3 at 11, 32).

17   Plaintiffs do not dispute that Ormat made these disclosures or that investors understood which sites

18   Ormat had abandoned.  (See Opp. at 9-11).

19           Instead, Plaintiffs argue, in effect, that the disclosures were misleading because Ormat

20   somehow gave the impression that each "area of interest" constituted only a single site and that

21   Ormat would expense costs as soon as it abandoned a single site (even if it had not abandoned the

22   "area of interest" in which such site was located).[1]  Plaintiffs distort the plain and accepted meaning

23   of the term "area of interest."  "Area of interest" is generally understood to refer to a broad

24

25           [1]      It should be noted that the timing of Ormat's write off of these expenses had no effect on
       Ormat's cash position or revenues.  It simply affected when Ormat took a non-cash charge for
26     money already spent.  (Compare Ex. 3 (2008 Form 10-K) at 100, 101 (cash and cash equivalents of
       $34,393,000; revenues of $344,833,000 as of 12/31/2008 before restatement) with Ex. 4 (2009 Form
27     10-K) at 122, 123 (cash and cash equivalents of $34,393,000; revenues of $344,833,000 as of
       12/31/2008 even after restatement)).
28

                                            2

1  geographic location that encompasses multiple mines, leases or sites.  See, e.g., Bullion Monarch

2  Mining, Inc. v. Newmont USA Ltd., No. 3:08-CV-0227-ECR, 2010 WL 2985496, at *2 (D. Nev.

3  July 23, 2010) ("area of interest" encompasses multiple mines); Palmer v. Fuqua, 641 F.2d 1146,

4  1154 (5th Cir. 1981) ("area of interest" not vague and encompasses multiple leases); In re Manville

5  Forest Products Corp., 89 B.R. 358, 362 (Bankr. S.D.N.Y. 1988) aff'd, 99 B.R. 543 (S.D.N.Y. 1989)

6  aff'd, 896 F.2d 1384 (2d Cir. 1990) (four mines in "area of interest").  This is the meaning ascribed

7  to the term in the glossary to Statement of Financial Accounting Standards ("SFAS") 19, which, as

8  Plaintiffs concede, also defines "areas of interest" as encompassing multiple sites, mines, or leases.

9  (See Opp. at 10 n.14).  Indeed, the glossary specifically notes that the term "areas of interest" is

10  "broader" than a single site.  (Ex. 43 at ¶ 272).[2]  Thus, Ormat made it clear by use of the phrase "area

11  of interest" that it would not expense capitalized costs as soon as it abandoned a single site.

12  Nonetheless, Plaintiffs attempt to interject ambiguity where there is none.  Plaintiffs quote

13  Ormat's disclosure that "although we do not commence exploration activities until feasibility studies

14  have determined that the project is capable of commercial production, it is possible that

15  economically recoverable reserves will not be found in an 'area of interest' and exploration activities

16  will be abandoned" and argue that it led investors to believe that Ormat expensed costs as soon as it

17  abandoned a particular site.  (See Opp. at 10 (citing CAC 34) (emphasis in Opp. omitted)).  This

18  argument ignores the preceding sentence in which Ormat indicated that its method of accounting

19  capitalized "dry hole costs." (CAC 34).  There would be no "dry hole costs" to capitalize if Ormat

20  expensed the costs of an exploration site as soon as it was abandoned.

21  Also, Plaintiffs' argument ignores Ormat's publicly disclosed financials for 2008.  Plaintiffs

22  acknowledge stockholders knew Ormat had abandoned Buffalo Valley and Grass Valley in the

23  fourth quarter of 2008.  Ormat's 2008 financial statements did not reflect a write-off of such

24

_____

25  [2]    Plaintiffs argue that the plural "areas of interest" does not have the same meaning as the
    singular "area of interest."  (Opp. at 10 n.14).  This is silly.  Under Plaintiffs' interpretation, a
26  "province" and "basin" (both of which also are pluralized in SFAS 19 ¶ 272 and which usually cover
    very large geographic regions) similarly would equate to a single, localized, site.  Plaintiffs cite no
27  authority indicating that FASB intended to distinguish the singular and plural form of "area of
    interest," nor would such a distinction be consistent with the terms' ordinary usage.
28

3

31540524

1    expenses.  (Ex. 3 at 101).  (When Ormat later wrote off such expenses, it made it very clear.  (Ex. 4

2    at 123).[3])  Therefore, investors clearly understood that, under Ormat's stated accounting method, the

3    drilling costs of individual sites would be capitalized absent an abandonment of an entire "area of

4    interest."

5            Plaintiffs' new theory seems to be that Ormat led its stockholders to believe it was applying

6    the "successful efforts" method of accounting for exploration and development costs whereby it

7    expensed costs immediately upon abandonment of a particular site.  Ormat, however, did no such

8    thing.  It never said that it used the "successful efforts" method.  It specifically noted it capitalized

9    "dry hole costs" which one would not do using the successful efforts method (Ex. 43 ¶ 18 (dry hole

10   costs expensed when incurred under successful efforts accounting), and it described its method of

11   accounting using the phrase "area of interest" that FAS 19 notes is a "modified full cost approach."

12   (Ex. 43 at FAS19-19).

13           If there were any doubt about the meaning of Ormat's disclosures, the certification by

14   Ormat's independent auditors would end that doubt.  (Ex. 3 at 99).  Ormat's description of its

15   accounting policy in the notes to the financials was essentially the same as the description Plaintiffs

16   challenge, the auditors knew that Ormat had abandoned certain sites, they were obviously aware

17   from their audit that Ormat continued to capitalize the costs of abandoned sites, and they therefore

18   certified that Ormat's application of its accounting policy was consistent with the description.[4]

19   _____

20   [3]     Plaintiffs also argue that Ormat did not disclose the costs it capitalized from abandoned
     projects in accordance with Plaintiffs' interpretation of certain provisions of Rule 4-10.  This is not
21   correct.  First, given that Ormat used a more conservative version of full cost accounting than that
     reflected in Rule 4-10, the specific provision did not apply.  Second, Ormat did disclose the costs it
22   capitalized from abandoned projects.  The CAC acknowledges that Ormat's 2008 Form 10-K
     indicated that "[e]xploration and drilling costs related to uncompleted projects are included as
23   construction-in-process in the consolidated balance sheets and totaled $52,435,000 and $16,677,000
     at December 31, 2008 and 2007, respectively."  (CAC 70 (quoting 2008 Form 10-K)).

24
     [4]     Plaintiffs are also wrong that a restatement is an admission that prior financial statements
25   were false.  In re Atlas Mining Co., Sec. Litig., 670 F. Supp. 2d 1128, 1134 (D. Idaho 2009) (citing
     cases and rejecting In re Cylink Sec. Litig., 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) (cited by
26   Plaintiffs at 12, n.18) as contrary to the majority view).  As discussed in the Motion, Ormat's
     financials may have been incorrect, but nobody was misled given that Ormat disclosed exactly how
27   it accounted for exploration and development costs.  See In re AgriBioTech Sec. Litig., No. 99-144,
     2000 WL 1277603, at *5-6 (D. Nev. Mar. 2, 2000); see also Benzon v. Morgan Stanley Distributors,
28
                                                                     (Footnote continues on next page.)

                                                      4

31540524

**B.**      **Plaintiffs Cannot Allege Scienter Given Ormat's Accurate And Auditor Approved Disclosure Of Its Accounting Policy.**

Defendants' Motion to Dismiss established that Plaintiffs have completely failed to meet their burden of pleading with particularity an inference of scienter that is cogent and at least as compelling as any competing non-fraudulent inference.  (MtD at 16-23).  Plaintiffs must "plead, in great detail, facts that [at least] constitute strong circumstantial evidence of deliberately reckless or conscious misconduct," In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999), that overcome "plausible opposing inferences."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310 (2007).  Plaintiffs have not done so.

Plaintiffs base their claim that they have pled scienter on two arguments:  (1) that Ormat's accurately disclosed method of accounting constituted an egregious violation of generally accepted accounting principles ("GAAP"); and (2) that Ormat's CEO (but not its CFO or Ormat itself) had a motive to mislead Ormat's stockholders.[5]  As described in more detail below neither argument is correct and looking at the allegations in totality, as Tellabs instructed, it is apparent that Plaintiffs do not meet their burden. Plaintiffs' inadequate allegations of scienter do not overcome the fact that (1) Ormat's nationally recognized auditors knew – like everybody else – that Ormat had abandoned certain sites, audited Ormat's financials, and issued clean audit opinions concerning Ormat's method of accounting; (2) nobody sold Ormat stock; and (3) Ormat's CEO suffered the biggest loss when Ormat's stock prices fell.

**1.**      **Ormat Made A Reasonable, Auditor Supported Decision Concerning How To Account For Its Exploration And Development Costs.**

Scienter cannot be inferred merely based on an alleged violation of GAAP except in rare

---

(Footnote continued from previous page.)

Inc., 420 F.3d 598, 608-09 (6th Cir. 2005).  In addition, Ormat's disclosure of its accounting policy undermines any inference of scienter.  Weiss v. Priceline.com, Inc., 330 Fed. Appx. 230, 232 (2d Cir. 2009) (scienter undercut where accounting treatment discussed in detail in financial statement); see also In re Imergent Sec. Litig., 2009 WL 3731965, at *11 (D. Utah Nov. 2, 2009).

[5]      Plaintiffs have abandoned any claim that Mr. Tenne acted with scienter recognizing that it is not enough to allege that one of the defendants was the CFO in an accounting restatement case.  See In re Hypercom Corp. Sec. Litig., No. 05-455, 2006 WL1836181, at *8 (D. Ariz. July 5, 2006).

31540524

1    situations where the violation is so pervasive, egregious and glaring that a defendant must have been

2    aware of it.  (MtD at 19 (citing Metzler Investment GMBH v. Corinthian Colleges, Inc., 540 F.3d

3    1049, 1069 (9th Cir. 2008) (technical GAAP violations do not establish scienter); Zucco Partners,

4    LLC v. Digimarc Corp., 552 F.3d 981, 1001 (9th Cir. 2009), as amended (Feb. 10, 2009)

5    ("[R]eporting false information will only be indicative of scienter where the falsity is patently

6    obvious") (internal citations omitted))).  This requires that the plaintiff plead particularized facts

7    establishing a "widespread and significant inflation of revenue" or some similar widespread and

8    significant accounting violation.  In re Aspeon, Inc. Sec. Litig., 168 F. App'x. 836, 838 (9th Cir.

9    2006); see also Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (there must be

10   "glaring accounting irregularities").  Technical violations of GAAP do not establish scienter and

11   courts do not infer scienter from the existence of a GAAP violation when a lack of industry specific

12   guidance exists and the defendant corporation is "not alone in its mistaken interpretation" of the

13   appropriate accounting standard.  DSAM Global Value Fund v. Altris Software, 288 F.3d 981, 1000

14   (9th Cir. 2002); In re Medicis Pharm. Corp. Sec. Litig., 689 F. Supp. 2d 1192, 1205, 1207 (D. Ariz.

15   2009). Plaintiffs here do not dispute that this is the correct standard.  (See Opp. at 13-15).  Yet, they

16   do not and cannot satisfy it.

17        Plaintiffs cannot allege that Ormat violated any established industry standards since there is

18   no actual industry-specific accounting standard for geothermal exploration.   Indeed, Plaintiffs

19   themselves appear uncertain about which standard Ormat should have applied.  In their CAC, they

20   allege that Ormat should have used the successful efforts method as described in SFAS 19 because

21   "the successful-efforts method is appropriate for geothermal companies."  (CAC 47).   In their

22   Opposition, however, they claim that Ormat should have used ASC 360-10-15 (formerly SFAS 144)

23   because "SFAS 19[] and Rule 4-10 of Regulation S-X specifically exclude geothermal activities."

24   (See Opp. at 7, 13).  However, Plaintiffs are not even sure about how ASC 360-10-15 applies noting

25   in one place that it purportedly requires that an abandoned project should be immediately written off

26   and in another acknowledging that it allows for "grouping of related assets" as Ormat initially did in

27   defining "areas of interest."  (Opp. at 7, 11 n.16; see also Pl. Ex. 10 at 360-10-35-23 (noting that

28   "assets shall be grouped with other assets")).   Moreover, ASC 360-10-15 provides no guidance

6

31540524

1    concerning when a company should capitalize or expense costs let alone whether to capitalize or

2    expense costs in connection with geothermal exploration and development.  It merely addresses the

3    "depreciation of property, plant and equipment and the post acquisition accounting for an interest in

4    the residual value of a leased asset."  (Pl. Ex. 10 at 360-10-35-1).

5         Furthermore, neither the Securities and Exchange Commission ("SEC") nor the Financial

6    Accounting Standards Board ("FASB") precluded geothermal companies from applying either full

7    cost or successful efforts accounting.  In creating Rule 4-10 and SFAS 19, they were specifically

8    addressing the oil and gas industry; they made no determination one way or the other about

9    geothermal.  There is a general accounting principle that one should apply the most analogous

10   applicable accounting standard.  See, e.g., United States v. Hawkins, No. 04-106, 2005 WL

11   1660984, at *21 (N.D. Cal. July 11, 2005); SEC, Staff Accounting Bulletin No. 99 ("registrants may

12   account for, and make disclosures about, . . . transactions . . .based on analogies to similar situations

13   or other factors").  Thus, companies engaged in geothermal exploration would naturally look at the

14   standards applicable to companies engaged in oil and gas exploration.

15        Moreover, even the SEC found the appropriate standard confusing, initially suggesting that

16   Ormat needed to comply with accounting pronouncements related to companies "engaged in

17   significant mining operations" and only after six months of communications – including 11 letters

18   and numerous phone calls – concluding that Ormat's method of accounting for exploration and

19   development costs was inappropriate in certain respects only.  (Ex. 21 at 11 (referring Ormat to

20   Industry Guide 7 Description of property by issuers engaged or to be engaged in significant mining

21   operations); Ex. 20 at 2).[6]  As discussed in Ormat's MtD, the SEC never noted that Ormat's chosen

22   method of accounting was egregious, "deliberately reckless," or even unreasonable, and the SEC's

23   Division of Enforcement has not opened an informal, let alone a formal inquiry or an enforcement

24   action, concerning Ormat's disclosures concerning its method of accounting.   Indeed, Ormat's

25

26   [6]      Contrary to Plaintiffs' insinuation that Ormat's "areas-of-interest" were cloaked in a cloud of
     secrecy (Opp. at 9 n.12), Ormat disclosed publicly and to the SEC that its Northern Area of Interest
27   included the sites of McGinness Hills, Grass Valley, Jersey Valley, and Buffalo Valley and that its
     Southern Area of Interest included Gabbs Valley and Rock Hills.  (Ex. 22 at 8).
28

7

1  forthright communications with the SEC support an inference that Defendants acted without

2  culpable intent.  (MtD at 7-8).[7]

3          Finally, and most significantly, Plaintiffs do not dispute that the auditors certified Ormat's

4  method of accounting for exploration and development costs.  (Opp. at 15).  Instead, they speculate

5  that Defendants may have misled the auditors by their use of a "secret definition of area-of-interest."

6  (Opp. at 15).  Plaintiffs do not, however, identify any allegations in the CAC that support this

7  baseless assertion.  See Corinthian Colleges, 540 F.3d at 1069 (a plaintiff's failure to allege that

8  independent, outside auditors counseled against a particular method of accounting weighs strongly

9  against an inference of scienter).  In fact, the auditors knew – like everybody else – that Ormat

10  abandoned certain sites in 2008, knew Ormat's accounting policy, knew how Ormat applied the

11  policy based on their audit, and therefore knew Ormat's application was consistent with its

12  description.[8]  Ormat's auditors also continued to certify Ormat's financial statements, including

13  noting that in their opinion the Company maintained effective internal control over financial

14  reporting, even after the restatement, and auditors who have been deceived do not simply accept

15  such purported deception.  (Ex. 4 at 121); see United States v. Arthur Young & Co., 465 U.S. 805,

16  818 (1984) (an auditor who lacks confidence in a corporation's conduct is "required to issue a

17  qualified opinion, an adverse opinion, or a disclaimer of opinion, thereby notifying the investing

18  public of possible potential problems inherent in the corporation's financial reports.).[9]

19  _____

20  [7]      Other companies engaged in geothermal exploration and development used the same
standard as Ormat thereby further demonstrating that Ormat did not violate any established industry
21  standard.  (MtD at 4 n.1).  Plaintiffs cannot discredit the choice made by Ormat by noting that these
companies are no longer publicly traded.  Plaintiffs have not pointed out any changes in the
22  accounting literature between 2000 and 2005 (when these companies used the full cost method) and
when Ormat used a more conservative version of the full cost method in 2008.
23

[8]      Plaintiffs similarly do not and cannot allege that Ormat's auditors did not support Ormat's
24  position in discussions with the SEC (which, they of course did).

25  [9]      Even if Plaintiffs had alleged an egregious violation of GAAP (and they have not), Plaintiffs'
argument that it would be "absurd to suggest" that Mrs. Bronicki was unaware that Ormat was using
26  the wrong accounting standard remains completely unconvincing.  See Corinthian Colleges, 540
F.3d at 1068.  In the Opposition, Plaintiffs assert that Mrs. Bronicki knew the accounting was wrong
27  because either she or her son had the authority to determine whether a site could be abandoned.
(Opp. at 14).  This is insufficient because knowledge that a site had been abandoned is not the same
28

8

(Footnote continues on next page.)

1   In short, there was no specific guidance instructing Ormat how to account for its exploration

2   and development costs.  Ormat had to account for its costs in some way, it looked to guidance

3   applicable to the oil and gas industry given the similarities, it picked the method that best reflected

4   its business model, it modified the full cost method rendering it more conservative than that applied

5   in the oil and gas industries, and its auditors approved the method chosen.

6            2.      **Plaintiffs Do Not Allege That Any Defendant Received Any Personal**

7                    **Benefit From Ormat's Method Of Accounting.**

8            Plaintiffs acknowledge that motive is most commonly established through allegations that a

9   corporation's management benefitted from insider stock sales.  (Opp. at 16).  Here, however, both

10  Individual Defendants held the majority of their stock during the putative class period thereby

11  undermining any inference of scienter.  (See Opp. at 16); In re Worlds of Wonder Sec. Litig., 35

12  F.3d 1407, 1424-25 (9th Cir. 1994) (where corporate management "held onto most of their

13  [company's] stock and incurred the same large losses" as plaintiffs the court will not infer scienter);

14  see also Corinthian Colleges, 540 F.3d at 1067 (one defendant "sold nothing at all, suggesting that

15  there was no insider information from which to benefit").  Plaintiffs also do not and cannot argue

16  that they have any basis for alleging motive as to Ormat's CFO, Joseph Tenne, and in fact ignore this

17  crucial failure in their Opposition even though Defendants pointed it out in the Motion to Dismiss.

18  (See MtD at 21; Opp. at 16-17).[10]  In a case based on an accounting restatement, the lack of any

19  motive by a CFO undermines an inference of scienter as to all defendants because courts have

20  recognized that "it seems as though the CFO would have been an essential participant in any

21  fraudulent scheme."  See, e.g., In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 677-78

22  (E.D. Mich. 1999).

23

24  (Footnote continued from previous page.)

25  as knowledge that the abandoned site did not receive proper accounting treatment.  See id. at 1069
    (allegations that CFO knew that the corporation was employing a particular accounting method

26  insufficient to plead a strong inference of scienter absent particularized allegations establishing that
    the CFO knew that the method of accounting was wrong).

27  [10]     Plaintiffs allege as to Mr. Tenne neither motive nor particularized facts relating to his role at

28  Ormat.  For these additional reasons, Mr. Tenne's Motion to Dismiss should be granted.

9

31540524

Defendants are surprised that Plaintiffs persist in asserting their countervailing theory of motive based on Ormat's payment of dividends.  The theory defies common sense.  The theory posits that the Bronickis (without the CFO, who had nothing to gain) contrived an inappropriate accounting method so that the three of them, collectively, could earn an extra $300,000 in dividends. Numerous courts have held that such an amount of "benefit" does not suffice as motive.  (MtD at 23).  But Plaintiffs' theory becomes even more ludicrous because they contend that the Bronickis did all this to "pay off a loan" to Bank Hapoalim that they took to fend off a takeover.[11]  The amount of the loan, however, was approximately $150,000,000 and these dividends would hardly "pay off" that loan or even make a tiny dent in it.  Furthermore, the pleadings show that Ormat had discretion to grant a dividend in the same amount that it did even it had expensed the abandoned sites.[12]  Thus, it would have been totally unnecessary for the Defendants to commit accounting fraud to gain their dividends.  In sum, Plaintiffs' motive theory is absurd.

### 3.   Plaintiffs' Allegations As A Whole Demonstrate That Defendants Did Not Act With Scienter.

The CAC fails to support a cogent and compelling inference of scienter when read holistically.  The allegations here, in fact, are far **less** compelling **than those found insufficient** by

---

[11]   A motive to prevent a takeover does not give rise to an inference of scienter.  Plevy v. Haggerty, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998); In re Lockheed Martin Corp. Sec. Litig., 272 F. Supp. 2d 944, 947 (C.D. Cal. 2003).  Similarly, nor does "a desire to reduce [] debt" support a culpable inference.  In re Geopharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 451 (S.D.N.Y. 2005); see also Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 279 (3d Cir. 2009) (same).

[12]   Ormat's "annual payout ratio of at least 20% of the Company's net income" was not a cap. Ormat had paid a dividend of 28.6% of net income in 2007.  It therefore could have paid the same dividend in 2008 because $0.22 is only 22% of Ormat's restated net income of $0.98 per share.  It also could have paid the same dividend in 2009 because $0.30 is only 20% of Ormat's restated net income of $1.51 per share.  (Exs. 13-20).  Plaintiffs' continued analysis of dividend payments on a quarterly basis ignores that Plaintiffs alleged in the CAC (but hide in their Opposition) that Ormat's policy calculated quarterly dividends based on an "annual payout ratio."  (Compare CAC 107 (dividend policy "targets an annual payout ratio of at least 20% of the Company's net income") with Opp. at 17 (intentionally deleting the clause "targets an annual payout ratio")).  Even under Plaintiffs theory that Ormat calculated its dividend quarterly, Ormat had paid quarterly dividends that constituted a much higher percentage of net income than what it paid in the fourth quarter of 2008. For example, Ormat paid a dividend of $0.05 a share in the first quarter of 2007 even though it **lost** $0.15 a share that quarter.  (Ex. 9).

the Ninth Circuit in <u>Corinthian Colleges</u>.  Thus, unlike in <u>Corinthian Colleges</u>, Plaintiffs here allege <u>no</u> stock sales, <u>no</u> internal dissent regarding the proper method of accounting, <u>no</u> motive to commit fraud whatsoever as to the CFO, <u>no</u> express refusal by executives to fix a possible error because of the effect on quarterly revenue, <u>no</u> decrease in revenue, and <u>no</u> characterization by anyone that the accounting was in a "gray area."  <u>Corinthian Colleges</u>, 540 F.3d at 1069. Moreover, Plaintiffs do not dispute that Ormat's auditors certified Ormat's accounting and their review of Ormat's procedures found no deficiencies in internal controls; Ormat fully disclosed the method of accounting it used; Ormat cooperated fully with the SEC when it raised questions; Ormat issued its restatement within days of the SEC's request that it do so; and nobody benefitted from the accounting policy.  Far from supporting an inference of scienter, these allegations instead support a conclusion that Defendants acted in good faith and with non-culpable intent.  Plaintiffs therefore fail to meet their burden of pleading a strong inference of scienter as to the alleged accounting violations.[13]

## II.   PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM BASED ON ORMAT'S STATEMENTS CONCERNING NORTH BRAWLEY

### A.   Plaintiffs Cannot Amend Their Complaint In an Opposition Memorandum.

Defendants' Motion to Dismiss explained that Plaintiffs have failed to state a claim based on the allegations in the CAC regarding North Brawley because:  (1) the allegations rest on forward looking statements shielded from liability by both independent prongs of the Reform Act's "safe harbor;" (2) the statements were not false when made; and (3) the statements did not cause the loss of which Plaintiffs complain.  (MtD at 24).  Plaintiffs' Opposition therefore takes an entirely different approach.   The Opposition appears to have abandoned the statements that Plaintiffs challenged in the CAC in favor of a handful of statements from conference calls never mentioned in the CAC based on exhibits attached to the Opposition.  (<u>Compare</u> CAC ¶¶ 146, 149, 156, 156, 160, 161, 163-169 <u>with</u> Opp. at 19-21 (citing conference call transcripts attached as exhibits to Plaintiffs'

---

[13]     Plaintiffs have seemingly retreated from their allegation that Ormat's stock price fell on February 24, 2010 based on any disclosure concerning its restatement in favor of an attempt to argue that it fell that day because of issues related to North Brawley.  (Opp. at 25, 38).  Plaintiffs have thus failed to allege loss causation concerning any alleged misleading statements about Ormat's method of accounting for exploration and development costs.

31540524

1  Opposition)).[14]  Plaintiffs also change their theory as to why any statement was false or misleading.

2  (Compare CAC 147, 150, 158 (describing the purported reasons that the statements in the CAC were

3  false) with Opp. at 3, 25, 27, 34 (arguing that Ormat omitted disclosures that the schedule was

4  "aggressive")).   Similarly, statements Plaintiffs characterized as false or misleading in the CAC

5  apparently now have transmogrified into disclosures of wrongdoing.  (Compare CAC 160, 161, 163,

6  164, 168 with Opp. at 24-26).  The law simply does not permit Plaintiffs to change their entire

7  theory of the case in an opposition memorandum.   AgriBioTech, 2000 WL 1277603, at *10 n.3

8  ("complaint may not be amended by briefs in opposition to a motion to dismiss").  For this reason

9  alone, the CAC should be dismissed.

10          **B.      Plaintiffs Have Not Alleged That Ormat's Present Tense Or Predictive**

11                  **Statements Were False Or Misleading.**

12          Plaintiffs' new theories are no better than the old ones.  While Plaintiffs have made it nearly

13  impossible for Defendants or the Court to determine which statements they challenge as they dance

14  around actually identifying statements using generalities and citations to large block quotes, it is still

15  clear that Plaintiffs have not specified "the reason or reasons why [any] statement is misleading"

16  with the particularity required by the Reform Act.[15]  For example, Plaintiffs seemingly challenge the

17  following statements made by Ormat in 2008:   "the California Public Utilities Commission

18  ["CPUC"] had approved Ormat's 20-year contract with [Southern California Edison ("SCE")]";

---

19  [14]      Defendants oppose Plaintiffs' Request for Judicial Notice to the extent that Plaintiffs are

20  using it to change their theory of the case as part of their opposition to Defendants' motion to
    dismiss.  The vast majority of Plaintiffs' North Brawley claim is now made up of these exhibits as

21  opposed to anything included in the CAC.

22  [15]      A plaintiff also must meet the requirements of Rule 8 of the Federal Rules of Civil

23  Procedure.  In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1073-75 (N.D. Cal.
    2001); see also MtD at 36 n.28).  "In the context of securities class action complaints, courts have

24  repeatedly lamented plaintiffs' counsels' tendency to place the burden on the reader to sort out the
    statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting

25  Plaintiffs' claims."  Splash, 160 F. Supp. 2d at 1075 (internal citations omitted) (citing cases); see
    also May v. Borick, 1997 WL 314166, at *8 (C.D. Cal. Mar. 3, 1997).  Plaintiffs here have engaged

26  in exactly the sort of puzzle pleading criticized by other courts both in the CAC and then even more
    so in the Opposition where they have seemingly added new block quotes and full exhibits (not

27  included or referenced in the CAC).  This furnishes another reason to dismiss Plaintiffs' North

28  Brawley allegations.

1   "that the majority of the power plant equipment was on site"; that "construction work and drilling

2   activity are at an advanced stage"; and "ongoing construction and drilling activities are proceeding in

3   parallel with the project's start up phase."  (Opp. at 23).  Plaintiffs, however, have not alleged that

4   the CPUC did not approve Ormat's contract, that the majority of the power equipment was not on

5   site, that construction and drilling was not at an advanced stage, or that construction and drilling

6   proceeded in parallel with the project's start up phase.  Indeed, Plaintiffs do not dispute the truth of

7   any present tense statement made by Ormat in 2008.  Plaintiffs have also entirely abandoned any

8   claim that Ormat's 2009 or 2010 disclosures were false or misleading as they have apparently

9   recognized that stockholders could not have been misled by statements disclosing delays in a build

10   out schedule.  (See Opp. at 34-36; MtD at 36-37); see also Detroit Gen. Ret. Sys. v. Medtronic, Inc.,

11   No. 09-2518, 2010 WL 3583388, at *4 (8th Cir. Sept. 16, 2010) ("[i]t is difficult to see how a letter

12   disclosing a possible problem and an investigation into that problem was materially misleading").[16]

13       Plaintiffs are thus left with their new fallback argument on falsity – raised for the first time in

14   the Opposition – directed to Ormat's forward looking statements that its estimated date to complete

15   North Brawley at the end of 2008 was "aggressive" and that Ormat was not "on track" or "on

16   schedule" during 2008.  This does not work.  First, Ormat disclosed the exact schedule it expected to

17   achieve and had no obligation to characterize its schedule with any particular adverb or adjective

18   that Plaintiffs now suggest.  See Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1163 (9th Cir. 2009)

19   (rejecting allegation that defendant should have disclosed its belief that profitability would

20   "dramatically increase" when defendant did disclose that net income for a quarter "was nearly four

21   times as large" as in the prior year).

22       Second, Plaintiffs pull out of thin air assertions, repeated throughout their Opposition, that

23   Ormat's schedule was "aggressive" because Ormat did not follow an appropriate exploration and

24   development process with respect to North Brawley.  Thus, ignoring the Reform Act's requirement

25   that they plead with particularity the facts that underlie their claims, they allege nothing to support

26   

27   [16]   Given that Plaintiffs do not challenge any of Ormat's statements in 2009 concerning North

28   Brawley, their North Brawley class period should end by February 25, 2009 at the latest.

13

31540524

1    their assertions that "Defendants did not properly investigate site conditions"; that "Ormat was not
2    proceeding methodically"; that "Defendants . . .had no basis whatsoever" for its projections; and that
3    Ormat took "short-cuts."  (Opp. at 27, 28, 30, 31, 34); 15 U.S.C. § 78u-4(b)(1)(B).  They quote
4    extensively from statements made by the Bronickis about the normal process for exploring a
5    developing a site and imply that the process was not followed at North Brawley.  However, they
6    never even assert that the process was not followed, much less support such an assertion with facts.

7         The facts are to the contrary.  For example, Ormat began exploration activities in North
8    Brawley in early 2006 and hoped to complete the project approximately three years later at the end
9    of 2008.  (Opp. at 20, 21 (exploration began in "early 2006")); CAC 121-123).  In the statements
10   quoted by Plaintiffs, Mrs. Bronicki indicated that it "normally takes us one to two years from the
11   time we start active exploration of a particular geothermal resource to the time we have an operating
12   production well"; Mr. Bronicki said that exploration takes three years.  The process included
13   Ormat's review in early 2006 of wells that had been previously drilled by Unocal that revealed that a
14   "shallow Brawley reservoir could be commercially developed."  (Ex. 48).  Ormat also drilled five of
15   its own exploratory wells in 2007 to further analyze the shallow reservoir at North Brawley from
16   depths of 3000 to 4500 feet.  (Ex. 48).  It tested each of these wells using an open-top flash tank and
17   collected water samples from each of the wells.  (Ex. 48).  The tests showed encouraging results
18   across every possible testable metric including temperature, pressure, permeability, solid
19   concentration, and heavy metal concentrations.  (Ex. 48).  Ormat's exploratory process was indeed
20   significant and rigorous enough to justify publication in a journal of the Geothermal Resources
21   Council.  (Ex. 48).[17]

22        Third, Ormat's construction was "on track" and "on schedule" until the plant commenced
23   initial operations in the fourth quarter of 2008.  As discussed above (and not challenged by

---

24   [17]    In addition, Plaintiffs allege that Ormat first described its exploration process in April and
25   October 2009.  (See CAC 146-178; Opp. at 20-26).  The statements Plaintiffs challenge, however,
     were made between only May 2008 and February 2009.  Stockholders who purchased shares
26   between May 2008 and February 2009 could not have relied on statements made after they
     purchased stock.  Indeed, Plaintiffs know that they are engaging in temporal sleight of hand as they
27   intentionally hide the dates of the April and October 2009 statements from the Court.  (Opp. at 20-
     21).
28

1    Plaintiffs), Ormat signed an agreement with SCE in July 2007, it had key power plant equipment at

2    the site by March 2008, the CPUC approved the agreement with SCE in May 2008, the majority of

3    the power plant equipment was on site by August 2008, and construction and drilling was

4    proceeding in parallel with the plant's start up in November 2008.  (Opp. at 22-23).  Ormat further

5    connected the production and injection wells it had drilled to the power plant it had constructed,

6    synchronized each of the power plant units to the electrical grid, and delivered electricity to SCE in

7    2008.

8        It was not until these initial operations that Ormat ran into unexpected problems.  (Opp. at

9    23).    These were not problems that Ormat could have discovered or anticipated during the

10   development or exploration process.   Problems such as too much sand being pulled from the

11   geothermal reservoir when geothermal fluids are pumped under pressure generally can only be

12   discovered as part of initial operations after a production well is connected to a power plant.  (CAC

13   161).  Similarly, the problem of interference between injection wells when operated together is an

14   operational and not an exploration and development issue.   (CAC 144)  Ormat disclosed these

15   problems to its stockholders and implemented a number of solutions that it believed and hoped

16   would control its issues.  Ormat unfortunately continued to have problems in reaching capacity at the

17   plant throughout 2009 and kept its stockholders fully apprised concerning those problems, its

18   theories as to why it was having problems, the solutions it was trying to implement and the attendant

19   delays.

20       In short, none of this constitutes fraud because "[p]roblems and difficulties are the daily work

21   of business people [and] that they exist does not make a lie out of any of the alleged false

22   statements" and "[a]lleging in substance that [a company] underestimated [its problems] does not

23   make out a fraud case."  Ronconi v. Larkin, 253 F.3d 423, 430, 433-34 (9th Cir. 2001); Santa Fe

24   Indus., Inc. v. Green, 430 U.S. 462, 477 (1977).

25       **C.    Ormat's Statements Concerning North Brawley Are Protected By The Reform**

26            **Act's Safe Harbor For Forward-Looking Statements.**

27       Plaintiffs' forward-looking statements are also protected by each of the Reform Act's two-

28   pronged safe-harbor.  The safe-harbor created the highest pleading and scienter standards because

15

31540524

1    Congress wanted to encourage companies to disclose forward-looking information without fear that

2    stockholders could after the fact claim that their statements were false because predictions failed to

3    become true.  1995 U.S.C.C.A.N. at 742.

4                    1.        **Ormat's Statements Were Forward Looking.**

5            Defendants' Motion to Dismiss established that the allegations in the CAC concerning the

6    timetable for completion and ramp up of the North Brawley plant, the plant's capacity when fully

7    ramped up and its expectations that it would resolve the technical challenges it confronted relating to

8    sand in the geothermal reservoir were forward looking.  (MtD at 25).  Plaintiffs do not dispute this.

9    (See Opp. at 27-29).     Rather, Plaintiffs seemingly now focus on two statements made by

10   Mrs. Bronicki during an August 6, 2008 conference call that were not cited in the CAC.  (Opp. at

11   23).  During that call, Mrs. Bronicki stated that Ormat's "construction and exploration programs . . .

12   continue on track" and that "[o]n construction activities, we remain on schedule."

13           Plaintiffs argue that these statements are present-tense, factual assertions.  See Opp. at 27.

14   The United States Court of Appeals for the Third Circuit, however, recently has considered this

15   exact argument.  In Institutional Investors Group v. Avaya, Inc., 564 F.3d 242 (3rd Cir. 2009) the

16   court held that representations by a company that it was "on track" to meet its goals for the year, and

17   that its first quarter results "position us" to meet those goals, could not "meaningfully be

18   distinguished from the future projection of which they are a part."  Avaya, 564 F.3d at 255.  The

19   court explained:

20           Shareholders argue that these phrases make claims of current fact.  Here, however, the
             assertions of current fact are too vague to be actionable.  These statements do not justify the
21           financial projections in terms of any particular aspect of the company's current situation;
             they say only that, whatever the situation is, it makes the future projection attainable.  Such
22           an assertion is necessarily implicit in every future projection.

23   Id.  Similarly, in Gissin v. Endres, __ F. Supp. 2d __, 2010 WL 3468508, at *8 n.108 (S.D.N.Y.

24   Sept. 1, 2010), the court applied Avaya and held that a corporation's representations that "based on

25   our current view and what we know, yes, we think we'll be just fine" were forward looking because

26   "defendants' statements in the instant case refer to present circumstances only as a basis for

27   forecasting future performance, not as a guarantee of the status quo."  See also In re Copper

28   Mountain Sec. Litig., 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) Sec. Litig., 311 F. Supp. 2d 857,

                                                16

31540524

1   880 (N.D. Cal. 2004) (statements that a company is "on track" to meet its targets "are best

2   characterized as inactionable puffery").

3        Plaintiffs here offer no basis to depart from <u>Avaya</u>.  Mrs. Bronicki's statements regarding the

4   current status of Ormat's construction projects cannot "meaningfully be distinguished" from the

5   future outcome of those projects.  <u>See Avaya</u>, 564 F.3d at 255.  Therefore, these statements either are

6   forward looking and entitled to protection by the Reform Act's safe harbor or puffery on which no

7   claim of securities fraud can rest.[18]

8            **2.    Ormat's   Forward-Looking   Statements   Were   Accompanied   By**

9                 **Meaningful Cautionary Language.**

10       Ormat's statements regarding North Brawley are not actionable because they were

11  "accompanied by meaningful cautionary statements."   (MtD at 26 (citing 15 U.S.C. § 78u-

12  5(c)(2)(A)(i))).   As previously explained, to invoke the safe harbor, a company must identify

13  "important factors" that could cause results to differ materially from its expectations, but Congress

14  expressly noted that a corporation need not identify the exact risk that ultimately results in a

15  projection not being realized.  (MtD at 26).

16       Plaintiffs do not really dispute that Ormat statements regarding North Brawley were

17  accompanied by meaningful cautionary language.  Plaintiffs acknowledge "it is true that Ormat

18  issued risk warnings that its business involves highly technical matters, <u>i.e.</u>, relating to the viability

19  of a geothermal resource and the ability to extract geothermal fluids, any one of which could ruin a

20  project – either before construction or after some period of operation."  (Opp. at 36).  They do not

21  dispute that Ormat also warned that "geothermal energy projects may suffer an unexpected decline

22  in the capacity of their respective geothermal wells and are exposed to a risk of geothermal

23  reservoirs not being sufficient for sustained generation of the electrical power capacity desired over

24  time."  (MtD at 28).  These warnings disclosed risks virtually identical to the problems that Plaintiffs

25

---

26  [18]    The court cases cited by Plaintiffs are inapposite.  The court in <u>In re Amilyn Pharm., Inc.</u>
    <u>Sec. Litig.</u>, No. 01-CV1455, 2003 WL 21500525, at *6 (S.D. Cal. May 1, 2003) actually held that
27  the statement most like the "on track" statement – "We have completed clinical testing of SYMLIN
    that we believe is sufficient to support [FDA] approval to market SYMLIN" – was forward looking.
28

31540524

1  argue ultimately lead to delays at the North Brawley site.  (CAC 177).  The cautionary language,

2  therefore, was sufficient to bring Ormat's disclosures within the Reform Act's safe harbor.  See In re

3  Skechers U.S.A., Inc. Sec. Litig., No. CV 03-02094, 2004 WL 1080174 (C.D. Cal. May 7, 2004),

4  aff'd 273 Fed. Appx. 626 (9th Cir. April 10, 2008).

5          Plaintiffs' only argument that Ormat's cautionary statements do not shield Defendants from

6  liability is that "Defendants knew something that undermined their risk warnings."  (Opp. at 36

7  (emphasis added)).  Plaintiffs' emphasis on the state of Defendants' knowledge, however, overlooks

8  the Ninth Circuit's recent decision in Cutera.  In that case, the Ninth Circuit expressly stated "**[t]he**

9  **defendants' state of mind is not relevant to [the adequacy of cautionary statements]**."  In re

10 Cutera Sec. Litig., 610 F.3d 1103, 1113 (9th Cir. 2010) (emphasis added).  Even if Ormat's state of

11 mind were relevant to this prong of analysis (which it is not), Plaintiffs have not alleged that

12 Defendants were aware of anything that undermined the risk warnings.  (See Part II(C)(3) below).

13 Standing alone, Ormat's meaningful cautionary language furnishes an adequate basis to dismiss all

14 allegations related to North Brawley.

15          **3.      Defendants Did Not Have Actual Knowledge, Nor Were They**

16                   **Deliberately Reckless in Not Knowing, That Ormat Would Be Unable To**

17                   **Complete The North Brawley Project By December 2008.**

18          The second prong of the safe harbor, which protects an entity or person making a forward

19 looking statement without "actual knowledge" that the statement was false or misleading when

20 made, also insulates Ormat's statements concerning North Brawley from liability.  (MtD at 28

21 (citing 15 U.S.C. § 78u-5(c)(1)(B)(i))).  Plaintiffs effort to lower this standard by arguing that the

22 Reform Act's "actual knowledge" standard can be satisfied merely by alleging that the defendants

23 had no reasonable basis for a forward looking statement does not work.  (Opp. at 33).  Plaintiffs

24 cannot rely on cases that pre-date the Reform Act – such as Marx v. Computer Scis. Corp., 507 F.2d

25 485 (9th Cir. 1974) which the Ninth Circuit has never cited in any case governed by the Reform Act

26 – because such cases are no longer good law.  And Plaintiffs misconstrue the Second Circuit's

27 decision in Slayton v. Am. Express Co., 604 F.3d 758 (2d. Cir. 2010) as applying a "reasonable

28 basis" standard where the court expressly indicated that it required plaintiffs to plead facts at least

18

establishing that Defendants "**actually knew** that they had no reasonable basis for making the statement." Slayton, 604 F.3d at 775 (emphasis added). Finally, the Ninth Circuit has made it plain in every case decided since the Reform Act that plaintiffs must allege nothing less than a strong inference of "actual knowledge" to plead scienter as to forward looking statements and actual knowledge is the most stringent standard for pleading scienter recognized by the law. Cutera, 610 F.3d at 1108; In re Vantive Corp. Sec. Litig., 283 F.3d 1078, 1091 (9th Cir. 2002).

In their Opposition, Plaintiffs seemingly abandon most of the bases alleged in the CAC that the Defendants had actual knowledge that their statements false or misleading. They do not discuss the third party drilling reports; they ignore Ormat's ordinary installation of sand separators in May 2008; and they scarcely mention the earlier Unocal/SCE plant in Brawley. (CAC ¶¶ 135, 136, 139, 141). Indeed, Plaintiffs make no effort to allege facts showing that Defendants actually knew that their statements regarding North Brawley were false or misleading other than to make conclusory claims, unsupported by any facts, that Ormat did not investigate site conditions prior to construction and that Ormat did not proceed methodically. (See Opp. at 27, 28, 33). Plaintiffs for example have offered no schedule showing that Ormat estimated that it would not complete the plant by the end of 2008, no report indicating that North Brawley would not generate 50 MWs of electricity, and no document reflecting anything but positive results at North Brawley. The only documents, in fact, show that Ormat did extensive testing that confirmed the promise of North Brawley especially in light of Ormat's positive experience at nearby sites in Ormesa and Heber.

Instead of particularized facts, Plaintiffs' Opposition has resorted to the trifecta of the Ninth Circuit's three most disfavored bases for pleading scienter: the "core operations" inference, fraud by hindsight, and conclusory confidential witness allegations.[19]   Since such allegations would be

---

[19]   Plaintiffs also point to the same inadequate motive allegations on which their accounting allegations rely. (See Opp. at 31). In addition, Plaintiffs argue Defendants were motivated to secure $100 million in government subsidies. A "motive to raise financing" (which is all a tax credit is), however, is common to every business and hence cannot be used as a basis for pleading scienter. In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) aff'd sub nom. Condra v. PXRE Group Ltd., 357 F. App'x. 393 (2d Cir. 2009). This might be a motive to do everything possible to complete the plant in 2008, but it is not a motive to deceive investors about Ormat's expectations.

19

1   insufficient to plead scienter under even the relatively more lax "deliberate or conscious recklessness

2   standard" applied to present tense statements, they plainly do not meet Plaintiffs' burden under the

3   applicable "actual knowledge" standard.  The North Brawley allegations should be dismissed.

4                    a.      The Core Operations Inference Does Not Apply.

5           Courts do not permit plaintiffs to plead scienter based on allegations that executives, because

6   of their role at the company, "must have known" or "should have known" that a statement was false.

7   Digimarc, 552 F.3d at 1000 ("[W]e have previously found inadequate complaints alleging that facts

8   critical to a business's core operations or an important transaction generally are so apparent that their

9   knowledge may be attributed to the company and its key officers.") (internal quotations omitted).

10  Plaintiffs nonetheless attempt to argue that this case falls within a narrow and limited exception

11  referred to as the "core operations" inference.  The Ninth Circuit, however, has cautioned that the

12  "core operations" inference should be applied in only an "exceedingly rare category of cases" and

13  that even so "it will usually fall short of the [Reform Act] standard."  S. Ferry LP, No. 2 v. Killinger,

14  542 F.3d 776, 784 (9th Cir. 2008).  Thus, the Ninth Circuit has applied the inference in only the

15  rarest of cases where "the nature of the relevant fact is of such prominence that it would be 'absurd'

16  to suggest" that management did not know it.  Id. at 786.

17          Plaintiffs' attempts to apply the "core operations" inference in the instant case are unavailing.

18  As an initial matter, it would be extraordinary for a court to apply this "exceeding rare" exception to

19  a case in which Plaintiffs must plead actual knowledge.  In fact, it does **not** appear that any court has

20  ever permitted a plaintiff to rely on such allegations to plead scienter as to a forward looking

21  statement.  Even under the relatively more lenient "deliberate recklessness" standard, the "core

22  operations" inference has been applied only once by the Ninth Circuit where the "relevant fact"

23  affected 80% of the company's revenue, resulted in the reassignment of 50-75 of the company's

24  employees, and required management themselves to complete a massive volume of paperwork."  See

25  Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir. 2008).  Those circumstances are

26  very different from the facts here.  Indeed, Plaintiffs have not actually identified any "relevant fact"

27  that anyone at Ormat – let alone the Defendants – supposedly knew during 2008 that rendered any

28  statements made false or misleading.  Ormat could not have discovered the unexpected problems it

                                                  20

1   encountered until it began operating the plant at the very end of 2008. Moreover, North Brawley

2   was only one of twenty-four geothermal and recovered energy plants that Ormat was operating,

3   constructing, or developing at year-end 2007 and its projected capacity accounted for only

4   approximately 7% of Omrat's "generating capacity" or "projected generating capacity" of between

5   686MW and 722MW. (Def. Ex. 2 at 9-10). The "core operations" inference simply does not apply.

6   Digimarc, 552 F.3d at 1001.

7                              b.      Plaintiffs Cannot Plead Fraud by Hindsight.

8          Plaintiffs cannot attempt to bolster their inadequate "core operations" allegations with "fraud

9   by hindsight" based on purported admissions by Ormat in 2009 and in April 2010. As Defendants'

10  Motion explained, Congress enacted the Reform Act "to put an end to the practice of pleading 'fraud

11  by hindsight.'" Silicon Graphics, 183 F.3d at 988. Accordingly, a later statement is probative of

12  scienter only if it "directly contradicts or is inconsistent with the earlier statement." In re Read-Rite

13  Corp., 335 F.3d 843, 846 (9th Cir. 2003). "It is clearly insufficient for plaintiffs to say that a later,

14  sobering revelation makes an earlier, cheerier statement a falsehood." Id. (internal citation and

15  quotation omitted). In addition, as with the core operations inference, it does not appear that any

16  court has ever held that plaintiffs can rely on fraud by hindsight to plead "actual knowledge."

17         Plaintiffs assert, in conclusory fashion, that Ormat's statements from 2009 and 2010

18  contribute to a strong inference of scienter because they contradict, or are inconsistent with, Ormat's

19  earlier statements. Not so. In 2009, Ormat disclosed that unexpected quantities of sand had delayed

20  final completion of North Brawley. (See CAC 161, 163, 169, and 173). At no point has Ormat

21  suggested that it knew in 2008 that the power plant would not be completed and operational by the

22  end of that year. Indeed, Ormat's disclosure that the amount of sand was "unexpected" is

23  inconsistent with any such inference. (See id.). Similarly, Ormat's purported April 2010

24  representations that it had not previously developed a similar project, had pursued an aggressive

25  schedule, and had not had operational information about the field also do not show that Ormat knew

26  that it could not have completed North Brawley by the end of 2008.[20] As explained in Defendants'

27  ───────────────
    [20]    These were not problems Ormat hid from its stockholders. Ormat's Forms 10-K disclosed
28  the expected number of MWs to be generated from North Brawley as well as all of its other plants.
                                                                    (Footnote continues on next page.)

1    Motion to Dismiss, cases applying the lower deliberate recklessness standard have held that

2    "[p]roblems and difficulties are the daily work of business people [and] that they exist does not make

3    a lie out of any of the alleged false statements" and "[a]lleging in substance that [a company]

4    underestimated [its problems] does not make out a fraud case." Ronconi, 253 F.3d at 430, 433-34;

5    see also In re Syntex Corp. Sec. Litig., 95 F.3d 922, 930 (9th Cir. 1996) (nothing fraudulent about a

6    company recognizing that it has certain issues, planning to remedy those issues, and still believing

7    that it can complete a project or reach capacity by an estimated date). Plaintiffs' attempts to plead

8    scienter based on Ormat's after-the-fact statements should be rejected.

9                   c.      Plaintiffs Cannot Plead Actual Knowledge Based on Statements from

10                          a Single, Unidentified Witness Who Was Not Employed by Ormat.

11          Defendants established in their Motion to Dismiss that Plaintiffs cannot plead recklessness,

12   let alone actual knowledge, based on allegations from a confidential witness who was not even

13   employed by Ormat or affiliated with the North Brawley project for most of the class period. (MtD

14   at 32). As Defendants explained, a complaint relying on confidential witnesses must:  (a) describe

15   the witnesses with sufficient particularity to establish their reliability and personal knowledge of the

16   facts alleged; and (b) establish that the proffered confidential witness statements are indicative of

17   scienter. (MtD at 32 (citing Digimarc, 552 F.3d at 995-996; Corinthian Colleges, 540 F.3d at 1069,

18   n.3)). Plaintiffs argue in the Opposition that they have met this standard because their confidential

19   witness ("CW1") was employed by a company contracted to lay electrical conduit lines for the North

20   Brawley. (Opp. at 31). While this may be indicative of CW1's knowledge regarding the electrical

21   line, Plaintiffs do not explain why this witness, whom Plaintiffs admit was uninvolved with drilling

22   or testing of the wells (CAC 138(a)), would have known what information Defendants had regarding

23   the timeline for completion of the drilling and construction of the North Brawley project. See, e.g.,

24   In re Pixar Sec. Litig., 450 F. Supp. 2d 1096, 1103 (N.D. Cal. 2006) (rejecting information from

25   non-employee CW). Moreover, Plaintiffs do not allege that CW1 ever spoke to, communicated

26   _____

     (Footnote continued from previous page.)

27   They also noted that North Brawley was Ormat's first project advanced from exploration through

28   construction. (Opp. at 22 n.25 (citing 2007 Form 10-K), 34; see also CAC 120, 122, 124).

                                                    22

1  with, or even met anybody at Ormat, let alone, either of the Individual Defendants.  (See CAC 138).

2  Furthermore, even if the Court were to credit the confidential witness' representation that Ormat had

3  drilled only 1/3 of the North Brawley wells by September 2008, it indicates nothing about the status

4  of the power plant itself, or that this meant that the wells necessary for plant operation could not be

5  drilled before year end.  In fact, Ormat actually delivered power to SCE before the end of 2008.  In

6  short, Plaintiffs' lone CW does nothing to support Plaintiffs' otherwise deficient scienter allegations.

7          d.    <u>Plaintiffs' CAC Considered In Its Entirety Demonstrates That</u>

8                <u>Defendants Did Not Act With Scienter.</u>

9       Even if Plaintiffs' allegations had some merit (and they do not for the reasons explained

10  above), <u>Tellabs</u> requires that courts "take into account plausible opposing inferences" including

11  "inferences unfavorable to the plaintiffs."  <u>Tellabs</u>, 551 U.S. at 310; <u>Corinthian Colleges</u>, 540 F.3d at

12  1061 (internal citations omitted).  These include:

13      1.  The contract entered into between Ormat and Southern California Edison ("SCE") whereby

14          SCE agreed to purchase 50 MW of clean energy output from the North Brawley plant.  (CAC 124).  This contract

15          undermines any inference of scienter as explained in Defendants' Motion to Dismiss.  (MtD at 29).

16      2.  Ormat's review of earlier wells drilled by Unocal revealing that a "shallow Brawley reservoir could be commercially developed."  (Ex. 48).

17

18      3.  Ormat's testing of the shallow reservoir at North Brawley, which again showed encouraging results in terms of temperature, pressure, permeability, solid concentration, and heavy metal

19          concentrations.  (Ex. 48).

20      4.  Ormat's positive experience at geothermal sites nearby, in Ormesa and Heber, where it produced 57 MWs and 92 MWs of electricity, respectively.  (Ex. 4 at 35-36, 40-41).

21

22      5.  Plaintiffs' admission that Ormat continued to put significant resources into the North Brawley project throughout 2008 and 2009 including the acquisition of a drilling rig to be

23          used in the construction of North Brawley.  (CAC 146, 154, 164; Opp. at 22).

24      6.  Plaintiffs' acknowledgement that Mrs. Bronicki acquired additional shares in Ormat at a time when Plaintiffs claim that she was hyping the North Brawley project including its estimated

25          completion by the end of 2008 and thereby artificially inflating Ormat's stock price.  (Opp. at 5, 22; CAC 103, 120-128); <u>see</u> <u>In re PEC Solutions, Inc. Sec. Litig.</u>, 418 F.3d 379, 390 (4th

26          Cir. 2005) (allegation that insiders purchased shares at prices plaintiffs alleged were inflated shows that no scienter exists); <u>Searls v. Glasser</u>, 64 F.3d 1061, 1068 (7th Cir. 1995) (increase

27          in stock holdings undermines scienter).

28      7.  Plaintiffs' concession that neither Mrs. Bronicki nor Mr. Tenne sold any of their shares.

31540524

8. Ormat's disclosures, throughout 2009, which detailed Ormat's problems ramping North Brawley up to full capacity.  (MtD at 29).

9. Ormat's provision of power to SCE by the end of December 2008 and production of electricity from North Brawley in significant quantities since (even if not in the quantities ultimately projected).  (Exs. 53-54).

Plaintiffs do not contest any of these factors, all of which militate against a strong inference of deliberate recklessness or actual knowledge.  When weighed against Plaintiffs' disfavored "core operations," "fraud by hindsight," and confidential witness allegations, far from pleading actual knowledge, Plaintiffs here fail to meet even the relatively more lenient burden of pleading deliberate recklessness.  Therefore, Plaintiffs' North Brawley allegations should be dismissed.

### D.   Plaintiffs Have Not Alleged That Their Losses, If Any, Were Caused By Any Disclosures Concerning North Brawley.

As with their other arguments related to North Brawley, the theory of loss causation Plaintiffs set forth in their Opposition bears no resemblance to that alleged in the CAC.  The CAC alleged only one stock price drop after February 24, 2010 and Plaintiffs alleged that drop was caused by Ormat's announcement of its restatement.  (CAC 148, 151, 84-86; see also MtD at 37-39 (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005)).[21]  Plaintiffs now argue, however, that Ormat's stock price fell based on a series of partially corrective disclosures made on February 26, 2009, March 2, 2009, and November 5, 2009.  (Opp. at 24-25).  As discussed above in Part II(A), Plaintiffs are not permitted to change their theories, and the facts upon which those theories rest, in an opposition memorandum.  More specifically with respect to loss causation, Plaintiffs cannot allege that the statements constituted partially curative disclosures when, in the CAC, they alleged that the statements were part of the alleged fraud.  (CAC 170); see In re Flag Telecom Holdings, Ltd., 574

---

[21]    Plaintiffs also now try to claim that Ormat's stock price fell after February 24, 2010 because of purported revelations concerning North Brawley.  Their conclusory claim that Ormat revealed more information on February 24, 2010 than it already had revealed on February 9, 2010 is meritless, however, because the allegations in the CAC indicate that both statements revealed the same information.  (Compare CAC 171 with CAC 173).  Plaintiffs do not allege in the CAC, nor do they identify in the Opposition, any new information purportedly disclosed on February 24, 2010 that Ormat had not already revealed on February 9, 2010.

1   F.3d 29, 41 (2d Cir. 2009) (plaintiffs "cannot allege that Defendants made a certain misstatement . . .

2   and simultaneously argue that the misstatement itself constituted a corrective disclosure").

3        Even if the Court were to consider Plaintiffs' new theory of loss causation, it still would be

4   inadequate.  Plaintiffs have twisted themselves in knots trying to claim that Ormat's statements on

5   February 26, 2009, March 2, 2009, and November 5, 2009 constitute partially corrective disclosures

6   that caused Ormat's stock price to fall.  Thus, they argue that Ormat's disclosure that finalizing

7   construction on North Brawley in March, 2009 would cost an additional $25 million <u>was corrective</u>,

8   but that the disclosure, just two months later, that its estimate of the cost of completion increased to

9   $35 million <u>was not corrective</u> (and, in fact, "buoyed investors").  (Opp. at 24).  Moreover,

10  Plaintiffs' reliance on selected quotes from different analysts, at different points in time, further

11  demonstrates that they do not have a coherent theory of loss causation.  (<u>See</u> Opp. at 24 (Avondale

12  for 2/25/2009); Opp. at 24 (RBC for 5/11/2009); Opp. at 25 n.29 (Pritchard for 2/24/2010)).

13  **III.**    **<u>PLAINTIFFS HAVE FAILED TO ALLEGE ANY CONTROL PERSON CLAIM</u>**

14       Plaintiffs agree that, if the Court finds no underlying 10(b) violation has been pled, their

15  control person claim also must be dismissed.  (<u>See</u> Opp. at 38).  Additionally, Plaintiffs have failed

16  to plead facts indicating that either Individual Defendant exercised control over a primary violator.

17  <u>See</u> <u>Paracor Finance, Inc., v. General Elec. Capital Corp.</u>, 96 F.3d 1151, 1163 (9th Cir. 1996).

18  **<u>CONCLUSION</u>**

19       Defendants' Motion should be granted and the CAC should be dismissed with prejudice.

20  DATED:  November 3, 2010       KATTEN MUCHIN ROSENMAN LLP

21
22                   By: <u>*/s/ Bruce G. Vanyo*</u>
                    Bruce G. Vanyo

23                      Richard H. Zelichov

24                      HOLLAND & HART LLP
                    Matthew B. Hippler, Esq.

25                      Nevada State Bar No. 7015
                    Tamara Jankovic, Esq.

26                      Nevada Bar No. 9840
                    tjankovic@hollandhart.com

27
                    Attorneys for Defendants

28

31540524